BRYAN H. HECKENLIVELY (SBN 279140)
DAVID H. FRY (SBN 189276)
ABIGAIL SHIM (SBN 352656)
MUNGER, TOLLES & OLSON LLP
560 Mission Street, Twenty-Seventh Floor
San Francisco, California 94105-2907
Telephone:     (415) 512-4000
Facsimile:     (415) 512-4077

HELEN E. WHITE*
CYNTHIA Y. LONG*
MUNGER, TOLLES & OLSON LLP
601 Massachusetts Ave. NW, Suite 500E
Washington, D.C. 20001
Telephone:     (202) 220-1100
Facsimile:     (202) 220-2300

Attorneys for Plaintiff Board of Trustees of the
California State University
*Application to appear pro hac vice forthcoming

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| BOARD OF TRUSTEES OF THE CALIFORNIA STATE UNIVERSITY,<br><br>              Plaintiff,<br><br>         vs.<br><br>UNITED STATES DEPARTMENT OF EDUCATION; LINDA McMAHON, in her official capacity,<br><br>              Defendants. | Case No.<br><br>**COMPLAINT**<br><br>**ADMINISTRATIVE PROCEDURE ACT CASE** |

**INTRODUCTION**

1.      This lawsuit challenges lawless overreach by the U.S. Department of Education (the "Department").  The Department is attempting to punish San José State University ("SJSU") for supposedly violating Title IX from 2022 to 2024, but there is no question that SJSU's conduct was *required* by Ninth Circuit law and the federal government's own guidance at the time.

2.      SJSU is one of the most effective engines of economic mobility in the United States.  Nearly half of its students are the first in their family to go to college.  Thirty-five percent qualify for federal grants reserved for only those students with exceptional economic need.  For less than half the cost of an elite private institution, students graduate ready to join Silicon Valley's competitive and highly paid workforce.  SJSU graduates not only go on to cutting-edge jobs at the world's most innovative companies, they also become teachers, nurses, and occupational therapists, and join any number of other essential fields facing shortages of qualified workers.

3.      To provide these opportunities to its students, SJSU relies on federal research funding and federal financial aid.  More than half of SJSU students receive federal financial aid.  For SJSU's lowest-income students, federal aid often covers the entire cost of attendance—putting a high-quality degree financially within reach.  Thousands of SJSU students learn valuable skills assisting with cutting-edge research financed by the federal government—research that, in turn, provides benefits to the public.

4.      The federal government is now threatening to upend SJSU's ability to deliver on its promise to students and fulfill its public mission by revoking SJSU's federal funding.  It threatens to do so not because SJSU violated the law.  But because SJSU followed the law.

5.      In late January 2026, the Department's Office for Civil Rights ("OCR") issued a Letter of Findings (or "the Letter," attached as Exhibit A).  The Letter purports to find that SJSU previously violated Title IX by allowing a transgender woman to compete on its women's volleyball team from 2022 to 2024.  And the Letter threatens that, unless SJSU agrees to a sweeping set of proposed terms—requiring both policy changes and statements on highly

politicized issues that defy the law—the federal government will pursue revoking SJSU's federal funding.

6.      These findings and threats are lawless.  Whether and under what conditions transgender women should be allowed to compete in women's athletics has been hotly contested.  But this case is not about that issue.  It is about the Department's attempt to punish SJSU, even though the law in the Ninth Circuit has been and is clear.  Under Ninth Circuit law, Title IX and the Equal Protection Clause protect transgender students from discrimination.  *See Grabowski v. Ariz. Bd. of Regents*, 69 F.4th 1110, 1113–14 (9th Cir. 2023); *Hecox v. Little*, 104 F.4th 1061, 1068 (9th Cir. 2024).  Transgender student-athletes who are qualified and eligible to play may not be excluded from the bathrooms and sports teams that are consistent with their gender identity simply because they are transgender.  *See Hecox*, 104 F.4th at 1068.

7.      That, however, is precisely what the Department says that SJSU should have done.  There is no dispute that the player the Department is focused on was qualified to play and eligible to play under the rules of the National Collegiate Athletic Association ("NCAA"), Mountain West Conference ("MWC"), and USA Volleyball.  The Department believes SJSU should have excluded her anyway—simply because she was transgender.  Ninth Circuit precedent unmistakably told SJSU that it could not do that.  On the contrary, excluding the player from the team or facilities would have been unlawful discrimination under Title IX and the Equal Protection Clause.

8.      The Department's recent Letter did not even mention these Ninth Circuit cases that bound SJSU at the time of the athlete's participation—and still do today.  The Department's lawlessness goes further.  The Letter also neglects to mention that, during the relevant time period of 2022 to 2024, the Department itself took the position that Title IX prohibited discrimination against and harassment of transgender people—as did a Department of Justice directive issued to SJSU specifically in 2022.  The Department itself entered into multiple resolution agreements with schools and universities across the country requiring students to have access to bathrooms and other facilities consistent with their gender identity.  That is consistent with Supreme Court

1  precedent interpreting Title VII.  And it is consistent with the approach taken by the Ninth Circuit

2  that SJSU relied on and followed from 2022 to 2024.

3        9.     Nor did the Department's Letter mention that a federal district court had already

4  heard a challenge to SJSU's conduct at issue here and held that the plaintiffs were unlikely to

5  succeed on their Title IX claim.  *See Slusser v. Mountain W. Conf.*, No. 1:24-cv-03155-SKC-

6  MDB, 2024 WL 4876221, at *9–11 (D. Colo. Nov. 25, 2024), *emergency injunction denied sub*

7  *nom.*, *Van Kirk v. Mountain W. Conf.*, No. 24-1461 (10th Cir. Nov. 26, 2024).

8        10.    Ninth Circuit law has not changed.  The federal administration has, but it cannot

9  rewrite the past.  Pursuant to executive orders signed in the first days of the new administration,

10  the federal government now takes the position that Title IX bars transgender women from

11  competing in women's sports under all circumstances and that Title IX offers no protection to

12  transgender people at all.  The lawfulness of these orders remains unsettled, but that is irrelevant

13  here.  These January and February 2025 orders do not and cannot change what SJSU was

14  obligated to do from 2022 to 2024.  The President does not have the authority to override judicial

15  decisions interpreting the Constitution or federal statutes—much less to go back in time and

16  change the rules that applied before he took office.

17        11.    Black-letter law supports that commonsense conclusion.  Title IX is Spending

18  Clause legislation, and Title IX funding recipients must be given "clear notice" of any legal

19  obligations they are expected to comply with in order to receive funds.  *Pennhurst State Sch. &*

20  *Hosp. v. Halderman*, 451 U.S. 1, 17, 25 (1981).  The government may not impose "post

21  acceptance or 'retroactive' conditions."  *City of Los Angeles v. Barr*, 929 F.3d 1163, 1175 (9th

22  Cir. 2019) (citation omitted).

23        12.    To be sure, the Supreme Court is currently weighing whether bans prohibiting

24  transgender women from participating in women's sports are unconstitutional.  It is not clear what

25  the Court will decide in that case.  What is clear is that a ruling in the future cannot change the

26  Ninth Circuit law that SJSU was obligated to follow and that SJSU did in fact follow from 2022 to

27  2024.  There is no serious argument that a future ruling somehow means that SJSU had "clear

28

1   notice" of that ruling in 2024 or that it should lose its federal funding for following the law that

2   applied at the time.  Yet that is the Department's position—and it is just wrong.

3       13.    The federal government purports to put SJSU to a choice.  SJSU can agree to a

4   sweeping set of terms, including making mandatory, highly politicized statements about sex and

5   gender that would be contrary to Ninth Circuit law and issuing a series of apology letters and

6   statements to any athletes who played for or against SJSU.  *See* Proposed Resolution Agreement

7   (attached as Exhibit B).  Or, if SJSU does not agree to all those extortionate terms, it will lose

8   federal funding that is essential to SJSU's ability to operate.

9       14.    That is no choice at all.  SJSU has complied with the law and will continue to

10  comply with the law.  If the Supreme Court or the Ninth Circuit changes the law and imposes new

11  or different requirements, then SJSU will comply going forward.  But SJSU does not have the

12  option to disregard what Ninth Circuit law is now.  Nor may the Department condition the

13  acceptance of federal funds on SJSU's unwillingness to make highly politicized public

14  statements—especially ones based on the false premise that SJSU violated the law between 2022

15  and 2024. The  Letter and findings must be set aside.  They are contrary to law, they are arbitrary

16  and capricious, they impose unconstitutional conditions, they attempt to compel speech in

17  violation of the First Amendment, and they impermissibly attempt to impose new obligations

18  retroactively.  SJSU has filed this action to defend the rule of law and protect itself and its

19  community against such lawless acts by the federal government.

20                                  **PARTIES**

21      15.    Plaintiff the Board of Trustees of the California State University ("CSU")

22  administers the country's largest four-year public university system, with 22 universities within

23  the system.  All are based in California.  SJSU is one of the universities within the CSU system

24  and is located in San Jose, California in the County of Santa Clara.

25      16.    The Department is a federal executive agency tasked with establishing policy for

26  education, administering education-related programs, and coordinating most federal assistance for

27  education.  The Department is headquartered in Washington, D.C.  It contains an Office for Civil

28

Rights (again, referred to here as "OCR").  In the area of education, OCR has exercised primary enforcement authority for Title IX.

17.    Defendant Linda McMahon is the U.S. Secretary of Education.  She is being sued in her official capacity only.  Secretary McMahon maintains an office at 400 Maryland Avenue SW, Washington, D.C., 20202.

<strong>JURISDICTION</strong>

18.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because the action arises under the U.S. Constitution and federal statutes including the Administrative Procedure Act ("APA"), 5 USC 701-706.  The APA waives sovereign immunity for actions seeking non-monetary relief against federal agencies and officials.  This Court also has jurisdiction under 20 U.S.C. § 1683 and 28 U.S.C. § 1346(a)(2) because the defendants are United States officials.

19.    The Court has authority to enter a declaratory judgment and to provide temporary, preliminary, and permanent injunctive relief pursuant to Rules 57 and 65 of the Federal Rules of Civil Procedure; the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202; the All Writs Act, 28 U.S.C. § 1651; the Administrative Procedure Act, 5 U.S.C. §§ 702, 703, and 706; 20 U.S.C. § 1683; and the Court's inherent equitable powers.

20.    CSU also has an independent right to non-statutory review of ultra vires executive action.  *See, e.g.*, *Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322, 1327–28 (D.C. Cir. 1996). Among other powers, this Court has inherent equitable power to enjoin executive conduct that violates the Constitution.  *See Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 491 n.2 (2010); *Franklin v. Massachusetts*, 505 U.S. 788, 801 (1992).

21.    This Court also possesses the equitable power to enjoin "violations of federal law by federal officials."  *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326–27 (2015). The Supreme Court has repeatedly allowed equitable relief against federal officials who act "beyond th[e] limitations" imposed by federal statute.  *Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 689 (1949).

**VENUE**

22.    Venue lies in this District under 28 U.S.C. § 1391(e)(1) because at least one defendant is an agency of the United States or is an officer or employee of the United States or an agency thereof sued in his or her official capacity, and a substantial part of the events giving rise to the claim occurred in this District.

**DIVISIONAL ASSIGNMENT**

23.    This action arises from events that took place, in substantial part, in Santa Clara County and, accordingly, assignment to the San Jose Division is appropriate under Civil Local Rule 3-2 and General Order 44.

**FACTS**

A.    **CSU and SJSU's Role as Engines of Economic Mobility**

24.    Established in 1960, CSU offers its students a life-changing education at one of the most affordable tuition rates in the country.

25.    CSU offers more than 4,000 degree programs, which are designed to meet the state's workforce demands.  In addition to its undergraduate offerings in areas like nursing, chemistry, art, and business, CSU offers independent doctorates in audiology, education, nursing practice, occupational therapy, physical therapy, and public health.

26.    The CSU system is consistently recognized for providing opportunities for social mobility.  For example, in 2024, all 22 of CSU's campuses were ranked among the top 100 "Best Bang for the Buck" universities in the West.

27.    CSU's student body is drawn primarily from the top third of California's high school graduates, regardless of their socioeconomic background.  Yet CSU graduates routinely go on to high-paying and high-need jobs in California.  Put simply, CSU transforms the lives of the students who enroll in and graduate from its programs.

28.    SJSU exemplifies the transformative nature of a CSU education.

29.    Nearly half of all undergraduate students at SJSU are first-generation college students.  Many are from very low-income families.  Nearly 35% of SJSU undergraduate students

1   are Pell Grant recipients, which are available only to "undergraduate students who display

2   exceptional financial need."[1]

3       30.    At SJSU, these students can pursue degrees in fields ranging from aviation to

4   public health, business administration to social work, and chemistry to psychology.

5       31.    SJSU's programs prioritize career readiness.  Students can enroll at SJSU and,

6   within four years, graduate ready and certified to work as a teacher, a nurse, or a commercial pilot.

7       32.    SJSU offers a wide array of STEM and other degree options that prepare students

8   to go work for the world's leading technology companies.  For instance, students interested in

9   engineering have their pick between aerospace, biomedical, chemical, civil, computer, electrical,

10  industrial and systems, materials, mechanical, and software engineering degree programs.

11      33.    SJSU offers its students these opportunities at a fraction of the typical higher-

12  education sticker price.  For the 2025–2026 academic year, full-time undergraduate tuition and

13  campus fees is just $8,846.  Even in one of the most expensive zip codes in the United States—in

14  the heart of Silicon Valley—tuition, on-campus room and board, books, transportation, and

15  personal expenses totals just $35,336 for California residents.  That is less than half the price of

16  many elite private institutions.

17      34.    SJSU has remarkable success in securing its students high-quality employment

18  after graduation.  The average annual starting salary for SJSU graduates is over $75,000.  Many of

19  its students earn far more, particularly those who go on to work for renowned global and Fortune

20  500 companies, many which are located in Silicon Valley just up the road from campus.

21      35.    Few institutions in the United States facilitate students from the lowest income

22  brackets receiving high-quality, career-oriented education at the scale and effectiveness of SJSU.

23  Students regularly enter in the bottom quintile of family incomes and leave in the top quintile of

24  earners.  This not only changes the student's life, but changes the economic trajectory of their

25  family and community.

26

27  [1] *Federal Pell Grants*, FED. STUDENT AID (last visited Mar. 6, 2026),

28  https://studentaid.gov/understand-aid/types/grants/pell.

36.     Federal financial aid is critically important to SJSU students.  At least 66% of the students on campus receive some form of federal financial aid for a total of approximately $130 million annually.  Without federal financial aid, many middle- and lower-income students would not be able to afford the cost of attending SJSU, even with assistance from SJSU institutional financial aid and State of California financial aid.  These students would be forced to make the difficult decision of leaving SJSU or significantly reducing their courseloads to avoid paying the standard tuition rate.  All of this would be devastating to campus life and would result in an immediate and dramatic contraction in tuition revenue that SJSU depends on to meet its financial obligations.

37.     Unlawful revocation of SJSU's eligibility to receive federal funding would be devastating.  If SJSU students were not eligible for financial aid, students who otherwise would have enrolled at SJSU would go to other schools where they could be eligible for federal financial aid.  SJSU faces a competitive enrollment landscape, and it could not maintain anything close to the number—much less the high quality—of students it now enrolls if SJSU students could not apply for federal financial aid.  This is an immediate problem.  Prospective students for Fall 2026 must decide by May 1, 2026 whether to accept offers of enrollment.

**B.     SJSU's Emerging Leadership as a Research Institution**

38.     SJSU is also home to a robust and growing research operation.  Over the past seven years, SJSU has made unprecedented investments in its research program.  Beginning in 2019, SJSU began offering its faculty additional paid time dedicated to research.  More than half of SJSU's tenured and tenure-track faculty now participate in this program, which costs SJSU $8 million per year.  SJSU also created the College of Graduate Studies, to further support its research operations, as well as its educational mission.

39.     That investment has paid off.  Last year, SJSU was listed for the first time as a "Research 2: High Spending and Doctorate Production" (known as "R2") institution in the Carnegie Classification of Institutions of Higher Education.  SJSU now spends approximately $90 million a year on research expenditures and has a total research grant portfolio of $275 million in committed grants.  Of that funding, nearly 64% comes from the federal government.

40.     The single largest tranche of federal research funding—approximately $90 million—flows to SJSU through grants sponsored by NASA.  SJSU is the agency's primary partner in conducting human factors research at the NASA Ames Research Center in Mountain View, California.  This research includes studying industrial design applications, autonomous driving, and how air and space travel affect humans, among other things.

41.     SJSU's $85 million in other federal funding covers a wide range of research grants from a wide range of agencies, including the National Science Foundation, the National Institutes of Health, the Department of Defense, and the Department of Energy.

42.     SJSU's research capabilities are also essential to attracting talented students, recruiting the faculty to teach them, and giving students modern and cutting-edge educational opportunities.

43.     More than 700 students are employed in service of this research.  Thousands more participate in research on a volunteer basis or via courses that have research work as part of their curricula.

44.     Unlawful termination of SJSU's federal research grants, even temporarily, would have lasting negative impacts on SJSU's research enterprise.  Even temporary gaps in funding can end long-term studies that depend on continuous data collection.  Disruptions in the data-collection process can negate years' worth of work and reset the project to ground zero.  Other types of research, like laboratory work, rely on actively maintaining specialized facilities, perishable samples, and sensitive equipment.  Pauses in funding would lead to the irreversible loss of research that depends on continuity in managing these facilities, materials, and tools.

45.     Terminating SJSU's federal research grants would also permanently and adversely impact its educational programs and faculty composition.  SJSU hires around 50 new faculty members every academic year.  Many of these hires are made in reliance upon continued federal funding.  Faculty rely on federal research grants to fund their research and live in one of the most expensive areas in the country.  Terminating federal research funding is therefore certain to trigger faculty attrition.  In the process, SJSU will lose invaluable expertise in highly specialized fields

like quantum technology, aerospace human factors, and wildfire mitigation.  Rebuilding those programs would take years—if it happened at all.

46.     Without federal research grants, SJSU could not recruit and retain the minimum number of research doctorates necessary to retain its R2 status, reversing its investments into its reputation as a nationally recognized research university.  And SJSU lacks other funding sources that could cover the nearly $175 million in lost federal research grants.

### C.     Title IX-Related Funding Revocations and Title IX's Clear Notice Requirement

47.     As a condition of receiving federal funding, universities like SJSU agree to the requirements of Title IX. The statute provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."  20 U.S.C. § 1681(a).

48.     Title IX is Spending Clause legislation, *Davis ex rel. LaShonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 640 (1999), which means that it imposes obligations on funding recipients as a condition of receiving those funds, *Pennhurst*, 451 U.S. at 17.  Accordingly, Title IX funding recipients must be given "clear notice" of their legal obligations in order to be held liable for violating them.  *Id.* at 25.  The government may not impose "post acceptance or 'retroactive' conditions" on funding recipients.  *City of Los Angeles*, 929 F.3d at 1175.

49.     Title IX also requires government agencies to follow various statutory procedural requirements when enforcing Title IX.  An agency may not suspend, terminate, or refuse to grant federal funds for failure to comply with Title IX unless "there has been an express finding on the record, after opportunity for hearing, of a failure to comply with such requirement."  20 U.S.C. § 1682.  Even then, the agency may not terminate or suspend aid "until the department or agency concerned has advised" the institution "of the failure to comply with the requirement and has determined that compliance cannot be secured by voluntary means."  *Id.*

50.      If the agency determines that voluntary compliance "cannot be secured," Title IX requires that it file a "full written report of the circumstances and the grounds for such action"

1    with specified congressional committees.  *Id.*  The termination or suspension of funds may not

2    "become effective until thirty days have elapsed after the filing of such report."  *Id.*

3         51.    Notwithstanding this requirement, the Department and other Executive Branch

4    agencies have, over the past year, routinely and unlawfully terminated institutions' federal funding

5    without complying with this statutory requirement.

6         52.    Title IX also limits the scope of funding terminations or suspensions.  The statute

7    states that any such action "shall be limited in its effect to the particular program, or part thereof,

8    in which" a failure to comply with Title IX "has been so found."  *Id.*

9         53.    OCR is also subject to regulations that establish additional procedural requirements

10   for any termination or suspension of federal financial assistance.  *E.g.*, 34 C.F.R. § 100.8.

11        **D.    <u>The Ninth Circuit Has Squarely Held that Title IX and the Equal Protection</u>**
             **<u>Clause Prohibit Discrimination Against Transgender People—and the</u>**
12           **<u>Executive Branch Agreed from 2022 to 2024</u>**

13        54.    The Department's Letter of Findings found SJSU violated Title IX by allowing a

14   transgender woman to play on its women's indoor volleyball team from 2022 to 2024 and its

15   beach volleyball team during the 2023 season.  That finding is not consistent with Ninth Circuit

16   precedent that controlled during this period (and still does today).  And in no way was SJSU on

17   "clear notice" that preventing that student from playing was a condition of receiving Title IX

18   funds.

19        55.    The Ninth Circuit has held that Title IX's prohibition on sex discrimination

20   prohibits discrimination against transgender individuals.  *Grabowski*, 69 F.4th at 1113–14.

21        56.    In the Ninth Circuit, educational institutions cannot discriminate against individuals

22   on the basis that they are transgender, and they must respond to student-on-student harassment

23   based on transgender status.  *See id.*

24        57.    That conclusion flowed from and was based on the Supreme Court's holding in

25   2020 that Title VII's prohibition on discrimination "because of . . . sex" prohibited discrimination

26   against transgender individuals.  *Bostock v. Clayton County*, 590 U.S. 644, 659–60 (2020).

27   Longstanding Ninth Circuit precedent establishes that Title VII and Title IX are to be construed in

28

1    parallel.  *E.g.*, *Emeldi v. Univ. of Or.*, 673 F.3d 1218, 1224 (9th Cir. 2012), *amended by* 698 F.3d

2    715 (9th Cir. 2012).

3        58.    Title IX further provides that "nothing" in Title IX "shall be construed to prohibit"

4    funding recipients "from maintaining separate living facilities for the different sexes."  20 U.S.C.

5    § 1686.  The Ninth Circuit has made clear that "just because Title IX authorizes sex-segregated

6    facilities does not mean that they are required, let alone that they must be segregated based only on

7    biological sex and cannot accommodate gender identity."  *Parents for Priv. v. Barr*, 949 F.3d

8    1210, 1227 (9th Cir. 2020).  Under this Ninth Circuit precedent, institutions are permitted to

9    segregate intimate facilities like bathrooms and locker rooms on the basis of gender identity, rather

10   than sex.  *Id.*

11       59.    In addition, the Ninth Circuit has held that the Equal Protection Clause of the U.S.

12   Constitution prohibits public institutions—like SJSU—from excluding transgender women from

13   women's sports teams solely because they are transgender.  *Hecox*, 104 F.4th at 1068.

14       60.    The Courts, not the Executive Branch, are the last word on the meaning of Title IX

15   and the Equal Protection Clause.  *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 369 (2024)

16   (citing *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803)).

17       61.    What is more, from January 20, 2021 to January 20, 2025—which covers the entire

18   period of SJSU's relevant conduct—the Executive Branch interpreted Title IX's protections to

19   prohibit discrimination against transgender people, just like the Ninth Circuit does.  A January 20,

20   2021 Executive Order adopted that as the official position of the Executive Branch.  *See* Exec.

21   Order No. 13,988, 86 Fed. Reg. 7023 (Jan. 20, 2021).  OCR then applied an interpretation of Title

22   IX that treated its prohibitions on "sex" discrimination to include prohibitions on discrimination

23   against transgender people.  *See, e.g.*, U.S. Dep't of Educ., Off. for C.R., Resolution Letter with

24   Taft College (Oct. 19, 2023); *see also* Nondiscrimination on the Basis of Sex in Education

25   Programs or Activities Receiving Federal Financial Assistance, 87 Fed. Reg. 41390 (proposed

26   July 12, 2022) (codified at 34 C.F.R. pt. 106).

27       62.    Even before the 2021 Executive Order, the Department also applied that

28   interpretation of Title IX to specifically require equal access to bathrooms and locker rooms

1    consistent with a student's gender identity.  *See, e.g.*, U.S. Dep't of Educ., Off. for C.R.,

2    Resolution Letter with Central Piedmont Community College (Aug. 14, 2015); U.S. Dep't of

3    Educ., Off. for C.R., Resolution Letter with Dorchester County School District Two (June 21,

4    2016); U.S. Dep't of Educ., Off. for C.R., Resolution Letter with Downey Unified School District

5    (Oct. 14, 2014); U.S. Dep't of Educ., Off. for C.R., Resolution Letter with Township High School

6    District 211 (Dec. 2, 2015).

7         63.    Indeed, on December 8, 2022, the Department of Justice's Civil Rights Division

8    informed SJSU directly that it expected SJSU to be "responsive to complaints of sex

9    discrimination based on sexual orientation and gender identity."  Letter from M. Tucker et al.,

10   Dep't of Just., C.R. Div., to Leora Freedman, Assoc. V.C. & Deputy Gen. Couns., California State

11   Univ. at 10 (Dec. 8, 2022).

12        **E.**    <u>**The Participation of a Transgender Player on the SJSU Women's Volleyball**</u>
          <u>**Team**</u>

13

14        64.    The Department found that, from 2022 to 2024, a transgender player (referred to by

     the government and here as "Student 1")[2] played on SJSU's women's volleyball teams.

15

16        65.    Throughout that entire period, there is no dispute Student 1 was eligible to play

17   volleyball and beach volleyball under NCAA rules and conference rules.  SJSU ensured that each

18   of the players on its volleyball and beach volleyball teams for each year was eligible to compete

     according to the NCAA rules, conference rules, and SJSU rules.

19

20        66.    In January 2022, the NCAA updated its transgender participation policy to clarify

21   that transgender women could compete on women's teams.  *See* 2022 NCAA Policy (attached as

     Exhibit C).  The update aligned NCAA policy with the U.S. Olympic and Paralympic

22

23   Committee's policy in determining eligibility on a sport-by-sport basis, using each sport's national

     governing body policy as a benchmark for NCAA eligibility.  *See id.*  So, for example, USA

24

25   Volleyball provided the benchmark for the permissible standards—including blood levels of

     testosterone—for transgender women to compete in women's volleyball.  *Id.*  SJSU was bound by

26

27   _____
     [2] SJSU is prohibited from disclosing the gender identity of any student under federal and state
28   privacy laws, including the Family Educational Rights and Privacy Act.

this policy as an NCAA member.  Further, under MWC policies, MWC member schools must comply with NCAA eligibility rules.

67.    On February 6, 2025, the NCAA changed its transgender student-athlete participation policy to prohibit "competition by an individual assigned male at birth to compete on a women's team."[3]

68.    There are more than 500,000 NCAA student athletes at any given time.  There are no official numbers reporting the number of transgender women who competed in the NCAA pursuant to these policies.  In 2024, NCAA President Charlie Baker testified to a U.S. Senate panel that he was aware of fewer than ten transgender athletes total competing in intercollegiate sports, without specifying how many were transgender women.[4]

69.    Student 1 was qualified for her roster spot and played without incident on the SJSU women's volleyball team during both the 2022 and 2023 seasons and on the beach volleyball team during the 2023 season.

70.    In April 2024, an online article alleged that Student 1 was transgender, and other articles followed.

71.    Throughout the Fall 2024 indoor volleyball season, multiple MWC conference opponents refused to play SJSU and received forfeits for doing so, as provided under MWC rules.

72.    Throughout the Fall 2024 season, multiple current and former members of the women's volleyball team—as well as the team's Associate Head Coach—publicly spoke out against Student 1's participation on the team.

73.    SJSU continued to roster Student 1 because she was qualified to play and eligible under NCAA rules.

---

[3] *Participation Policy for Transgender Student-Athletes*, NCAA (Feb. 6, 2025), https://www.ncaa.org/sports/2022/1/27/transgender-participation-policy.aspx.

[4] Ralph D. Russo, *NCAA President Says Legal Clarity Needed on Transgender Athlete Participation*, N.Y. TIMES: THE ATHLETIC (Apr. 29, 2025), https://www.nytimes.com/athletic/6062855/2025/01/14/ncaa-transgender-athlete-policy-charlie-baker.

74.     One student (referred to in the Letter and here as "Student 3") was a vocal opponent of SJSU's decision to roster Student 1.  She spoke repeatedly with the national media to express her opposition, often outing her transgender teammate and referring to her as male or a man.

75.     On September 24, 2024, Student 3 joined a lawsuit in the Northern District of Georgia challenging the NCAA's transgender eligibility policies on the same day SJSU opened its MWC season.

76.     Despite repeated efforts by SJSU's Title IX office to contact Student 3 specifically to discuss her experience on the team, Student 3 never responded.  Student 3 also repeatedly declined invitations to be interviewed by investigators investigating alleged Title IX violations related to the SJSU women's volleyball team.

77.     In response to the national attention and controversy surrounding the team, SJSU devoted substantial additional resources to the team over the course of the season.

78.     Administrators and coaches met nearly every day in order to respond to developments during the season.

79.     Administrators—from the Title IX office, the athletics department, and the communications staff—met with the team and the coaches to help them navigate the unusual and difficult situation.  Players were told repeatedly that they were free to speak to the media about their experiences and that they could report Title IX matters to the Title IX office.  They were also reminded that, consistent with the law, SJSU's policies prohibited harassment on the basis of gender identity.

80.     The media attention and national political environment resulted in Student 1 receiving repeated hateful messages on social media, including from her own teammates.

81.     Student 1 ultimately filed a Title IX complaint alleging that she was experiencing discrimination and harassment because of her transgender status related to her experiences on the volleyball team, including that one of her coaches refused to coach her because she was transgender.

82.    That coach, Melissa Batie-Smoose, later confirmed to Fox News that "she 'never talked to [Student 1]'" because "she preferred to focus on coaching and protecting the [cisgender] female athletes."[5]

83.    Batie-Smoose later filed her own Title IX complaint, which contained sensitive and legally protected student information, and in which she advocated for excluding Student 1 from the team solely because she was transgender—something the law prohibited SJSU from doing. Batie-Smoose shared that complaint with media outlets and spoke publicly about sensitive, legally-protected student information, despite being instructed by SJSU not to share that information.

84.    On November 1, 2024, Batie-Smoose was placed on administrative leave.

85.    On November 14, 2024, Student 3, Batie-Smoose, certain former SJSU volleyball players, and other then-current MWC players from other teams sued the MWC, CSU, and SJSU employees, including SJSU women's volleyball Head Coach Todd Kress, in federal court in Denver.  Among other claims, the lawsuit alleged that SJSU was violating Title IX and the Equal Protection Clause by rostering Student 1 and permitting her to use the women's locker rooms and restrooms.

86.    On November 16, 2024, Student 3, Batie-Smoose, and the other plaintiffs moved for a preliminary injunction in the Denver litigation seeking to bar Student 1 from playing in the upcoming MWC tournament.

87.    On November 24, 2024, the court denied the motion for a preliminary injunction on the grounds that the plaintiffs were not likely to succeed on their claims that SJSU was violating Title IX or the Equal Protection Clause.  Plaintiffs sought emergency relief from the Tenth Circuit, which the Tenth Circuit denied in short order.

---

[5] Jackson Thompson, *Ex-SJSU Volleyball Coach Opens Up on Lawsuit After Losing Job amid Trans Athlete Scandal*, FOX NEWS (Oct. 1, 2025), https://www.foxnews.com/sports/ex-sjsu-volleyball-coach-opens-up-lawsuit-against-school-after-losing-job-amid-trans-athlete-scandal.

88.     On November 25, 2024, the SJSU team traveled to Las Vegas for the MWC tournament.  After advancing due to a forfeit, SJSU played Colorado State University in the conference championship game on November 30, 2024.  SJSU lost, ending SJSU's 2024 season.

89.     Student 1 does not have any remaining NCAA eligibility to compete in women's volleyball, has concluded her NCAA career, and has not participated on any University athletics team since November 30, 2024.

**F.      The Department's Investigation and Notice of Findings**

**1.      President Trump Signs New Executive Orders**

90.     On January 20, 2025, the same day President Trump was inaugurated, he signed an Executive Order adopting an interpretation of "sex" for purposes of Title IX that provides that: "'Sex' shall refer to an individual's immutable biological classification as either male or female. 'Sex' is not a synonym for and does not include the concept of 'gender identity.'"  Exec. Order No. 14,168, 90 Fed. Reg. 8615, 8615–16 (Jan. 20, 2025).

91.     The Executive Order also adopted definitions of certain other terms.  Specifically, "'Women' or 'woman' and 'girls' or 'girl' shall mean adult and juvenile human females, respectively."  *Id.*  "Female" is defined to mean "a person belonging, at conception, to the sex that produces the large reproductive cell."  *Id.*  By contrast, "'Men' or 'man' and 'boys' or 'boy' shall mean adult and juvenile human males, respectively," where "Male" is defined to mean "a person belonging, at conception, to the sex that produces the small reproductive cell."  *Id.*

92.     The following month, President Trump signed a second Executive Order, applying these definitions to the administration's regulation of athletics under Title IX.  Exec. Order No. 14,201, 90 Fed. Reg. 9279 (Feb. 5, 2025) (incorporating Executive Order 14,168's definitions).

93.     As explained above, these orders marked a complete reversal from the prior administration's policies and interpretations of Title IX.

**2.      OCR's Investigation of SJSU and SJSU's Cooperation**

94.     On February 6, 2025, the Department of Education's Office for Civil Rights informed SJSU by letter that it was "initiating a directed investigation of" SJSU.  *See* Notice of Investigation Letter (attached as Exhibit D).  That letter explained that under President Trump's

Executive Orders, "'it is the policy of the United States to rescind all funds from educational programs that deprive women and girls of fair athletic opportunities,' and to take 'all appropriate action to affirmatively protect all-female athletic opportunities and all-female locker rooms and thereby provide the equal opportunity guaranteed by Title IX of the Education Amendments Act of 1972.'" *Id.*

95.     The letter described the directed investigation as "examin[ing] whether the University denies equal athletic benefits and opportunities to female athletes through an athletic participation policy that permits biological males to participate in women's intercollegiate athletics." *Id.* OCR did not identify any other issues that it would be investigating.

96.     Over the next nine months, SJSU fully cooperated with OCR's investigation.  SJSU provided over 20,000 pages of documents, a detailed narrative response to questions, and responses to follow-up questions by email.  SJSU agreed to make witnesses available for interviews.  SJSU even offered to provide an OCR attorney the opportunity to review hundreds of hours of recorded footage of the volleyball team's practice sessions.

97.     OCR declined the opportunity to review the video footage.  OCR also declined the opportunity to interview any SJSU witnesses, despite SJSU making them available.

### 3.     OCR's Baseless and Legally Flawed Letter of Findings

98.     On January 28, 2026, OCR issued a letter to SJSU informing SJSU that OCR had concluded SJSU was "in clear violation of Title IX."  Ex. A.  The Letter informed SJSU that OCR's directed investigation had reached that conclusion because SJSU "allows males to participate in women's sports and to use women's locker rooms and bathrooms." *Id.*

99.     OCR found that four aspects of SJSU's conduct had violated Title IX.  First, OCR found that SJSU violated Title IX by permitting Student 1 to play on its women's volleyball team.  Second, OCR found that SJSU violated Title IX by permitting Student 1 to use women's locker rooms and bathrooms and to room with other women during team travel.  Third, OCR found that SJSU failed to adequately respond to reports of discrimination and harassment related to Student 1's participation.  Fourth, OCR found that SJSU violated Title IX by engaging in disparate

1    treatment based on sex—specifically, that it treated Kress more favorably than Batie-Smoose, and

2    Student 1 more favorably than others.

3         100.    All of these findings are unfounded—and the second, third, and fourth were not

4    even part of the directed investigation that OCR noticed and informed SJSU it would be

5    conducting.

6                        *(a)*      *Student 1's Participation in Women's Sports*

7         101.    OCR identified only one instance of a transgender woman who competed in

8    intercollegiate athletics at SJSU—Student 1, who played for SJSU from 2022–2024.  OCR did not

9    identify any other transgender women that SJSU had rostered, was rostering, or planned to roster

10   on its women's teams.  SJSU is not aware of any transgender women currently playing for any of

11   its women's teams.  Nor is SJSU aware of any plans to recruit transgender women to play on those

12   teams.

13        102.    OCR explained that SJSU violated Title IX by permitting transgender women to

14   play on women's teams because "[w]hen a recipient of federal funding separates sports based on

15   sex, the recipient is not 'discriminat[ing]' based on sex because the recipient is treating the sexes

16   differently with a sufficient justification: the real biological differences between men and women."

17   Ex. A at 33–34.  Permitting NCAA-eligible transgender women to participate, OCR explained,

18   "separates sports based on sex and also allows males with a certain 'gender identity' to participate

19   in women's sports" in a way "that undermines the recipient's justification for different treatment

20   based on sex." *Id.*

21        103.    OCR's analysis completely ignored the binding Ninth Circuit decisions in *Hecox*

22   and *Grabowski* that are directly contrary to what OCR concluded.  Nor did OCR acknowledge or

23   discuss any of the circuit and district court decisions across the country that have interpreted Title

24   IX and the Equal Protection Clause to preclude public institutions from taking the very steps that

25   OCR now contends were necessary.  *See B.P.J. ex rel. Jackson v. W. Va. State Bd. of Educ.*, 98

26   F.4th 542, 561–63 (4th Cir. 2024) (athletics); *Tirrell v. Edelblut*, 748 F. Supp. 3d 19, 30–45

27   (D.N.H. 2024) (athletics); *A.C. ex rel. M.C. v. Metro. Sch. Dist. of Martinsville*, 75 F.4th 760, 769

28   (7th Cir. 2023) (bathrooms); *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 593–94 (4th Cir.

2020) (bathrooms). Instead, OCR focused only on those decisions that supported its view of Title IX—none of which are binding in California or the Ninth Circuit, which had squarely rejected the position OCR now takes.

104.    OCR also did not address that, at the time of the relevant conduct, the position of the Executive Branch—including OCR itself—was that Title IX prevented discrimination against transgender people and that SJSU was required to protect transgender students from discrimination and harassment. The Letter did not address any of the guidance to that effect discussed above.

105.    The Letter only implicitly acknowledged a change in the administration's view of the law, by focusing on President Trump's January and February 2025 Executive Orders. But those Orders cannot change the law that applies to SJSU or require SJSU to violate Ninth Circuit precedent. Nor may the orders be used to hold SJSU liable for conduct that entirely predated them.

106.    Instead, OCR presupposed—based only on its own legal interpretation that conflicts with the Ninth Circuit's—that sex assigned at birth was the only permissible basis on which to separate sexes under Title IX.

107.    That reasoning is flawed and incomplete, even as a matter of biology. OCR never addressed, for example, how Title IX might apply to intersex students. Most individuals with XX chromosomes possess reproductive organs associated with the production of ova and female secondary sex characteristics, and most individuals with XY chromosomes possess reproductive organs associated with the production of sperm and male secondary sex characteristics. But not all do. For intersex individuals, these sex indicators may not be aligned.[6] For example, a person with ovotestes has both ovarian and testicular tissue. *Talbott v. United States*, 775 F. Supp. 3d 283, 329 (D.D.C. 2025). Other conditions create discrepancies between external and internal sex markers, which as one court put it, "can produce XX males or XY females," as well as "other

---

[6] The Cleveland Clinic's website addresses some of these presentations. *See Intersex*, CLEVELAND CLINIC (July 19, 2022), https://my.clevelandclinic.org/health/articles/16324-intersex.

1  chromosomal combinations such as XXY or XXX that affect overall sexual development." *A.C.*

2  *ex rel. M.C.*, 75 F.4th at 770.  Intersex people are often assigned male or female at birth; some

3  continue to identify that way in adulthood.  Others may not.  In all cases, "[p]eople with this

4  genetic make-up are entitled to Title IX's protections." *Id.*   Yet OCR did not consider that.

5         108.    OCR's analysis also ignores the Department's own policy guidance instructing that

6  such equal opportunity analyses are to be undertaken at a program level.  OCR simply inferred

7  that the participation of only one allegedly transgender woman on one team meant that "women in

8  sex-segregated teams" at SJSU "are compelled to compete against" transgender women.  Ex. A at

9  36.  OCR identified at most one instance of this happening—yet OCR described SJSU's athletics

10 program *as a whole* as violating Title IX.

11        109.    OCR similarly ignored or adopted an interpretation of Title IX that conflicted with

12 and departed from its own regulations and policy documents governing Title IX athletics

13 compliance more generally.  *See* 34 C.F.R. § 106.41(b) (contemplating non-sex-segregated teams);

14 Title IX of the Education Amendments of 1972; a Policy Interpretation; Title IX and

15 Intercollegiate Athletics, 44 Fed. Reg. 71413, 71415–16 (Dec. 11, 1979); Off. for C.R., Dep't of

16 Educ., OCR-00016-B, Clarification of Intercollegiate Athletics Policy Guidance: The Three-Part

17 Test (1996), http://www.ed.gov/about/offices/list/ocr/docs/clarific.html (explaining that athletics

18 programs comply with Title IX if they offer a number of roster spots to women that is

19 substantially proportionate to their enrollment);  44 Fed. Reg. at 71415–16 (programs need not

20 offer "identical" benefits to men and women's teams).

21        110.    OCR failed to consider other important information as well.  For example, OCR

22 based its conclusion that Student 1's participation undermined safe and fair competition primarily

23 on observations from Batie-Smoose and the fact that several other teams refused to play against

24 SJSU.

25        111.    But OCR never considered the fact that, at the time, USA Volleyball and the

26 NCAA had each determined that players meeting their eligibility guidelines—as all players on

27 SJSU's team did—could compete without undermining safety or fairness.  That included

28 transgender players.

112.    OCR also did not consider that top women's volleyball programs intentionally practice against male practice players.

113.    OCR did not purport to have reviewed any game footage or made any comparative analysis of Student 1's height, strength, serve speed, or spike speed compared to other NCAA Division I women's volleyball players.

114.    OCR also did not consider that no SJSU athletics trainers or team physicians reported any significant injury due to Student 1's play on the court, despite SJSU sharing that fact during the investigation.

115.    OCR's effective accommodations findings also suffer from significant problems. OCR found that SJSU was failing to "effectively accommodate the interests and abilities of members of both sexes" because "[a]t [SJSU], men get sex-segregated teams in which competitors compete only against other men; women in sex-segregated teams, however, are compelled to compete against [transgender women]. Men competing in men's sports get fair and safe competition while women get unfair and unsafe competition, are subjected to increased risk of injury, [and] are displaced from podiums and other opportunities and recognition." Ex. A at 36. This, in OCR's view, "deprive[d] women of equal athletic opportunities in violation of Title IX." *Id.*

116.    OCR was simply wrong that as a matter of policy or eligibility "men . . . compete only against other [cisgender] men." *Id.* at 36. Even today, NCAA rules permit transgender men to compete on men's teams. And Title IX regulations specifically contemplate that women may sometimes be permitted to compete on men's teams where no women's team is offered in the same sports. 34 C.F.R. § 106.41(b). And OCR did not follow its own longstanding guidelines for assessing effective accommodation. *See* 44 Fed. Reg. at 71415–16; OCR-00016-B.

(b)    *Student 1's Use of Locker Rooms and Other Intimate Facilities*

117.    OCR found that SJSU "purported to create sex-separate intimate facilities but it has abandoned the biological justification for sex separation in intimate facilities by allowing [transgender women] to use the women's locker room, housing, or overnight stay arrangements." Ex. A at 37. OCR described this "biological justification" as women's "privacy interest in using

intimate facilities away from men, and in shielding their bodies from men while changing in the locker room, living in on-campus housing, and on overnight stays for school activities." *Id.* And, in light of this, OCR held that SJSU violated Title IX by permitting Student 1 to use bathrooms, locker rooms, and other intimate facilities for women.

118.    But the Ninth Circuit has *specifically rejected* OCR's reasoning. *Parents for Privacy v. Barr*, 949 F.3d 1210, 1227 (9th Cir. 2020), held that cisgender women do not have a right under Title IX or the Equal Protection Clause to bathrooms and other facilities that exclude transgender women. As the Ninth Circuit explained, "just because Title IX authorizes sex-segregated facilities does not mean that they are required, let alone that they must be segregated based only on biological sex and cannot accommodate gender identity." *Id.* This was and is the law on the books that governs SJSU.

119.    OCR never mentions *Parents for Privacy*, nor does it engage with its underlying reasoning. OCR cannot simply ignore binding, on-point precedent. Nor may it threaten SJSU's federal funding for following the Ninth Circuit's interpretation of Title IX.

120.    OCR also never addresses that, during the relevant period of time, OCR itself took the position that funding recipients were required to permit transgender students to use bathrooms and intimate facilities consistent with their gender identity.

121.    OCR's finding was not procedurally proper either. OCR informed SJSU in its notice of directed investigation that it was investigating its athletics participation policies, not SJSU's conduct regarding intimate facilities. *See* Ex. D. It never gave SJSU the opportunity to address that issue during the investigation. Consistent with OCR's longstanding practice and basic notions of fairness, OCR's own Case Processing Manual states that notices of investigation must provide the "allegations to be investigated."[7] Here, OCR did not do so.

---

[7] U.S. Dep't of Educ., Off. for C.R., Case Processing Manual § 111 (2025), https://www.ed.gov/media/document/ocr-case-processing-manual-us-department-of-education-office-civil-rights-33891.pdf.

1

*(c)     SJSU's Handling of Reports of Title IX Violations*

2      122.    OCR found that SJSU failed to adequately respond to the Title IX complaints it

3    received regarding Student 1's participation.  This, too, was not part of the notice of directed

4    investigation.  *See* Ex. D.

5      123.    In the course of reaching this conclusion, OCR found that "the University has

6    failed to provide sufficient information or approve requested interviews, for OCR to make

7    additional conclusions regarding compliance."  Ex. A at 38.  But two sentences later, OCR

8    acknowledges that SJSU told OCR that it was "working to make arrangements for interviews."  *Id.*

9    OCR's findings on this score concededly, and unnecessarily, rested on incomplete information.

10     124.    OCR primarily faulted SJSU for not characterizing any of the reports it received as

11   "Title IX complaints," with the exception of the formal complaint filed by Student 1 on her own

12   behalf.  *See id.* at 41.  OCR then faulted the Title IX office for deciding not to investigate "most of

13   the allegations" raised in the various reports that SJSU received.  *Id.*  OCR is wrong in both

14   respects.

15     125.    The Department's Title IX regulations require investigations only in response to

16   formal complaints describing "conduct that reasonably may constitute sex discrimination under

17   Title IX."  34 CFR § 106.44(f)(1).

18     126.    OCR describes five reports of Title IX violations related to Student 1's

19   participation on the women's volleyball team that, according to OCR, were "complaints" that

20   SJSU did not adequately address.

21     127.    In light of the Ninth Circuit precedent and Executive Branch guidance discussed

22   above, SJSU's Title IX coordinator could not reasonably have concluded that allowing Student 1

23   on the roster or permitting Student 1 to use women's bathrooms, locker rooms, or other intimate

24   facilities violated Title IX.  OCR never considered that fact.

25     128.    OCR also never addressed or considered SJSU's obligations under Ninth Circuit

26   precedent and Executive Branch guidance to address discrimination and harassment against

27   transgender students.  Yet OCR faulted SJSU for reminding players that while they were free to

28   speak out about their "experiences without fearing retaliation," they were still "*subject to the*

*University's policy against harassment*." Ex. A at 42 (emphasis in original).  But that is precisely what the law required of SJSU.  All SJSU was asking of its athletes was not to discriminate or harass fellow students, even as they were free to oppose SJSU's conduct.  OCR never explained how else SJSU was supposed to handle this situation, given unambiguous precedent holding that Title IX obligated SJSU to respond to student-on-student harassment based on gender identity.

129.    SJSU also appropriately responded to each and every report OCR identifies in the Letter as having been mishandled.

130.    ***The September 23, 2024 Letter:***  On September 23, 2024, SJSU received a letter from Student 3's lawyers informing SJSU that Student 3 "was joining a lawsuit against the NCAA" that asserted that Student 1's participation on the volleyball team violated Title IX and "remind[ing] the University" not to retaliate against or permit retaliation against Student 3.  *Id.* at 20.  The letter did not report that Student 3 had experienced any retaliation.

131.    Once again, the Ninth Circuit had specifically prohibited public institutions like SJSU from excluding a transgender woman from its women's team solely because she was transgender.  Thus, the conduct complained of in the letter was not "conduct that reasonably may constitute sex discrimination under Title IX," and did not require an "investigation" under the Department's rules.  34 CFR § 106.44(f)(1).

132.    ***The ICONS Letter:***  On September 24, 2024, SJSU received a letter from the Independent Council on Women's Sports (ICONS) that OCR describes as "alleging the University's policy and practice of allowing [transgender woman] to participate in the women's volleyball program violated Title IX by denying women equal athletic opportunities and by allowing a [transgender woman] in women's locker rooms."

133.    Just like the September 23 report, this letter did not describe "conduct that reasonably may constitute sex discrimination under Title IX," 34 CFR § 106.44(f)(1), under Ninth Circuit precedent.

134.    The letter also asserted, based on representations from Student 3, that Student 1's participation posed a safety risk because she was hitting volleyballs at "80mph."

135.     SJSU takes the safety of its students seriously.  Thus, over the course of the season, SJSU's Title IX coordinator consulted with coaches and athletic training staff to assess practices for safety.  They determined that Student 1's participation did not pose a safety risk.

136.     These assessments were consistent with those of neutral third parties, including those of current and former players at top programs.

137.     Any person familiar with college volleyball would understand the ICONS letter's assertion that Student 1 hit volleyballs at "80mph" to be a rhetorical statement, not a factual one. An 80-mile-per-hour serve would be among the fastest ever recorded in NCAA Division I men's volleyball, where an 84-mile-per-hour serve is the current record.  An 80-mile-per-hour spike—i.e., a ball hit over the net mid-point—would be among the fastest ever in a men's Olympic competition.

138.     ESPN independently analyzed Student 1's spikes across multiple games, including one shared on social media by Student 3.  That analysis revealed Student 1's average spike speed to be 50.6 miles per hour, right in the middle of average spike speeds for NCAA Division I women's volleyball players.

139.     ESPN also interviewed top NCAA women's volleyball players who reported that they "get [hit] in the face in practice every single day," that "[t]his is normal," and that at top-50 programs, women's players play against male practice players (who do not undergo any testosterone suppression).[8]  The use of male practice players by top programs confirms that there is nothing inherently unsafe about collegiate women's volleyball players practicing with someone assigned male at birth.

140.     ***The October 5, 2024 Report:*** On October 5, 2024, Coach Kress emailed the Title IX coordinator sharing a "report from one of my student-athletes yesterday of some behavior initiated by [Student 1] that could be deemed as retaliation toward [Student 3].  This behavior

---

[8] Katie Barnes, *Inside San Jose State's Polarizing Volleyball Season*, ESPN (Nov. 26, 2024, 7:00 AM), https://www.espn.com/college-sports/story/_/id/42549609/inside-san-jose-state-university-2024-volleyball-season-gender-fairness-safety.

occurred in Colorado on Wednesday, October 2, while we were there for our match vs Colorado State."

141.    OCR characterizes this report as one in which the Title IX office "decided not to investigate." *Id.* at 41.  But earlier in the Letter, OCR acknowledges that the MWC "found there was 'insufficient evidence to corroborate the allegations of misconduct.'" Ex. A at 28.  OCR does not explain why SJSU may not rely on the investigation conducted by the MWC.

142.    OCR also entirely ignores SJSU's active response when it learned of an alleged plan to target Student 3 during the Colorado State University game.  On October 3, 2024, the University received a report about an Instagram message that had been sent to a teammate about that supposed plan.  The same day, the SJSU Title IX office informed the Colorado State University Police Department, the Fort Collins Police Department, and the Colorado State University Title IX Office that additional security measures were needed for the team.  SJSU's Title IX Office also alerted the SJSU police officer who was traveling with the team of the message and potential safety threat.  To ensure the team's safety while at Colorado State, SJSU coordinated with agencies in Colorado to implement precautionary security measures, including deploying undercover and plainclothes officers at the match and providing 24/7 security for the team.  Law enforcement also interviewed players and worked with university administrators to prepare a comprehensive safety plan for the match.

143.    On the evening of October 3, 2024, SJSU received a report that Student 1 and two teammates had met with a player on the Colorado State team before the match to allegedly "conspire" to target Student 3.  SJSU promptly contacted both Coach Kress and Colorado State's head coach to determine if either had observed any misconduct.  After reviewing the game footage, both coaches reported that they saw no abnormal play.

144.    On October 7, 2024, the Title IX office again sent outreach to Student 3 offering supportive measures, the option to initiate the grievance procedure, and an offer to meet. Student 3 did not respond to the outreach.

145.    OCR also did not consider the fact that the underlying conduct—advocating for SJSU to exclude a transgender woman from its team in violation of binding Ninth Circuit

1    precedent—is not protected Title IX activity because it was not reasonable under the

2    circumstances to believe that rostering a transgender player violated Title IX.

3        146.    ***Batie-Smoose's Report:***  On October 29, 2024, Batie-Smoose filed a Title IX

4    "Complaint."  OCR describes this complaint as: "requesting 'an immediate and comprehensive

5    Title IX investigation' alleging in part: (1) San José State University was engaged in illegal

6    discrimination on the basis of subjective identity; (2) Student 2 was wrongfully refused a women's

7    volleyball scholarship while Student 1 was permitted to maintain a women's volleyball

8    scholarship; (3) the University's Senior Associate Athletics Director for Student-Athlete Wellness

9    and Leadership Development stated 'anyone who disagrees with [Student 1] being on the

10   women's volleyball team needs to get therapy and needs to leave SJSU'; (4) Student 1's physical

11   abilities and strength placed women on the team and opponents' teams at increased risk of injury;

12   (5) Coach 2 was giving Student 1 preferential treatment over the women on the team; (6) Women

13   in the San José State University women's volleyball team were being denied opportunities and

14   benefits on the basis of sex; (7) University officials took action to dissuade women on the team

15   from filing a complaint or speaking out in opposition to Student 1 being able to participate on the

16   women's volleyball team; (8) Coach 2 retaliated against Student 3 after she joined a Title IX

17   lawsuit challenging Student 1's participation in the women's volleyball program; and

18   (9) University officials were not responding properly to student, parent, and Coach 3's concerns

19   regarding Student 1's participation in the women's volleyball program." *Id.* at 40.

20       147.    The majority of these assertions boil down to an objection to Student 1's

21   participation on the team, which is not "conduct that reasonably may constitute sex discrimination

22   under Title IX," 34 CFR § 106.44(f)(1), under Ninth Circuit precedent.

23       148.    Batie-Smoose's complaints about "dissuading women on the team from speaking

24   out" refers to comments made at a single meeting after media reports regarding Student 1 at the

25   beginning of the season.  Within days after that meeting, other SJSU employees, including those

26   in the Title IX office, met with the team to inform the players that they were free to speak out on

27   these issues.

28

149.    In addition, the Title IX office repeatedly invited students to report concerns, as well as to participate in the investigations that were subsequently launched into both Batie-Smoose and Kress.

150.    To the extent Batie-Smoose's complaint referred to reminders of students' obligations not to harass their peers on the basis of gender identity, that is not "conduct that reasonably may constitute sex discrimination under Title IX," 34 CFR § 106.44(f)(1), under Ninth Circuit precedent.

151.    The same is true of mere favoritism.  *E.g.*, *Bradley v. Harcourt, Brace & Co.*, 104 F.3d 267, 271 (9th Cir. 1996).

152.     And SJSU *did* open an investigation into Kress's alleged retaliation against Student 3 and found that there was insufficient evidence to substantiate the allegation.

153.    ***November 3, 2024 Letter from Parents:***  On November 3, 2024, parents of another SJSU player sent a letter to SJSU asserting that Kress gave Student 1 preferential treatment and that players were discouraged from expressing opposition to Student 1 being on the roster.

154.    The letter was forwarded to SJSU's Title IX Coordinator, who then met with the parents who sent the letter.  During the meeting, the parents told the Title IX coordinator that they felt misled because of how the 2024 season was unfolding and the continuing presence of a transgender player on the team.

155.    The Title IX coordinator understood the parents' grievance to concern Kress's honesty during recruitment, which was not a Title IX matter.  For that reason, as well as the fact that no complaint by any affected student had been filed, the Title IX office declined to open an investigation.

156.    In sum, none of OCR's findings regarding SJSU's handling of reports of purported Title IX violations withstands scrutiny.

         *(d)*    *SJSU's Alleged Disparate Treatment in Employment and Scholarships*

157.    In yet another issue that it addressed without giving SJSU any notice, OCR concluded that in two instances SJSU had treated cisgender women worse than similarly situated

transgender women or cisgender men.  First, it placed Batie-Smoose, but not Kress, on administrative leave, despite receiving Title IX complaints about both.  Second, Kress allowed Student 1 to retain her scholarship in a year where she was injured, but did not permit a cisgender woman to do the same.  These findings are procedurally improper and wholly unsupportable.

158.    Batie-Smoose and Kress are not similarly situated.  Among other differences, Batie-Smoose consistently and repeatedly advocated for SJSU to violate binding legal obligations imposed by the Ninth Circuit.  Kress did not.  Batie-Smoose intentionally shared sensitive and legally protected information about students both in interviews and by sharing her Title IX complaint with news outlets.  Kress did not.  After a thorough investigation, Batie-Smoose was found to have discriminated against Student 1 on the basis of sex and gender identity.  Batie-Smoose later admitted to this in an interview with Fox News.  After a thorough investigation, Kress was found *not* to have retaliated against Student 3.

159.    In addition, SJSU had other bases for its suspension of Batie-Smoose, including unprofessional, on-duty conduct.

160.    OCR's findings with respect to disparate treatment by Kress of Student 1 and the other injured player fall apart for similar reasons.  OCR also did not take into account whether Student 1 was a better player, the team's positional needs, or any of the other considerations that are relevant to whether the two students were "similarly situated" for purposes of Title IX.  Indeed, OCR did not even *meet* with Kress in the course of its investigation into SJSU.

161.    Similarly, OCR found that Student 1 was not disciplined for violations of team rules, when other players were.  But with respect to Student 1's violation of team rules before the Colorado State game, she snuck out of the hotel with two other (cisgender) players who were also not punished.  And the record provided to OCR revealed that Kress elected not to discipline Student 1 for leaving her hotel room because such conduct was not typically disciplined.  OCR never considered this explanation for Kress's disciplinary decisions.

162.    OCR also did not address that SJSU's inquiry into Kress—the person who was responsible for disciplining violations of team rules—found no credible evidence of retaliation towards even the most vocal student opposing Student 1's participation on the team.  Nor did it

1    address that mere favoritism is insufficient to violate Title IX.  OCR also did not take into account

2    whether any of the alleged disparate treatment of Student 1 with respect to discipline could be a

3    supportive measure in response to her own complaints under Title IX.

4    163.    OCR did not provide notice of this subject of its investigation in its notice of

5    directed investigation.

6    **4.    OCR'S Proposed Resolution Agreement**

7    164.    Along with the Letter of Findings, OCR transmitted to SJSU a Proposed Resolution

8    Agreement.  *See* Ex. B.  That agreement would require SJSU to:

A.    Prohibit transgender women from competing in any women's athletic
program, not limited to intercollegiate athletics.

B.    Make a public statement adopting OCR's preferred definition of the words
"Sex," "Female," "Male," "Woman," "Girl," "Man," and "Boy" for
purposes of all SJSU policies, as well as agreeing to the "fact" that "there
are only two sexes (female and male) because there are only two types of
gametes (eggs) and sperm" and that sex is "unchangeable."

C.    Award cisgender female athletes any individual awards they would have
won absent participation by transgender women in all competitions.

D.    Issue a personalized apology letter to every woman who played on a team
with the allegedly transgender player or who forfeited a match against SJSU
and make a public statement to anyone who played against SJSU during
that time "expressing genuine regret and remorse" about the player's
participation.

23    165.    OCR described these and other components of the Proposed Resolution Agreement

24    as "actions that will remedy current and past discrimination, and to prevent any similar instances

25    where future violative conduct may recur."  Ex. A at 45.

166.    According to OCR's own Case Processing Manual, "[t]he provisions of the resolution agreement must be tied to the allegations and the evidence obtained during the investigation, and will be consistent with applicable regulations."[9]

167.    The Proposed Resolution Agreement would require SJSU to violate existing, on the books, Ninth Circuit controlling precedent.

168.    In addition, the Proposed Resolution Agreement was contrary to the First Amendment because it would improperly compel speech by SJSU—and, as described above, the statements that OCR would compel are legally and factually wrong.  OCR did not address how to reconcile the Proposed Resolution Agreement with section 109 of OCR's Case Processing Manual, which states that "all actions taken by OCR must comport with First Amendment principles.  OCR will not interpret any statute or regulation to impinge upon rights protected under the First Amendment or to require recipients to encroach upon the exercise of such rights."[10]

169.    OCR closed its letter by warning SJSU that if "OCR determines an agreement will not be reached, the Department may begin enforcement action including" by taking steps to initiate an "action to suspend, terminate, or refusal to grant or continue federal financial assistance."  Ex. A at 45.

### G.    The Administration's Pattern and Practice of Revoking Universities' Funding

170.    Though both Title IX and its parallel statute covering race discrimination, Title VI, each require agencies to undertake multiple procedural steps prior to terminating federal funding, the current administration's practice has been to ignore those requirements.

171.    The government has terminated, frozen, or failed to pay billions of dollars in funds to dozens of universities across the country.  And it has often done so based on assertions that those institutions have violated Title IX or Title VI, which prohibits discrimination on the basis of race, color, and national origin in programs and activities receiving federal financial assistance.

---

[9] U.S. Dep't of Educ., Off. for C.R., Case Processing Manual § 302 (2025), https://www.ed.gov/media/document/ocr-case-processing-manual-us-department-of-education-office-civil-rights-33891.pdf.

[10] *Id.*  § 109.

172.    But this administration has *never*—not once—followed the statutory and regulatory procedural requirements of Title IX or Title VI when cutting off these funds.

173.    The government began its funding-termination campaign in the spring of 2025.

174.    In March and April of 2025, the government froze funding for Columbia, the University of Pennsylvania, Brown, Cornell, Northwestern, Harvard, and the State of Maine, asserting that those entities had violated Title IX or Title VI.

175.    In two of those freezes, the government accused the targeted institution of Title IX violations.

176.    In March 2025, the government froze $175 million in federal contracts awarded to the University of Pennsylvania based on the participation of a transgender athlete on the women's swimming team in 2022.  The University had been notified that OCR initiated a directed investigation under Title IX into its athletics policies, but it learned about the suspension of its funding "through various news outlets" rather than the government itself.

177.    In April 2025, the Department of Agriculture froze federal funding for the State of Maine based on the state's alleged violation of Title IX by allowing transgender girls to participate in girls' sports.  OCR (along with the Office of Civil Rights for the Department of Health and Huaman Services) had informed the State of Maine in February and March that it was found in violation of Title IX.  The State declined to execute the government's proposed resolution agreement.  Days after that refusal, without providing notice or following procedures required by statute, the Department of Agriculture froze its funding for the Maine Department of Education, threatening crucial programs that fight child hunger.

178.    The government engaged in the same course of action against institutions that it accused of violating Title VI.

179.    For example, on March 3, 2025, the government notified Columbia University that it would conduct a review of Columbia's federal contracts and grants.  Four days later, without providing Columbia notice, the government summarily announced "the immediate cancellation of approximately $400 million in federal grants and contracts to Columbia University" and asserted

that those cancellations "represent[ed] the first round of action" and that "additional cancellations [were] expected to follow."

180.    On March 31, 2025, the government notified Harvard University that it would conduct a review of Harvard's federal contracts and grants.  On April 11, the government sent Harvard a proposed resolution, and Harvard declined to execute that resolution on April 14. Hours later, without providing any further notice or following any additional procedures, the government froze $2.2 billion in grants and $60 million in contracts to Harvard.

181.    Many universities did not receive any form of notice from the government that they were being targeted or that their funding was at risk.  It has been publicly reported, for example, that Brown University, Northwestern University, and Cornell University learned from press reports that funding was being terminated.

182.    In none of these cases did the administration follow Title VI's or Title IX's procedural requirements.

183.    It is against this backdrop that Defendants issued the Letter of Findings and Proposed Resolution Agreement that have put CSU in an immediate and concrete dilemma: either accept Defendants' unlawful proposed Resolution Agreement or face termination or suspension of substantial federal funding.  Defendants' statements and actions have made clear that failure to execute the proposed Resolution Agreement may result in termination or suspension of funding. The credible threat of such enforcement establishes a present injury sufficient for Article III standing.

184.    Defendants' and other federal agencies' repeated practice of refusing to follow Title VI's and Title IX's procedural requirements before terminating funding demonstrates a pattern of filing suit, revoking funding, and/or taking other punitive actions without following established procedures.  SJSU has therefore come to this Court to assert its rights and protect itself and the community it is proud to serve.

**CAUSES OF ACTION**

**COUNT ONE**

**U.S. Constitution - Spending Clause**
**(Against All Defendants)**

185.    The paragraphs above are incorporated and reasserted as if fully set forth herein.

186.    Under the Spending Clause, the Executive Branch has no authority to impose conditions beyond those contained in Title IX. *City & County of San Francisco v. Trump*, 897 F.3d 1225, 1232 (9th Cir. 2018). The Ninth Circuit's interpretation of the Constitution and Title IX binds SJSU, and SJSU complied with that law. The Letter of Findings is therefore contrary to the U.S. Constitution because it reflects the imposition of unlawful funding conditions in that it necessarily imposes obligations on SJSU not found in Title IX.

187.    In addition, Title IX is Spending Clause legislation. *Davis ex rel. LaShonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 640 (1999). Thus, when "Congress decides to impose conditions on the allocation of funds to the states, it "must do so unambiguously . . . , enabl[ing] the States to exercise their choice knowingly, cognizant of the consequences of their participation." *City of Los Angeles v. Barr*, 929 F.3d 1163, 1174 (9th Cir. 2019). "The legitimacy of Congress'[s] power to legislate under the spending power thus rests on whether the State voluntarily and knowingly accepts the terms . . . ." *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981). Accordingly, "Congress goes too far when it surprises states with "post acceptance or 'retroactive' conditions.'" *Barr*, 929 F.3d at 1174.

188.    All of SJSU's relevant conduct occurred between 2022 and 2024. SJSU's conduct was lawful at the time, and remains lawful today. Even if the law—or the Executive Branch's interpretation of it—has changed since 2024, that cannot impose retroactive legal obligations on SJSU under Title IX.

**COUNT TWO**

**Administrative Procedure Act, 5 U.S.C. § 706**
**Contrary to Law - Spending Clause**
**(Against All Defendants)**

189.    The paragraphs above are incorporated and reasserted as if fully set forth herein.

190.    Under the Administrative Procedure Act ("APA"), a court shall "hold unlawful and set aside agency action . . . found to be . . . contrary to constitutional right, power, privilege, or immunity."  5 U.S.C. § 706(2)(B).

191.    OCR's Letter of Findings and Proposed Resolution Agreement constitute final agency action.  *See Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (actions that "mark the 'consummation' of the agenc[ies'] decisionmaking process," "determine[]" "rights [and] obligations," and are backed by "legal consequences" constitute final agency action) (citations omitted).

192.    As explained above, Defendants' finding that SJSU violated Title IX is contrary to the Spending Clause because it reflects the imposition of unlawful, post-hoc funding conditions. It is therefore unlawful under the APA and must be set aside.

### COUNT THREE

**Administrative Procedure Act, 5 U.S.C. § 706**
**Contrary to Law – Title IX**
**(Against All Defendants)**

193.    The paragraphs above are incorporated and reasserted as if fully set forth herein.

194.    Under the APA, a court shall "hold unlawful and set aside agency action . . . found to be . . . in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."  5 U.S.C. § 706(2)(C).

195.    Defendants' finding that SJSU violated Title IX is contrary to Title IX.

196.    Defendants' finding that SJSU violated Title IX is contrary to binding Ninth Circuit precedent, Title IX regulations, and OCR's interpretation of Title IX in place at the time of SJSU's conduct.

197.    If the correct reading of Title IX changed after November 30, 2024, or does change in the future, that change in the law cannot be the basis for liability under Title IX for acts taken prior to that date.  *City of Los Angeles*, 929 F.3d at 1175.

198.    Defendants' finding that SJSU violated Title IX is therefore contrary to law and must be declared unlawful and set aside under the APA.

1

2

3

### COUNT FOUR

**Administrative Procedure Act, 5 U.S.C. § 706**
**Contrary to Law – Equal Protection**
**(Against All Defendants)**

4      199.    The paragraphs above are incorporated and reasserted as if fully set forth herein.

5      200.    Under the APA, a court shall "hold unlawful and set aside agency action . . . found

6   to be . . . contrary to constitutional right, power, privilege, or immunity."  5 U.S.C. § 706(2)(B).

7      201.    Defendants' finding that SJSU violated Title IX is contrary to the Equal Protection

8   Clause.  Under binding Ninth Circuit precedent, state actors like SJSU may not exclude qualified

9   and eligible transgender women from women's sports teams on the sole basis that they are

10  transgender.  *See Hecox v. Little*, 104 F.4th 1061, 1068 (9th Cir. 2024).

11     202.    Defendants' finding that Title IX required SJSU to exclude Student 1 from the

12  women's volleyball team or sex-segregated intimate facilities or to adopt blanket bans on the

13  participation of transgender women on women's sports teams would require violating the Equal

14  Protection Clause of the U.S. Constitution.  *Id.*

15     203.    Defendants' finding is therefore contrary to law and must be declared unlawful and

16  set aside under the APA.

17

### COUNT FIVE

18

19

**Administrative Procedure Act, 5 U.S.C. § 706**
**Arbitrary & Capricious**
**(Against All Defendants)**

20     204.    The paragraphs above are incorporated and reasserted as if fully set forth herein.

21     205.    The APA requires this Court to hold unlawful and set aside any final agency action

22  that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5

23  U.S.C. § 706(2)(A).

24     206.    As explained above, OCR's Letter of Findings and Proposed Resolution Agreement

25  constitute final agency action.

26     207.    Defendants' actions are arbitrary and capricious because they are neither

27  "reasonable [nor] reasonably explained."  *Ohio v. EPA*, 603 U.S. 279, 292 (2024) (citation

28  omitted).  They are not the product of "reasoned decisionmaking," *Motor Vehicle Mfrs. Ass'n of*

*U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 52 (1983), including because Defendants' actions "entirely fail[] to consider . . . important aspect[s] of the problem." *Id.* at 43; *see also DHS v. Regents of the Univ. of Calif.*, 591 U.S. 1, 30 (2020).  The Letter ignores SJSU's legal obligations under binding circuit precedent, does not address the many steps SJSU took in response to reports of Title IX violations even when SJSU was not required to investigate, and departs from the agency's own regulations and longstanding policy guidance interpreting Title IX.

208.    Defendants' actions were arbitrary and capricious because Defendants failed to "articulate a satisfactory explanation for [their] action[s]" and demonstrated no "rational connection between the facts found and the choice made." *State Farm Mut. Auto. Ins. Co.*, 463 U.S. at 43 (citation omitted).  Defendants have not articulated *any* rationale for holding SJSU liable under Title IX for following the law that binds it.  Nor have they articulated *any* rationale that justifies forcing SJSU to choose between adopting sweeping, forward-looking remedies and make highly politicized statements or losing substantial federal funding due to the inclusion of a single player who played her last game for SJSU more than a year ago.

209.    Defendants' actions were arbitrary and capricious because Defendants failed to consider reasonable, obvious alternatives to sweeping cuts to and limits on SJSU's federal financial assistance, such as the more limited corrective actions that the government has historically employed to address Title IX violations.  *See Yakima Valley Cablevision, Inc. v. FCC*, 794 F.2d 737, 746 n.36 (D.C. Cir. 1986).

210.    Defendants' actions were arbitrary and capricious because Defendants neglected to "take[] into account" the "serious reliance interests" "engendered" by the government' prior regulatory approach and current Supreme Court and Ninth Circuit precedent.  *Regents of the Univ. of Calif.*, 591 U.S. at 30 (2020) (quoting *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 222 (2016)).  SJSU had every reason to rely on the Ninth Circuit's precedents here.  In addition, in 2022, OCR itself had told SJSU it needed to do more to protect transgender students from discrimination and harassment on its campus.  And, during the 2024 volleyball season, SJSU prevailed in emergency litigation in which Student 3, Batie-Smoose, and others sought to exclude

1    Student 1 from the volleyball team.  The Court rejected the plaintiffs' Title IX and Equal

2    Protection theories.

3         211.    SJSU conformed its behavior to the law and the regulatory environment at the time;

4    it should not be punished for conforming its conduct to those standards.  In addition, for several

5    decades, SJSU has relied on the well-established process for federal financial assistance in its

6    budgeting and financial planning, including with respect to staffing, infrastructure, facility and

7    equipment purchases, and long-term investment decisions.  OCR never mentions the effect of

8    funding terminations on SJSU, its faculty, students, or the broader San Jose area.

9         212.    Defendants' actions therefore must be set aside under the APA.

10                                     **COUNT SIX**

11                    **Administrative Procedure Act, 5 U.S.C. § 706**
                     **Failure to Follow Procedure Required by Law**
12                                **(Against All Defendants)**

13        213.    The paragraphs above are incorporated and reasserted as if fully set forth herein.

14        214.    The APA requires this Court to hold unlawful and set aside any final agency action

15    that is "without observance of procedure required by law."  5 U.S.C. § 706(2)(D).

16        215.    OCR's Letter of Findings and Proposed Resolution Agreement constitute final

17    agency action.

18        216.    Title IX provides that federal funding cannot be "suspend[ed], terminat[ed], or

19    refus[ed]" without "an express finding on the record, after opportunity for a hearing, of a failure

20    [by the applicant or recipient] to comply such requirement" of Title IX.  20 U.S.C. § 1682.  The

21    APA mandates formal adjudications whenever a statute or regulation requires a finding "on the

22    record after opportunity for an agency hearing."  *Ass'n of Nat'l Advertisers, Inc. v. FTC*, 627 F.2d

23    1151, 1160 (D.C. Cir. 1979) (quoting 5 U.S.C. § 554(a)).  In such adjudications, parties have a

24    right to trial-like procedures, such as "the right to present evidence and to conduct cross-

25    examination."  *Id.*  At a minimum, then, OCR cannot revoke SJSU's Title IX funding without

26    affording it an opportunity for a formal hearing and informing Congress of the basis of a

27    revocation.  OCR has not provided SJSU that opportunity.

28

## COUNT SEVEN

### Administrative Procedure Act, 5 U.S.C. § 706
### Failure to Follow Procedure Required by Law
### (Against All Defendants)

217.    The paragraphs above are incorporated and reasserted as if fully set forth herein.

218.    Under the APA, a court shall "hold unlawful and set aside agency action, findings, and conclusions found to be without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

219.    When issuing legislative rules, federal agencies are required to follow the notice-and-comment process set forth in the APA.  *E.g.*, *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 95–96 (2015) (explaining rulemaking requirements of 5 U.S.C. § 553(b)).

220.    The agency must publish a "[g]eneral notice of proposed rule making" in the Federal Register.  5 U.S.C. § 553(b).  That notice must describe "either the terms or substance of the proposed rule or a description of the subjects and issues involved."  *Id.* § 553(b)(3).  The agency must further provide "interested persons" an "opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation." *Id.* § 553(c).

221.    The rule announced in the Letter that "Title IX's bar on sex discrimination does not include discrimination on the basis of the subjective perception of one's own 'gender,'" Ex. A at 4, as a new basis for Title IX enforcement is a legislative rule, not an interpretive rule or a general statement of policy.[11]  *See, e.g.*, *N.H. Hosp. Ass'n v. Azar*, 887 F.3d 62, 70–74 (1st Cir. 2018) ("We have said that a legislative rule is one that 'creates rights, assigns duties, or imposes obligations, the basic tenor of which is not already outlined in the law itself.'"); *accord Nat'l Mining Ass'n v. McCarthy*, 758 F.3d 243, 251–52 (D.C. Cir. 2014) (characterizing legislative rules as those that "impose legally binding obligations or prohibitions on regulated parties); *Mendoza v.*

---

[11] Because the Letter's new rule is a legislative rule, it is necessarily reviewable as final agency action.  *See Cal. Communities Against Toxics v. EPA*, 934 F.3d 627, 635 (D.C. Cir. 2019) ("[I]f a rule is legislative it has the force and effect of law, and a legislative rule is thus necessarily final.").

1  *Perez*, 754 F.3d 1002, 1021 (D.C. Cir. 2014) (explaining that a legislative rule "supplements a

2  statute, adopts a new position inconsistent with existing regulations, or otherwise effects a

3  substantive change in existing law or policy"); *Syncor Int'l v. Shalala*, 127 F.3d 90, 94–95 (D.C.

4  Cir. 1997) (noting that "a substantive rule *modifies* or *adds* to a legal norm"); *Am. Mining Cong. v.*

5  *Mine Safety & Health Admin.*, 995 F.2d 1106, 1112 (D.C. Cir. 1993) (explaining that a rule is

6  legislative, inter alia, if there is no "adequate legislative basis for enforcement action" without the

7  rule, or if the rule "effectively amends a prior legislative rule"); *see also Clarian Health W., LLC*

8  *v. Hargan*, 878 F.3d 346, 357–58 (D.C. Cir. 2017) (treating legislative rules as binding upon the

9  agency, whereas interpretive rules and policy statements leave the agency "free to exercise

10  discretion").

11    222.    There are no circumstances that would create good cause for the Department to

12  forgo notice and comment in issuing the Letter's new rule. *See* 5 U.S.C. § 553(b)(B).

13    223.    The Department does not invoke the good cause exception in the Letter by

14  "incorporat[ing] the finding [of good cause] and a brief statement of reasons therefor" as required

15  by § 553(b)(B).

16    224.    In using the Letter to issue a legislative rule, Defendants have failed to follow the

17  procedural requirements of the APA. The offending paragraph of the Letter, and the conclusions

18  that flow from it, are therefore unlawful and must be set aside.

19                                    **COUNT EIGHT**

20                     **U.S. Constitution – First Amendment**
                            **(Against All Defendants)**
21

22    225.    The First Amendment provides that the federal government "shall make no

    law . . . abridging the freedom of speech." U.S. Const. amend. I.
23

24    226.    "[A]cademic freedom" is "a special concern of the First Amendment" and receives

25  heightened protection. *Keyishian v. Bd. of Regents of Univ. of N.Y.*, 385 U.S. 589, 603 (1967).

    This freedom protects "not only students and teachers, but their host institutions as well."
26

27  *Asociacion de Educacion Privada de P.R., Inc. v. Garcia-Padilla*, 490 F.3d 1, 8 (1st Cir. 2007)

28  (citation omitted). As the Supreme Court has recognized, "[a]cademic freedom thrives not only on

the independent and uninhibited exchange of ideas among teachers and students, but also . . . on autonomous decisionmaking by the academy itself." *Regents of Univ. of Mich. v. Ewing*, 474 U.S. 214, 226 n.12 (1985) (citations omitted).  Colleges and universities have a constitutionally protected right to "manage an academic community and evaluate teaching and scholarship free from [governmental] interference." *Blasdel v. Nw. Univ.*, 687 F.3d 813, 816 (7th Cir. 2012) (citation omitted).  After all, "[i]f there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein." *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943).

227.    Funding conditions that curtail a university's ability to govern itself or that demand it take institutional positions on contested topics can therefore "result in an unconstitutional burden on First Amendment rights." *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.* ("*AID*"), 570 U.S. 205, 214 (2013).  The government cannot "deny a benefit to a person on a basis that infringes his constitutionally protected interests." *Perry v. Sindermann*, 408 U.S. 593, 597 (1972).

228.    The terms of Defendants' Proposed Resolution Agreement "compel" SJSU to speak the government's "own preferred messages," or else face the "sanction[]" of the loss of federal funding. *303 Creative LLC v. Elenis*, 600 U.S. 570, 586, 588–89 (2023).  Specifically, the Agreement would require SJSU to make a public statement adopting OCR's preferred definitions of the words "Sex," "Female," "Male," "Woman," "Girl," "Man," and "Boy" for purposes of all SJSU policies; agreeing to the "fact[]" that "there are only two sexes (female and male) because there are only two types of gametes (eggs and sperm)"; and declaring that sex is "unchangeable." Ex. B at 2.  The Agreement would also require SJSU to send letters to certain female athletes "expressing apology for allowing [their] educational experience and participation in athletics to be marred by sex discrimination" and "expressing genuine regret and remorse that [they] were placed in a position in which they had to compete against a male athlete in an athletic program designed for women." *Id*. at 3.  OCR has made clear that rejecting these terms will result in the termination of federal funding.  *See id.*

229.    The First Amendment forbids such compelled speech, except when it survives strict scrutiny.  While the government is free to "define the limits of the government spending program," it cannot impose "conditions that seek to leverage funding to regulate speech outside the contours of the program itself." *AID*, 570 U.S. at 214–15.  Conditioning funding upon SJSU's agreement to "profess a specific belief" therefore impermissibly compels speech in violation of the First Amendment. *Id.* at 218.

230.    The Letter and Proposed Resolution Agreement also trigger strict scrutiny because they are content- and viewpoint-based.  They go far beyond requiring or securing SJSU's compliance with the law and instead dictate that SJSU make public statements reflecting specific beliefs about sex and gender and express certain sentiments, like remorse, in public and private communications with particular individuals of the government's choosing.  And unless SJSU makes these specific statements, in the way the government wants, SJSU stands to lose critical government funding.

231.    The government "bears the burden of proving the constitutionality of its actions." *FEC v. Cruz*, 596 U.S. 289, 305 (2022) (citation omitted).

232.    Defendants cannot reasonably argue that the conditions they seek to impose on SJSU are "the least restrictive means of achieving a compelling [governmental] interest." *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 607 (2021) (citation omitted).

233.    The conditions are overbroad because the statements the government would require of SJSU do not further any government interest.  The government's reading of Title IX directly contravenes Ninth Circuit precedent.  But even if it did not, SJSU can comply with the law without professing to certain beliefs about sex and gender or expressing remorse for complying with Ninth Circuit precedent.

234.    The conditions are also overbroad because Defendants have ignored less restrictive alternatives.  The government does not explain why an agreement in which SJSU agrees to follow the law would not be sufficient.

235.    SJSU's fear that Defendants will terminate or freeze federal funding, as they have threatened to do, is reasonable in light of the government's prior conduct with other institutions. *See Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 165–66 (2014).

236.    Because Defendants' actions in imposing viewpoint-based conditions on SJSU violate the First Amendment, those actions lack lawful authority.  This Court should declare them unconstitutional and ultra vires.

237.    Because Defendants' actions are unconstitutional and ultra vires, this Court should enjoin Defendants in their official capacities from imposing the freeze.

238.    If Defendants' actions are not declared unlawful, set aside, and enjoined as unconstitutional and ultra vires, SJSU will suffer substantial injury, including irreparable injury.

**COUNT NINE**

**Administrative Procedure Act, 5 U.S.C. § 706**
**Contrary to Law – First Amendment**
**(Against All Defendants)**

239.    The paragraphs above are incorporated and reasserted as if fully set forth herein.

240.    Under the Administrative Procedure Act ("APA"), a court shall "hold unlawful and set aside agency action . . . found to be . . . contrary to constitutional right, power, privilege, or immunity."  5 U.S.C. § 706(2)(B).

241.    As alleged in Count 8, Defendants' demand that SJSU adopt and profess certain highly politicized beliefs or else lose federal funding violates the First Amendment.

242.    For that reason, the Court should declare Defendants' actions unlawful and enjoin Defendants from engaging in future terminations, suspensions, or refusals to grant or to continue funding or work pursuant to the Letter of Findings or Proposed Resolution Agreement.

243.    The Letter of Findings and Proposed Resolution Agreement must be vacated and "set aside" under 5 U.S.C. § 706(2)(B).

244.    Without such an order, SJSU will suffer substantial injury, including irreparable injury.

**PRAYER FOR RELIEF**

245.    For the foregoing reasons, Plaintiff respectfully requests an order:

A.    Expediting the resolution of this action to prevent further harm to Plaintiff;

B.    Declaring that Defendants' Letter of Findings and Proposed Resolution Agreement violate the Administrative Procedure Act;

C.    Declaring that Defendants' Letter of Findings and Proposed Resolution Agreement violate the Spending Clause;

D.    Declaring that the Letter of Findings and Proposed Resolution Agreement violate the First Amendment;

E.    Vacating and setting aside the Letter of Findings and Proposed Resolution Agreement;

F.    Preliminarily and permanently enjoining Defendants, their agents, and all persons acting in concert or participating with Defendants from terminating, freezing, blocking, or refusing to grant SJSU's funding in violation of the Spending Clause, Title IX, and the Administrative Procedure Act or otherwise giving effect to the Letter of Findings or Proposed Resolution Agreement in any way;

G.    Preliminarily and permanently enjoining Defendants, their agents, and all persons acting in concert or participating with Defendants from violating Plaintiff's First Amendment rights;

H.    Entering judgment in favor of Plaintiff;

I.    Awarding Plaintiff its reasonable costs and attorneys' fees in accordance with the law, including but not limited to amounts available pursuant to 42 U.S.C. § 1988; and

J.    Issuing any and all other relief as the Court deems appropriate.

COMPLAINT

1    DATED:  March 6, 2026                    MUNGER, TOLLES & OLSON LLP

2

3                                             By:    _/s/ Bryan H. Heckenlively_
4                                                    Bryan H. Heckenlively
                                                     Attorneys for the Board of Trustees of the
5                                                    California State University

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28