# EXHIBIT A



UNITED STATES DEPARTMENT OF EDUCATION
OFFICE FOR CIVIL RIGHTS

January 28, 2026

Dr. Cynthia Teniente-Matson, President
San José State University
Office of the President
c/o Sophia Khan, University Counsel – Civil Rights
Office of the General Counsel
Clark Hall 555
One Washington Square
San Jose, CA 95192-0002
Sent via email to: skhan@calstate.edu

Re: OCR Case Number 09256902 – Letter of Findings (violation)

Dear President Teniente-Matson:

This letter is to inform you of the outcome of the investigation conducted by the U.S. Department of Education (Department), Office for Civil Rights (OCR), of San José State University, referenced above.

Title IX of the Education Amendments of 1972 (Title IX), 20 U.S.C. § 1681 *et seq*., and its implementing regulation, 34 C.F.R. Part 106,[1] prohibit discrimination on the basis of sex in any education program or activity receiving federal financial assistance. Recipients of federal financial assistance from the Department are subject to these laws and regulations and to OCR's enforcement jurisdiction. Additional information about the laws OCR enforces is available on OCR's website.

OCR investigated whether San José State University (the University) denies equal education benefits or opportunities to female student athletes through general or athletics-specific participation policies that permit males to participate in intercollegiate athletic programs designated for women, depriving women of equal athletic opportunities. OCR also examined whether San José State University denies female students the equal benefits of any education program or activity by denying females access to female-only intimate facilities, such as sex-separated locker rooms and bathrooms.[2]

In accordance with OCR's Case Processing Manual (February 19, 2025), OCR has reached its determination by using a preponderance-of-the-evidence standard, and finds that the evidence supports a conclusion of noncompliance with Title IX. As further explained below, Title IX's prohibition of discrimination on the basis of sex does not include "gender identity" or "gender-identity discrimination." "Sex," as used by Title IX, does not mean, and has never meant, "gender identity." Title IX and its implementing regulations have never used or defined the term "gender

---

[1] This matter cites to the Title IX regulations that are currently in force and that took effect August 14, 2020 (85 Fed. Reg. 30,026-30,579 (May 19, 2020). *See Tennessee v. Cardona*, 762 F. Supp. 3d 615, 626-28 (E.D. Ky. 2025).

[2] The terms "bathrooms" and "restrooms" are used interchangeably throughout this letter.

identity." When recipients of federal funding treat males who identify as females as if they are biological females, they defeat the very purpose of Title IX: to ensure equal opportunities for women and girls. Allowing males to compete in women's sports is demeaning, unfair, dangerous to women, and denies women the same equal opportunity to participate and excel in competitive sports afforded to men. And allowing males to invade intimate female-only facilities like locker rooms or bathrooms endangers women's safety, privacy, and dignity, while denying them equal access to educational activities or programs. San José State University allows males to participate in women's sports and to use women's locker rooms and bathrooms. The University has done so despite seeing women harmed during sporting events, displaced from podiums in athletic competitions, lose opportunities for advancement in competitions, miss out on critical visibility and recognition, and denied access to previously available athletic competition in programs designed for and dedicated to female-only student athletes. And it has done so despite seeing women suffer privacy and safety harms from their locker-room and bathroom policies—harms that are the obvious result of such policies. Thus, the University is in clear violation of Title IX.

## I.    Legal Standards

### A.    Statutory and Regulatory Background

Title IX states a general prohibition on "sex" discrimination in education programs or activities receiving federal funding: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving federal financial assistance." 20 U.S.C. § 1681(a).[3]

After that general ban on sex discrimination, Title IX lists various sex-based practices that the statute does not forbid. Recipients of federal funding, for example, may have traditionally sex-separated schools (*id.* § 1681(a)(5)), fraternities and sororities (*id.* § 1681(a)(6)), Boys and Girls State conferences (*id.* § 1681(a)(7)), and scholarships for "beauty" pageants (*id.* § 1681(a)(9)). Schools may also have father-daughter dances if they provide "reasonably comparable activities" for "the other sex." *Id.* § 1681(a)(8). And Title IX's ban on sex discrimination cannot be "construed" to prohibit "separate living facilities for the different sexes." *Id.* § 1686.

Title IX empowers and directs Federal departments and agencies to issue and enforce regulations to effectuate the provisions of Title IX. *See id.* § 1682. The Department has exercised this authority from the beginning, issuing regulations making clear that schools may have sex-separate bathrooms, athletic programs, among other things. *See* 40 Fed. Reg. 24,128, 24,141-43

---

[3] Title IX defines "educational institution" to include "any public or private . . . institution of . . . higher education, except that in the case of an educational institution composed of more than one school, college, or department which are administratively separate units, such term means each such school, college, or department." 20 U.S.C. § 1681(c). Similarly, 34 C.F.R. § 106.2(k) defines "educational institution" to include institutions of undergraduate higher education and institutions of graduate higher education. And Title IX defines "program or activity" to include: "a college, university, or other postsecondary institution . . . ; an entire corporation, partnership, or other private organization . . . if assistance is extended to such corporation, partnership, private organization; or which is principally engaged in the business of providing education, . . . ; or any other entity which is established by two or more of the entities described [herein]; any part of which is extended Federal financial assistance . . . ." 20 U.S.C. § 1687; *see also* 34 C.F.R. § 106.2(h).

(June 4, 1975). The general prohibition against sex discrimination appears at 34 C.F.R. § 106.31(a). Some specific applications appear at 34 C.F.R. § 106.31(b).

Regarding intimate facilities, the regulations require parity: "A recipient may provide separate toilet, locker room, and shower facilities on the basis of sex, but such facilities provided for students of one sex shall be comparable to such facilities provided for students of the other sex." 34 C.F.R. § 106.33.

And with regard to athletics, the regulations first state a general prohibition against sex-segregation:

> (a) General. No person shall, on the basis of sex, be excluded from participation in, be denied the benefits of, be treated differently from another person or otherwise be discriminated against in any interscholastic, intercollegiate, club or intramural athletics offered by a recipient, and no recipient shall provide any such athletics separately on such basis.

34 C.F.R. § 106.41(a). The regulations then state two exceptions:

> (b) Separate teams. Notwithstanding the requirements of paragraph (a) of this section, a recipient may operate or sponsor separate teams for members of each sex where selection for such teams is [1] based upon *competitive skill* or [2] the activity involved is a *contact sport*. However, where a recipient operates or sponsors a team in a particular sport for members of one sex but operates or sponsors no such team for members of the other sex, and athletic opportunities for members of that sex have previously been limited, members of the excluded sex must be allowed to try-out for the team offered unless the sport involved is a contact sport. For the purposes of this part, contact sports include boxing, wrestling, rugby, ice hockey, football, basketball and other sports the purpose or major activity of which involves bodily contact.

34 C.F.R. § 106.41(b) (emphasis added). Further, notwithstanding the general prohibition against sex segregation or the two exceptions in which sex-segregation is permitted, the regulations require that members of both sexes be afforded equal athletic opportunity:

> (c) Equal Opportunity. A recipient which operates or sponsors interscholastic, intercollegiate, club or intramural athletics shall provide equal athletic opportunity for members of both sexes. In determining whether equal opportunities are available the Director will consider, among other factors:
>
> > (1) Whether the selection of sports and levels of competition effectively accommodate the interests and abilities of members of both sexes;
> >
> > (2) The provision of equipment and supplies;
> >
> > (3) Scheduling of games and practice time;
> >
> > (4) Travel and per diem allowance;
> >
> > (5) Opportunity to receive coaching and academic tutoring;

(6) Assignment and compensation of coaches and tutors;

(7) Provision of locker rooms, practice and competitive facilities;

(8) Provision of medical and training facilities and services;

(9) Provision of housing and dining facilities and services;

(10) Publicity.

Unequal aggregate expenditures for members of each sex or unequal expenditures for male and female teams if a recipient operates or sponsors separate teams will not constitute noncompliance with this section, but the Assistant Secretary may consider the failure to provide necessary funds for teams for one sex in assessing equality of opportunity for members of each sex.

34 C.F.R. § 106.41(c).

The regulations also expressly prohibit discrimination based on sex in employment in an education program or activity:

No person shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination in employment, or recruitment, consideration, or selection therefor, whether full-time or part-time, under any education program or activity operated by a recipient which receives Federal financial assistance.

34 C.F.R. § 106.51(a)(1).

## B.    Title IX Prohibits Discrimination Based on "Sex," Not "Gender Identity"

Title IX states a general prohibition on "sex" discrimination in education programs or activities receiving federal funding: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving federal financial assistance." 20 U.S.C. § 1681(a). The term "sex" is both objective and binary. As used in Title IX, it does not mean, and has never meant, "gender identity."

When Congress passed Title IX in 1972, contemporaneous dictionaries defined "sex" as biological sex. *See Adams v. Sch. Bd. of St. Johns Cnty.*, 57 F. 4th 791, 812-13 (11th Cir. 2022) (en banc) (consulting nine contemporary dictionaries for definitions); *see id.* at 812-15 (finding Title IX refers to biological sex). What dictionaries establish, Title IX's context confirms. "Title IX and its implementing regulations include provisions that presuppose sex as a binary classification, and provisions in the Department's current [and longstanding] regulations . . . reflect this presupposition." *Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*, 85 Fed. Reg. 30,026, 30,178 (May 19, 2020). Section 1681(a)(2), for example, distinguishes between "institution[s] which admi[t] only students of one sex" and "institution[s] which admi[t] students of *both sexes*." 20 U.S.C. §1681(a)(2) (emphasis added). Section 1681(a)(8) similarly refers to sex in binary terms: If father-son or mother-daughter activities are provided for "one sex," then "reasonably comparable activities" must be provided for "the other sex." *Id.* § 1681(a)(8). And Title IX's implementing regulation on bathrooms, like other regulations, use the term "sex" in binary and biological terms. *See, e.g.*, 34 C.F.R. § 106.33

(authorizing "separate toilet, locker room, and shower facilities on the basis of sex" and making clear that "such facilities provided for students of *one sex* shall be comparable to such facilities provided to students of *the other sex*") (emphasis added); 85 Fed. Reg. at 30,178 ("In promulgating regulations to implement Title IX, the Department expressly acknowledged physiological differences between the male and female sexes."). Thus, all indicators of ordinary meaning show that "sex" in Title IX means biological sex and not influenced by subjective perceptions of one's own "gender." *See Alabama v. U.S. Sec'y of Educ.*, No. 24-12444, 2024 WL 3981994, at *4 (11th Cir. Aug. 22, 2024) ("the term 'sex' in Title IX 'unambiguously' referred to 'biological sex' and not 'gender identity'").

Consistent with "sex" meaning biological sex in Title IX, on January 20, 2025, and February 5, 2025, the President of the United States issued two Executive Orders that reaffirm the meaning of the term "sex" in Title IX:

> (a) "Sex" shall refer to an individual's immutable biological classification as either male or female. "Sex" is not a synonym for and does not include the concept of "gender identity."

> (b) "Women" or "woman" and "girls" or "girl" shall mean adult and juvenile human females, respectively.

> (c) "Men" or "man" and "boys" or "boy" shall mean adult and juvenile human males, respectively.

> (d) "Female" means a person belonging, at conception, to the sex that produces the large reproductive cell.

> (e) "Male" means a person belonging, at conception, to the sex that produces the small reproductive cell.

Executive Order 14168, *Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*, 90 Fed. Reg. 8,615-16 (Jan. 30, 2025); *see also* Executive Order 14201, *Keeping Men Out of Women's Sports*, 90 Fed. Reg. 9,279 (Feb. 11, 2025) (incorporating Executive Order 14168's definitions). And following the Executive Order 14168, the U.S. Department of Health and Human Services published definitions of "sex" and related words (such as "female," "male," "girl," "woman," "boy," and "man"), stating that "sex" means "a person's immutable biological classification as either male or female."[4]

Title IX and its implementing regulations never use the term "gender identity," let alone define the term, reinforcing that Title IX prohibits sex discrimination, not "gender identity" discrimination. And that makes sense: "gender identity" is subjective. As the President has explained, "gender identity" "reflects a fully internal and subjective sense of self, disconnected from biological reality and sex and existing on an infinite continuum, that does not provide a meaningful basis for identification and cannot be recognized as a replacement for sex." Executive Order 14168, 90 Fed. Reg. at 8,616. Indeed, as some courts have explained, "gender identity" is not a "'discrete'" category but "can describe 'a huge variety of gender identities and expressions.'"

---

[4] U.S. Dep't of Health and Human Services, Office on Women's Health, Sex-Based Definitions, https://womenshealth.gov/article/sex-based-definitions (Nov. 14, 2025).

*L.W. ex rel. Williams v. Skrmetti*, 83 F.4th 460, 487 (6th Cir.), *aff'd sub nom.*, 605 U.S. 495 (2025).[5] And according to a once blindly followed but now discredited organization, World Professional Association for Transgender Health (WPATH), someone can be "more than one gender identity simultaneously or at different times (*e.g.*, bigender)," "not have a gender identity or have a neutral gender identity (*e.g.*, agender or neutrois)," "have gender identities that encompass or blend elements of other genders (*e.g.*, polygender, demiboy, demigirl)," or "have a gender that changes over time (*e.g.*, genderfluid)." *Standards of Care for the Health of Transgender and Gender Diverse People*, World Prof. Ass'n Transgender Health, S80 (8th ed. 2022); *United States v. Skrmetti*, 605 U.S. 495, 544 (2025) (Thomas, J., concurring) ("WPATH appears to rest [its conclusions] on self-referencing consensus rather than evidence-based research."); *id.* at 547 (WPATH and other "prominent medical professionals . . . have built their medical determinations on concededly weak evidence" and "have surreptitiously compromised their medical recommendations to achieve political ends."). Even the ACLU contends that "transgender" means "a broad range of identities and experiences that fall outside of the traditional understanding of gender." *See* ACLU, *Transgender People and the Law*, at 19-20.[6]

Simply put, "gender identity" is not "ascertainable at the moment of birth." *L.W.*, 83 F.4th at 487; *Skrmetti*, 605 U.S. at 550-51 (Barrett, J., concurring) (explaining that someone's status as "transgender" is not "definitively ascertainable at the moment of birth," that "transgender status does not turn on an immutable characteristic," that "the transgender population [is not] a discrete group," and that the group's "boundaries . . . are not defined by an easily ascertainable characteristic that is fixed and consistent across the group" (cleaned up)); *id.* at 566 (Alito, J., concurring in part and in the judgment) ("Transgender status is not 'immutable,' and as a result, persons can and do move into and out of the class. Members of the class differ widely among themselves, and it is often difficult for others to determine whether a person is a member of the class."); *id.* at 576-77(similar). Or, as the Department of Health and Human Services has explained, "[i]t may be true that a person's gender identity is subjective[,] . . . but the more critical point is that no tolerably clear definition of 'gender identity' has been offered in the first place."[7] Quite sensibly, therefore, neither Title IX nor its implementing regulation address "gender identity."

In short, Title IX's bar on sex discrimination does not include discrimination on the basis of the subjective perception of one's own "gender." As many courts have rightly concluded, "the term 'sex' in Title IX 'unambiguously' refer[s] to 'biological sex' and not 'gender identity.'" *Alabama*, 2024 WL 3981994, at *4; *accord, e.g.*, *Tennessee v. Cardona*, No. 24-5588, 2024 WL 3453880, at *2 (6th Cir. July 17, 2024); *Adams v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791, 814-15 (11th Cir. 2022) (en banc); *Kansas v. United States Dep't of Educ.*, 739 F. Supp. 3d 902, 920

---

[5] In a recent seminal decision, the Supreme Court rejected an equal-protection challenge to a State's child-protection law that prohibited providing controversial medical interventions to minors to address gender dysphoria. *United States v. Skrmetti*, 605 U.S. 495 (2025). The Court concluded that the challenged law was subject to rational-basis review because it did not classify based on sex or "transgender status." *Id.* at 510-15, 517-19. The law, the Court explained, easily passed the rational-basis standard because of the "medical and scientific uncertainty" surrounding interventions for "gender dysphoria." *Id.* at 522-25.

[6] https://www.aclu.org/sites/default/files/field_pdf_file/lgbttransbrochurelaw2015electronic.pdf.

[7] *Treatment for Pediatric Gender Dysphoria: Review of Evidence and Best Practices*, U.S. Department of Health and Human Services, 34 (May 1, 2025), https:// opa.hhs.gov/gender-dysphoria-report.

(D. Kan. 2024); *Tennessee v. Cardona*, 737 F. Supp. 3d 510, 530-36 (E.D. Ky. 2024); *Louisiana v. U.S. Dep't of Educ.*, 737 F. Supp. 3d 377, 399-400 & nn.48-49 (W.D. La. 2024); *Carroll Indep. Sch. Dist. v. U.S. Dep't of Educ.*, 741 F. Supp. 3d 515, 520-25 (N.D. Tex. 2024).

Contemporaneous post-enactment history confirms Title IX does not include discrimination based on "gender identity." Shortly after Title IX was enacted in 1972, Congress passed the Javits Amendment, which directed the Department of Education's predecessor to create regulations "implementing . . . [T]itle IX," which "shall include" regulations on "intercollegiate athletic activities." 88 Stat. 484, 612 (1974). The agency then issued regulations that allow sex separation in many contexts—including sports. 40 Fed. Reg. 24,128, 24,141-43 (June 4, 1975).[8] Those contemporaneous regulations, nearly all of which still exist today, are strong evidence of Title IX's original public meaning. *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 394 (2024) ("[I]nterpretations issued contemporaneously with the statute at issue, and which have remained consistent over time, may be especially useful in determining the statute's meaning."); *id.* at 370 ("Such respect was thought especially warranted when an Executive Branch interpretation was issued roughly contemporaneously with enactment of the statute and remained consistent over time.").[9] In fact, that evidence is even stronger here because Congress had the chance to disapprove of these regulations before they went into effect and chose not to. *See Grove City Coll. v. Bell*, 465 U.S. 555, 568 (1984); *N. Haven Bd. of Educ. v. Bell*, 456 U.S. 512, 530-35 (1982). Reading Title IX's bar on sex discrimination to wholesale include "gender-identity discrimination," as some wrongly claim, would eviscerate these contemporaneous regulatory interpretations of Title IX, including the regulation on athletics. That "highly counterintuitive result" cannot be right. *See Yellen v. Confederated Tribes of Chehalis Rsrv.*, 594 U.S. 338, 360 (2021).

Congress's actions for more than 50 years following Title IX's enactment further confirm that Title IX's bar on sex discrimination does not include "gender-identity discrimination." In other statutory contexts, Congress has acted affirmatively to address gender-identity discrimination as a distinct category separate from sex discrimination. For example, when Congress enacted the

---

[8] *E.g.*, 40 Fed. Reg. 24,137, 24,142-43 (July 4, 1975) (presently at 34 C.F.R. §106.41(b) ("a recipient may operate or sponsor separate teams for members of each sex where selection for such teams is based upon competitive skill or the activity involved is a contact sport")); 40 Fed. Reg. at 24,141 (presently at 34 C.F.R. § 106.43 ("If use of a single standard of measuring skill or progress in physical education classes has an adverse effect on members of one sex, the recipient shall use appropriate standards that do not have that effect.")); 40 Fed. Reg. at 24,141 (presently at 34 C.F.R. § 106.32(b) (A recipient "may provide separate housing on the basis of sex" provided the housing provided "to students of one sex, when compared to that provided to students of the other sex, shall be" proportionate and comparable); 40 Fed. Reg. at 24,141 (presently at 34 C.F.R. § 106.33 ("A recipient may provide separate toilet, locker room, and shower facilities on the basis of sex, but such facilities provided for students of one sex shall be comparable to such facilities provided for students of the other sex.")).

[9] *See also* Revised Letter of Impending Enforcement Action, Connecticut Interscholastic Athletic Conference, *et al.*, Case Nos. 01-19-4025, 01-19-1252, 01-20-1003, 01-20-1004, 01-20-1005, 01-20-1006, and 01-20-1007, at 34 (Aug. 31, 2020) (looking to contemporaneous actions to demonstrate that "Title IX was passed . . . to protect equal athletic opportunity for students who are biological females, including [in] sex-segregated athletics").

Matthew Shepard and James Byrd, Jr. Hate Crimes Prevention Act of 2009, Pub. L. No. 111-84, Div. E., 123 Stat. 2190 (2009), Congress found that the "incidence of violence motivated by the actual or perceived race, color, religion, national origin, *gender*, sexual orientation, *gender identity*, or disability of the victim poses a serious national problem." 34 U.S.C. § 30501(1) (emphases added). Similarly in 2013, Congress amended the Violence Against Women Act to create a federal government enforcement action that protected the separate bases of sex and gender identity. *See* 34 U.S.C. § 12291(b)(13)(A) (2013), as amended by Pub. L. No. 113-4, § 3, 127 Stat. 56 (2013) (prohibiting discrimination in certain federally funded programs "on the basis of actual or perceived race, color, religion, national origin, *sex, gender identity* (as defined in [18 U.S.C. § 249(c)(4)]), sexual orientation, or disability" (emphasis added)). These post-Title IX enactments show that Congress recognizes the difference between "sex" and "gender identity" and prohibits discrimination based on "gender identity" when it so intends; it did not do so in Title IX. *DHS v. MacLean*, 574 U.S. 383, 394 (2015).[10]

### C.    Title IX's Exceptions for Sex-Segregated Intimate Facilities and in Athletics Are Rooted in Bona Fide Biological Distinctions Between the Two Sexes

As noted above, Title IX permits recipients to segregate students based on sex in intimate facilities, as long as the facilities "provided for students of one sex shall be comparable to such facilities provided for students of the other sex." 34 C.F.R. § 106.33. And regarding athletics, such sex-based segregation is permitted "where selection for such teams is [1] based upon *competitive skill* or [2] the activity involved is a *contact sport*." 34 C.F.R. § 106.41(b) (emphasis added). Both exceptions are based on actual and relevant biological distinctions between males and females.

### 1.    Intimate Facilities

Making distinctions based on relevant biological differences between the sexes is not prohibited sex discrimination under Title IX. Title IX states a general prohibition on "sex" discrimination in education programs or activities receiving federal funding. 20 U.S.C. § 1681(a). Discrimination in Title IX, just as elsewhere, means treating individuals or groups that "are similarly situated differently without sufficient justification for the difference in treatment." *Alabama Dep't of Revenue v. CSX Transp., Inc.*, 575 U.S. 21, 26 (2015); *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 174 (2005). Thus, because the two sexes are usually similarly situated when it comes to educational programs, Title IX usually prohibits sex separation in academic programs. *See, e.g.*, 34 C.F.R. § 106.31(b), 106.34(a); *but see* 34 C.F.R. 106.34(b).

Critically, not *all* sex-based classifications are prohibited discrimination under Title IX. Acknowledging material biological differences between the sexes, Congress explicitly clarified

---

[10] *Bostock v. Clayton County*, 590 U.S. 644 (2020), is not to the contrary. *Bostock*, a Title VI case, does not extend to Title IX, and certainly not to sex-segregated athletics and intimate facilities, which are both expressly authorized under Title IX. Further, even on its own reasoning, *Bostock* would not yield a result different than the one articulated here. Unlike in *Bostock*, males and females are not similarly situated when it comes to athletics and intimate facilities, given their pertinent and real biological differences. Thus, treating all males as males (and all females as females) for the purposes of sex-segregated athletics and intimate facilities, notwithstanding each student's subjective perceptions of their "gender," is not, and logically cannot be, prohibited by Title IX.

that Title IX's general bar on sex discrimination must not "be *construed* to prohibit any" federal-funding recipient "from maintaining separate living facilities for the different sexes." 20 U.S.C. § 1686 (emphasis added).

In particular, when students are in a state of undress, the biological differences between the sexes are pronounced and paramount. It is for that reason that Title IX's implementing regulations have, since Title IX's enactment, permitted separation based on sex in intimate facilities, authorizing "separate toilet, locker room, and shower facilities on the basis of sex." 34 C.F.R. § 106.33. That regulation, which was reviewed by Congress before becoming effective, "accurately reflect[s] congressional intent" and reflects the statute's original public meaning. *Grove City*, 465 U.S. at 568; *Loper Bright*, 603 U.S. at 394.

"In light of the privacy interests that arise from the physical differences between the sexes, it has been commonplace and universally accepted—across societies and throughout history—to separate on the basis of sex those public restrooms, locker rooms, and shower facilities that are designed to be used by multiple people at a time." *Grimm*, 972 F.3d at 634 (Niemeyer, J., dissenting). "[T]he privacy afforded by sex-separated bathrooms has been widely recognized throughout American history and jurisprudence. In fact, 'sex-separation in bathrooms dates back to ancient times, and, in the United States, preceded the nation's founding.'" *Adams*, 57 F.4th at 805.

Unsurprisingly, "courts have long found a privacy interest in shielding one's body from the opposite sex in a variety of legal contexts," which is why "[t]he protection of students' privacy interests in using the bathroom away from the opposite sex and in shielding their bodies from the opposite sex is obviously an important governmental objective." *Id.* at 804-05. Including the Supreme Court: The Court acknowledged that admitting women to the Virginia Military Institute for the first time "would undoubtedly require alterations necessary to afford members of each sex privacy from the other sex in living arrangements." *United States v. Virginia*, 518 U.S. 515, 550 n.19 (1996). Indeed, "as then-Professor Ruth Bader Ginsburg noted, 'separate places to disrobe, sleep, and perform personal bodily functions are permitted, *in some situations required*, by regard for individual privacy." *Adams*, 57 F.4th at 804 (emphasis in original) (alterations omitted) (quoting Ruth Bader Ginsburg, The Fear of the Equal Rights Amendment, Wash. Post, Apr. 7, 1975, at A21).

Title IX recognizes as much. It thus allows recipients to assign sex-segregated living facilities, bathrooms, locker rooms, and shower facilities. 20 U.S.C. § 1686; 34 C.F.R. §§ 106.32(b), 106.33. Those rules are grounded in students' privacy, safety, and dignitary interest in using intimate facilities away from students of the opposite sex and in shielding their bodies from students of the opposite sex while in intimate facilities. Conversely, permitting people of the opposite sex into such sex-segregated spaces undermines those privacy, safety, and dignitary interests. *See, e.g.*, Reem Alsalem, *Special Rapporteur on Violence Against Women and Girls, Its Causes and Consequences*, U.N. Doc. A/79/325 at 5/24 (August 27, 2024), https://docs.un.org/en/A/79/325 (indicating that policies denying female students sex-separated intimate facilities increases the risk of sexual harassment, assault, voyeurism, and physical and sexual attacks in unisex locker rooms and toilets).

Thus, segregating intimate facilities on the basis of each person's subjective perceptions of their own "gender" does not merely read words into the regulation that are not there. It affirmatively violates Title IX by imposing on women and girls the very harms that Title IX and its implementing regulation 34 C.F.R. § 106.33 was intended to prevent. Title IX permits recipients

to segregate intimate facilities based on sex. It *prohibits* them from segregating intimate facilities based on subjective "gender identity."

### 2.     Contact Sports

Title IX similarly permits recipients to operate sex-segregated athletics programs in sports "the purpose or major activity of which involves bodily contact." 34 C.F.R. § 106.41(b). There are two rationales for this exception. The first relates to student safety: Women tend to be lighter and smaller than men, thus putting women who are compelled to compete with men in contact sports in a significantly greater risk of danger. (As we discuss further below, the pertinent differences between men and women turn on biology, not subjective perception of one's "gender.")

The second rationale for the contact sports exception is similar to the rationale for segregating intimate spaces. Contact sports, such as wrestling and rugby, compel competitors to be in regular close—sometimes intimate—physical contact. The regulations rightly recognize that compelling men and women to wrestle against each other, for example, would often involve unwanted physical contact that is exceptionally intrusive and may even be perceived to be sexual in nature. For younger students, natural curiosity about the differences between the sexes might cause students in exceptionally close physical contact with members of the opposite sex to explore the ways in which their competitor's body differs from their own. For older students, sexual attraction might motivate a student to engage a competitor in ways that he or she would not have but for that sexual attraction. And for the student being touched, the mere *perception* (even if it is not true) that he or she is being touched due to sexual curiosity or sexual attraction can be exceptionally uncomfortable, distracting, and possibly even traumatic. The need to protect personal privacy could not be greater than where it involves potential unwanted or inappropriate direct physical contact that is or is perceived to be sexual in nature.

The regulations therefore permit recipients to draw a bright line, segregating participation in contact sports on the basis of sex, even if that means that members of one sex are denied the opportunity to play that particular contact sport. *See* 34 C.F.R. § 106.41(b) (distinguishing the competitive skill and contact sport rationales on this point); *but see* 34 C.F.R. § 106.41(c) (demanding "equal athletic opportunity for members of both sexes").

To be sure, unwanted or inappropriate physical contact, including sexual contact, can and does occur between members of the same sex. But eliminating that from student athletics entirely would require a ban on all contact sports. The regulations, quite rightly, impose no such categorical prohibition. Instead, recognizing that the likelihood of unwanted or inappropriate touching is far greater when members of *different* sexes compete against each other in contact sports, the regulations permit recipients to keep contact sports limited to members of a single sex, who all share the same biological features.

### 3.     Competitive Skill

The regulations further permit recipients to segregate components of their athletics program on the basis of sex when "selection for such teams is based upon competitive skill." 34 C.F.R. § 106.41(b). The regulations thus acknowledge an obvious truth: men and women are different, not just in appearance but also in their physical abilities.

"It is beyond dispute that, barring rare genetic mutations not at issue here, a person either has male sex chromosomes or female sex chromosomes," and this biological trait "determines many of the physical characteristics relevant to athletic performance." *B.P.J. v. W. Virginia State*

*Bd. of Educ.*, 98 F.4th 542, 567 (4th Cir. 2024) (Agee, J., dissenting in relevant part), *cert. granted*, No. 24-43, 2025 WL 1829164 (U.S. July 3, 2025). On average, males and females differ with respect to attributes like height, weight, bone structure, muscle mass, and heart and lung capacity. *See, e.g.*, *id.* at 567-68; *Adams*, 57 F.4th at 819-20 (Lagoa, J., concurring) (discussing scientific literature regarding biological advantages of males over females in many sports). This results in males being stronger and faster than females, all else being equal—*i.e.*, if they have had similar environmental experiences and possess similar genetic traits other than the different sex chromosome.

This biological fact has legal implications. For example, in *United States v. Virginia*, the Supreme Court found that admitting women to a previously all-male military academy "would undoubtedly require" that institution "to adjust aspects of the physical training programs." 518 U.S. 515, 550 n.19 (1996). Similarly, in *Bauer*, the Fourth Circuit recognized that "[m]en and women simply are not physiologically the same for the purposes of physical fitness programs." 812 F.3d at 350. "[T]o account for the[se] innate physiological differences," the FBI has adopted sex-normed physical-fitness standards for special agents: *e.g.*, men must do 30 push-ups and run 1.5 miles in 12 minutes and 24 seconds, whereas women need only do 14 push-ups and run 1.5 miles in 13 minutes and 59 seconds. *See id.* at 343-44; U.S. Fed. Bureau of Investigation, U.S. Dep't of Justice, Special Agent Physical Requirements, https://fbijobs.gov/special-agents/physical-requirements. The Fourth Circuit held that the adoption or implementation of such sex-based standards do not constitute discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a). *Bauer*, 812 F.3d at 351. Congress has likewise recognized that "physiological differences between male and female individuals" warrant sex-based differences in physical-fitness admissions standards at military academies. Pub. L. No. 94-106, Tit. VIII, § 803(a), Oct. 7, 1975, 89 Stat. 537-538 (10 U.S.C. § 7442 note).

So too with regard to Title IX: the regulations permit recipients to separate males and females in their athletics programs to the extent that doing so reflects a difference in the competitive skill of the sexes. 34 C.F.R. § 106.41(b).[11]

### D. Equal Athletic Opportunity is Denied When Men Are Permitted to Play in Women's Sports

The regulations further require "[a] recipient which operates or sponsors interscholastic, intercollegiate, club or intramural athletics shall provide equal athletic opportunity for members

---

[11] Though the sexes' divergence in athletic performance grows in adulthood, it rests on innate biological differences that exist at birth and manifest during childhood. Sex chromosomes give rise to "pre-puberty physical differences that affect athletic performance." *Adams*, 57 F.4th at 819 (Lagoa, J., specially concurring); *see B.P.J.*, 98 F.4th at 568 (Agee, J., dissenting in relevant part) ("there is evidence that biological boys have a competitive advantage over biological girls even before puberty"). The undeniable physiological differences between males and females provide boys and men with inherent advantages in strength, speed, and physicality that pre-determine the outcome of athletic contests. "Males and females are materially different with respect to the main physical attributes that contribute to athletic performance." Doriane Lambelet Coleman et. al., *Re-Affirming the Value of the Sports Exception to Title IX's General Non-Discrimination Rule*, 27 Duke J. Gender L. & Pol'y 69, 92 (2020) (citing *The Role of Testosterone in Athletic Performance*, Duke Ctr. for Sports Law & Policy (Jan. 2019)). https://law.duke.edu/sites/default/files/centers/sportslaw/Experts_T_Statement_2019.pdf.

of both sexes." 34 C.F.R. § 106.41(c). The regulations provide a list of factors that OCR considers when assessing the equality of opportunity, and direct OCR not to rest any decision on "[u]nequal aggregate expenditures for members of each sex." *Id.* This often yields a complex multi-factor analysis. Not so here.

As explained above, 34 C.F.R. § 106.41(a) prohibits discrimination on the basis of sex in athletics programs. 34 C.F.R. § 106.41(b) permits recipients to offer sex-segregated athletics in certain specific contexts. Within those contexts, men are able to participate on male-only teams. Sections 106.41(b) (for non-contact sports) and 106.41(c) both generally require that women be afforded the opportunity to participate on corresponding female-only teams.

Recipients that permit men to compete on women's teams on the basis of their subjective perception of their "gender" thus presumptively violate § 106.41(c) and § 106.41(b) (for non-contact sports). Such recipients allow men to engage in fair and safe competition against other men while subjecting women to unfair and unsafe conditions, subjecting them to risk of injury, displacing them from podiums in athletic competitions, causing them to lose opportunities for advancement to regional and national competitions, and to miss out on critical visibility for future opportunities and recognition. That unequal treatment denies them "equal athletic opportunity" in violation of Title IX. 34 C.F.R. § 106.41(c); *see* Executive Order 14,201, 90 Fed. Reg. at 9279 ("In recent years, many educational institutions and athletic associations have allowed men to compete in women's sports. This is demeaning, unfair, and dangerous to women and girls, and denies women and girls the equal opportunity to participate and excel in competitive sports."); *McCormick v. Sch. Dist. of Mamaroneck*, 370 F.3d 275, 294-95 (2d Cir. 2004) ("Treating girls differently regarding a matter so fundamental to the experience of sports—the chance to be champions—is inconsistent with Title IX's mandate of equal opportunity for both sexes.").

Title IX's purpose confirms as much. *See Abramski v. United States*, 573 U.S. 169, 179 (2014) ("[The Court] must (as usual) interpret the relevant words not in a vacuum, but with reference to the statutory context, structure, history, and purpose." (quotation marks omitted)). Title IX was manifestly passed to promote "girls' and women's rights." *Adams*, 57 F.4th at 817 (Lagoa, J., concurring); *see McCormick*, 370 F.3d at 286 ("Title IX was enacted in response to evidence of pervasive discrimination against women with respect to educational opportunities."). And Title IX has achieved substantial success in that regard, especially in the realm of sports. "[O]ne need not look further than the neighborhood park or local college campus to see the remarkable impact Title IX has had on girls and women in sports." *Adams*, 57 F.4th at 818 (Lagoa, J., concurring). "In 1971, before Congress enacted the statute, approximately 300,000 girls and 3.67 million boys played competitive high school sports nationwide." *McCormick*, 370 F.3d at 286. Today, Title IX "has had stellar results." *Louisiana*, 737 F. Supp. 3d at 390. By 1999, 2.6 million girls participated in interscholastic athletics. By 2011, that number was 3.25 million. *Id.*

Policies or practices that "comingl[e] both biological sexes in the realm of female athletics" have "vast societal consequences" and "threaten to undermine one of Title IX's major achievements, giving young women an equal opportunity to participate in sports." *Adams*, 57 F.4th at 818, 821 (Lagoa, J., concurring) (brackets omitted); *see Clark v. Arizona Interscholastic Ass'n* (*Clark II*), 886 F.2d 1191, 1193 (9th Cir. 1989) ("If males are permitted to displace females on the school volleyball team even to the extent of one player . . . ., the goal of equal participation by females in interscholastic athletics is set back, not advanced."). This confirms that creating new

extra-statutory privileges based on "gender identity" for otherwise sex-separate sports violates Title IX.[12]

### E. Recipients Must Provide a Prompt and Equitable Resolution to Student and Employee Complaints of Sex Discrimination.

Title IX's regulations provide that "[a]ny person may report sex discrimination, including sexual harassment (whether or not the person reporting is the person alleged to be the victim of conduct that could constitute sex discrimination or sexual harassment)" and  require the recipient to "adopt and publish grievance procedures that provide for the prompt and equitable resolution of student and employee complaints alleging any action that would be prohibited by this part. . . ." 34 C.F.R. § 106.8. If OCR determines that a student or employee was discriminated against on the basis of sex, the recipient is responsible to determine what occurred and to respond appropriately. OCR evaluates the appropriateness of the responsive action by assessing, among other matters, whether the response was prompt and equitable. *See* 34 C.F.R. §§ 106.8(b)(2); 106.44; 106.45; 106.46.  What constitutes a reasonable response to discrimination will depend on the circumstances.  But in all cases, the recipient must conduct a prompt, adequate, and impartial inquiry designed to reliably determine what occurred, and, if discrimination is found, the recipient must take reasonable, timely, age-appropriate, and effective corrective action, including steps tailored to the specific situation. *See id.*

### F. The Office for Civil Rights Has Authority to Enforce Title IX and Its Implementing Regulations Against Noncompliant Recipients of Federal Funding.

If OCR "finds that a recipient has discriminated against persons on the basis of sex in an education program or activity under this part, or otherwise violated this part," then the noncompliant "recipient must take such remedial action" as OCR "deems necessary to remedy the violation, consistent with 20 U.S.C. § 1682." 34 C.F.R. § 106.3.

As a condition of receiving federal financial assistance from the Department of Education, a recipient must make an assurance that the education program or activity will be operated in compliance with Title IX. 34 C.F.R. § 106.4(a). The obligation to comply with Title IX is "not obviated or alleviated by any State or local law" or "by any rule or regulation of any organization, club, athletic or other league, or association," except to the extent required by the U.S. Constitution. 34 C.F.R. § 106.6(b)-(d).

34 C.F.R. § 106.81 incorporates "[t]he procedural provisions applicable to Title VI of the Civil Rights Act of 1964," which are codified at "34 CFR 100.6 through 100.11 and 34 CFR part 101." 34 C.F.R. § 100.7 authorizes OCR to investigate possible deprivations of the rights protected

---

[12] To explain the meaning of "equal athletic opportunity" and "effective accommodation" under 34 C.F.R. § 106.41(c), OCR issued a Policy Interpretation, entitled Title IX of the Education Amendments of 1972—A Policy Interpretation: Title IX and Intercollegiate Athletics, 44 Fed. Reg. 71,413 (1979) ("Policy Interpretation"). The Policy Interpretation provides a "three-part test" to assess compliance. *See Berndsen v. N. Dakota Univ. Sys.*, 7 F.4th 782, 786 (8th Cir. 2021). The "three-part test" can be, and has been, used by OCR and courts to apply § 106.41(c). *It is not applicable here*. The three-part test is a helpful tool to determine when efforts to provide women with an equal athletic opportunity have been effective. It has nothing to say when, as here, women have been *denied* access to sex-segregated athletics opportunities.

by the statutes within its jurisdiction. And 34 C.F.R. § 100.8(c)-(d) authorizes, *inter alia*, "the suspension or termination of or refusal to grant or to continue federal financial assistance" or referral "to the Department of Justice with a recommendation that appropriate proceedings be brought to enforce any rights of the United States under any law of the United States."

Moreover, all federal grant recipients from the Department are required to comply with all applicable federal laws, including Title IX, and all related Executive Orders. 34 C.F.R. § 75.500.

### G.    Recipients of Federal Funding Must Provide OCR Access to Sources of Information Pertinent to Ascertain Compliance with Title IX

The regulations further provide:

> *Access to sources of information.* Each recipient shall permit access by the responsible Department official or his designee during normal business hours to such of its books, records, accounts, and other sources of information, and its facilities as may be pertinent to ascertain compliance with this part. Where any information required of a recipient is in the exclusive possession of any other agency, institution or person and this agency, institution or person shall fail or refuse to furnish this information the recipient shall so certify in its report and shall set forth what efforts it has made to obtain the information. Asserted considerations of privacy or confidentiality may not operate to bar the Department from evaluating or seeking to enforce compliance with this part. Information of a confidential nature obtained in connection with compliance evaluation or enforcement shall not be disclosed except where necessary in formal enforcement proceedings or where otherwise required by law.

34 C.F.R. § 100.6(c). In accordance the Family Educational Rights and Privacy Act (FERPA), 20 U.S.C. § 1232g, and FERPA's implementing regulation at 34 C.F.R. § 99.31(a)(3)(iii), OCR is authorized to review personally identifiable information in a recipient's records without redaction of private or confidential student information.

## II.    Findings of Fact

### A.    San José State University is a Recipient of Federal Funding and Subject to Title IX and to OCR's Enforcement Authority.

San José State University is a member of the California State University system and is currently, and has been for many years, a recipient of federal financial assistance from the Department.

The University first entered into an agreement to comply with federal law as a condition of eligibility in 1965. To continue eligibility for federal funding, San José State University signed a U.S. Department of Education Federal Student Aid School Eligibility and Oversight Service Group – Program Participation Agreement (PPA) on August 30, 2024, which states in part: "The execution of this Agreement by the Institution and the Secretary is a prerequisite to the Institution's initial or continued participation in any Title IV [of the Higher Education Act] HEA Program . . . and further agrees that such participation is subject to the Institution's compliance with the terms and conditions set forth in this Agreement." The Agreement covers San José State University's eligibility to participate in programs such as the Federal Pell Grant Program, Federal Family

Education Loan Program, Federal Direct Student Loan Program, Federal Perkins Loan Program, and the Federal Work-Study Program, just to name a few. As a condition of the Agreement, San José State University "agrees to comply with: Title IX of the Education Amendments of 1972 and the implementing regulation, 34 C.F.R. Part 106 (nondiscrimination on the basis of sex)." The current PPA expires September 30, 2028.

Further, as explained above, all federal grant recipients from the Department, including San José State University, are required to comply with all applicable federal laws, including Title IX, and all related Executive Orders. 34 C.F.R. § 75.500. As a recipient of federal financial assistance from the U.S. Department of Education, San José State University is subject to Title IX, its implementing regulations, Executive Order 14168, *Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*, 90 Fed. Reg. 8,615-16 (Jan. 30, 2025), Executive Order 14201, *Keeping Men Out of Women's Sports*, 90 Fed. Reg. 9,279 (Feb. 11, 2025) (incorporating Executive Order 14168's definitions), and to OCR's enforcement jurisdiction.

**B.    San José State University Men's and Women's Athletic Programs**

**1.    Sex-Separated Men's and Women's Athletic Programs at San José State University**

Historically, intercollegiate athletic opportunities for women in the United States have been limited, but the same cannot be said for men. For example:

> Participation in intercollegiate sports has historically been emphasized for men but not women. Partially as a consequence of this, participation rates of women are far below those of men. During the 1977-78 academic year women students accounted for 48 percent of the national undergraduate enrollment (5,496,000 of 11,267,000 students). Yet only 30 percent of the intercollegiate athletes are women. The historic emphasis on men's intercollegiate athletic programs has also contributed to existing differences in the number of sports and scope of competition offered men and women.

*Policy Interpretation*, 44 Fed. Reg. at 71,419; *see also* Women's Sports Foundation, 50 Years of Title IX infographic (2022).[13]

Because there is sufficient interest and ability among San José State University students to sustain viable women-only intercollegiate athletic teams, and there is a reasonable expectation of intercollegiate competition for women's teams, San José State University has provided a variety of sex-separated athletic programs for men and women. A variety of sex-separated athletic programs is a proven way to provide equal athletic opportunities for girls and women. *See, e.g.*, *Clark I*, 695 F.2d at 1131 ("[T]he governmental interest claimed is redressing past discrimination against women in athletics and promoting equality of athletic opportunity between the sexes. There is no question that this is a legitimate and important governmental interest."). Following is an example of some of the sex-separated intercollegiate athletic programs provided by San José State University for men and women:

**Men's Programs**

---

[13] https://www.womenssportsfoundation.org/wp-content/uploads/2022/04/FINAL6_WSF-Title-IX-Infographic-2022.pdf.

- Baseball
- Basketball
- Cross Country
- Football
- Golf
- Soccer
- Track & Field
- Water Polo

**Women's Programs**
- Basketball
- Beach Volleyball
- Cross Country
- Golf
- Gymnastics
- Soccer
- Softball
- Swimming & Diving
- Tennis
- Track & Field
- Volleyball
- Water Polo

The evidence obtained by OCR indicates that prior to April 2022, San José State University had not recruited or permitted men to participate in intercollegiate athletic programs designated for women. Although OCR was unable to locate a specific San José State University policy that explicitly permits or prohibits men from participating in intercollegiate athletic programs designated for women, historically, San José State University has provided many intercollegiate athletic programs separated by sex, and only by sex. It was not until April 2022, that the University began knowingly and actively recruiting a male player to join the women's indoor volleyball team.

The University's own actions of historically providing sex-separated intercollegiate athletic programs implicitly recognize biological differences between men and women that are so significant such that the differences between the sexes justify sex-separated intercollegiate athletic programs in many sports. The need for intercollegiate athletic teams separated by sex is further evidenced by the different equipment authorized for use in men's and women's intercollegiate athletic competitions for several sports. Some examples of differences in NCAA sanctioned intercollegiate athletic competitions that would constitute impermissible sex discrimination unless supported by the fact men have pertinent biological advantages over women include:

- Volleyball: Men play with a higher net. The net height for women's volleyball is 7 feet 4 1/8 inches, and the Men's net is 7 feet 11 5/8 inches.

- Hurdles: Men's hurdles are considerably higher. Men's High Hurdles (110m, 60m indoor): 42 inches; Women's High Hurdles (100m, 60m indoor): 33 inches; Men's Intermediate Hurdles (400m): 36 inches; Women's Intermediate Hurdles (400m): 30 inches; Men's Steeplechase: 36 inches; Women's Steeplechase: 30 inches.

- Shot Put: The minimum men's shot put weighs 7.26 kg (16 lbs.) and the minimum women's shot put weighs 4 kg (9 lbs.); The men's shot put measures 110–130 mm (4.3–5.1 inches) in diameter; The women's shot put measures 95–110 mm (3.7–4.3 inches) in diameter.

- Discus: Men's Discus weighs 2.0 kilograms (4.4 pounds) and has a diameter of 22 centimeters (8.66 inches); Women's Discus: weighs 1.0 kilogram (2.2 pounds) and has a diameter of 18 centimeters (7.09 inches).

- Basketball: Men play with a larger and heavier ball and for longer stretches of time between official stoppage of play. The basketball used in women's games is smaller (28.5 inches in circumference) and lighter than the ball used in men's games (29.5 inches); Women play four 10-minute quarters, whereas men play two 20-minute halves.

Because of the obvious biological advantages men have over women in athletics, the University has, for many years, offered sex-separated athletics programs in order to fulfill its antidiscrimination and equal opportunity obligations under Title IX. 34 C.F.R. § 106.41. Then, in April 2022, without any corresponding change to the Title IX athletics regulations, the University recruited and began allowing a male athlete to compete in intercollegiate athletic programs designated for women, specifically women's indoor volleyball and women's beach volleyball. OCR finds that the change in the University's policy and practice eliminated the availability of all-female intercollegiate volleyball  programs at San José State University, and the change in policy threatens the future availability of all-female athletic programs (across all sports) at San José State University, resulting in disparities of a substantial and unjustified nature in the benefits, treatment, services, and educational opportunities afforded to female athletes with no meaningful impact on the benefits, treatment, services, and educational opportunities afforded to male student athletes.

As detailed herein, the University's change in policy and practice to allow a male student to participate in intercollegiate athletic programs designated for women, including the San José State University women's indoor volleyball team and women's beach volleyball team, resulted in a denial of educational opportunities to female student athletes at San José State University, including scholarship opportunities, playing time, publicity, and recognition, and denied women the opportunity and benefit of playing in an all-women intercollegiate athletic program. The male student's participation on the San José State University women's indoor volleyball team placed women in increased danger of injury and provided San José State University an unfair advantage over the all-female teams from opposing colleges and universities. At the same time, no male athletic programs at San José State University were similarly impacted.

2.    **San José State University Women's Indoor Volleyball Program**

a.    ***Examples of Student 1's Influence Over the 2022 Women's Indoor Volleyball Season***

In April 2022, the University's women's indoor volleyball head coach (Coach 1) began actively recruiting a male volleyball athlete from another university to join the San José State University women's indoor volleyball team. Coach 1 is male. Internal email communications provided by the University indicate the head women's volleyball coach contacted the Director of the San José State University PRIDE Center & Gender Equity Center to discuss recruiting a male volleyball player (Student 1) for the San José State University women's indoor volleyball team. Additional communications indicate Coach 1 stated that Student 1 texted him wanting to commit

to transferring to San José State University. Coach 1 stated his belief that Student 1 "is good enough to make us better." A letter of support sent to the University from a former club volleyball coach for Student 1 states: "We had a team full of 'closers;' hitters who could finish the rally easily. In a team that talented, [Student 1] still stood out." The internal communications also indicated a concern regarding whether or not Coach 1 should inform the women on the San José State University women's indoor volleyball team that a male player would be joining the team. Coach 1 stated he wanted to ask the women on the team their thoughts after they found out Student 1 was joining the team, but he did not want to relinquish decision making power to the women on the team regarding whether a male player would be allowed to join the team. Student 1 joined the San José State University women's indoor volleyball team in 2022 and played on the team during the 2022 season. Records obtained from the University clearly establish Student 1 is male and the University knew Student 1 is male.

Student 1 played in 27 matches and 106 sets that season. Student 1 averaged 2.93 kills and .58 blocks per set. The San José State University Official Athletics Website boasts that Student 1 had a season-best 20 kills versus UNLV; led the team with 18 kills and hit .467 (18-4-30) in Student 1's debut versus Weber State; recorded 15 kills in three matches; recorded 10 or more kills in 20 matches; recorded five blocks versus San Diego State; recorded four block assists against Fresno State and New Mexico; scored a total of 343.5 points for the season, was awarded Mountain West Offensive Player of the Week on September 19; and made the Trojan Challenge All-Tournament team--all during the 2022 women's indoor volleyball season. Coach 1, who recruited Student 1 to San José State University, left the University after completing the 2022 season to coach women's volleyball at another institution.

### b. Examples of Student 1's Influence Over the 2023 Women's Indoor Volleyball Season

A new head coach (Coach 2) and associate head coach (Coach 3) joined the San José State University women's indoor volleyball team between the end of the 2022 season and the beginning of the 2023 season, following the departure of Coach 1. Coach 2 and Coach 3 had been working together coaching a women's volleyball team at another university prior to taking the job at San José State University. Coach 2 is male and Coach 3 is female. Coach 3 has stated she did not find out that the San José State University women's indoor volleyball team had a male player until after joining the team. Coach 3 has indicated that Student 1 and Coach 2 informed her that Student 1 is male but identifies as "transgender." Coach 3 states she was specifically instructed by Coach 2 and the Senior Associate Athletics Director for Student Wellness and Leadership Development to not tell anyone either on the team or off the team that Student 1 is male. Coach 3 states she was also told "anyone who disagrees with [Student 1] being on the women's volleyball team needs to get therapy and needs to leave SJSU."

During the 2023 women's indoor volleyball season, Student 1 played in 17 matches and approximately 62 sets that season. Student 1 sustained an injury at the beginning of the season and missed a significant part of the season, however Student 1 averaged 3.57 kills and 0.46 blocks per set during the 17 matches played. Student 1's season highlights included 22 kills against Saint Mary's (CA), 22.5 points against University of Texas Rio Grande Valley, 11 digs against San Diego State, 7 blocks against Portland, and scored a total of 235.5 points. At the end of the 2023 women's indoor volleyball season, approximately eight of the 19 women on the San José State University women's indoor volleyball team entered the transfer portal, which, according to Coach 3, was an unusually high number of transfers out of the program.

  c.  *Examples of Student 1's Influence Over the 2024 Women's Indoor Volleyball Season*

  During the 2024 women's indoor volleyball season, Student 1 played in 21 matches and 81 sets.[14] Student 1 averaged 3.88 kills and 0.56 blocks per set. Student 1's season highlights included 25 kills against California State Fullerton, 29 points against California State Fullerton, 15 digs against UNLV, 4 blocks against Portland, and scoring a total of 361.5 points. During this same season, several all-women's indoor volleyball teams from other universities who were scheduled to compete against the San José State University women's indoor volleyball team informed the University they elected to forfeit their contests and accept a loss rather than compete against San José State University because a male (Student 1) was competing as a member of the San José State University women's team. These teams include: Southern Utah University, Boise State University, the University of Wyoming, Utah State University, and the University of Nevada Reno. Boise State University and the University of Wyoming chose to accept two forfeits each because of the unfair advantage and dangers caused by the male player, Student 1. At the end of the 2024 women's indoor volleyball season, approximately eight of the 19 women on the San José State University women's indoor volleyball team entered the transfer portal, which was again, an unusually high number of transfers out of the program according to Coach 3 and various sports media writers.

  3.  **Concerns About Student 1's Participation Expressed by Players, Coaches, and Parents**

  As a preliminary matter, it is important to note that during the course of this investigation, OCR made multiple requests for the University to provide access to sources of information relating to these allegations and related investigations, including documents and witnesses, but the University has failed to provide sufficient information or approve requested interviews for OCR to make additional conclusions regarding compliance. The University's failure to provide sufficient records was intentional, despite having received notice of its obligations under 34 C.F.R. §§ 100.6, 106.6. Instead, the University has provided only partial records to OCR, while redacting significant portions of the records that were provided, withholding other records entirely, and stating they are working to make arrangements for interviews.

  Due to the University's refusal to provide complete and unredacted records to OCR, it was difficult to ascertain precisely what occurred over the three-year span that Student 1 participated in women's intercollegiate athletics at San José State University. The uncontroverted evidence, however, is that Student 1 is a male, Student 1's presence on the women's volleyball team resulted in a significant and unjustified negative impact on the educational opportunities for women on the team on the basis of sex, and Student 1's presence on the women's volleyball team negatively impacted women at San José State University and women on teams who competed against San José State University. The negative impact caused by Student 1's presence on the women's indoor volleyball team and beach volleyball team resulted in a denial of the benefits of the intercollegiate athletic program provided by the University to women student athletes, and limited women's enjoyment of their rights, privileges, benefits, advantages and opportunities that are associated with intercollegiate athletics. The University was on notice of these concerns, and not only failed

---

[14] The University has reported to OCR that Student 1 has exhausted his NCAA eligibility and is no longer a participant in any intercollegiate athletic programs at San José State University.

to take action to end the discrimination resulting from Student 1's participation on the women's program, but instead took action that, in effect, discouraged women from speaking out about their concerns and failed to adequately respond to the concerns that were raised.

The information that has been provided to OCR forms the basis of these findings and conclusions. University records show that Student 1's participation in the women's volleyball program created significant division among team members, coaches, and parents. The University had actual notice of those concerns, but instead of responding to those concerns in a manner consistent with the University's obligations under Title IX, the University took action that perpetuated unlawful discrimination. The University intentionally decided to continue supporting Student 1's participation in the women's volleyball program, while at the same time took action that discouraged women from filing complaints and voicing dissent and was indifferent to the concerns expressed about different treatment, denial of opportunities, and increased risk of injury. The evidence indicates that rather than addressing those problems by removing Student 1 from the women's program to conform with the University's obligations under Title IX, the University instead attempted to silence Coach 3 and team members through intimidation and different treatment.

### a.    Title IX Complaints Received by the University

The University indicated in their March 6, 2025, data response to OCR, that: "To date, the University has received numerous reports and one formal complaint of potential discrimination due to [Student 1's] participation on the team." However, the evidence indicates the University received multiple Title IX complaints related to Student 1's participation in the women's volleyball program, but it appears the University failed to open an investigation into most of those complaints. Examples of Title IX complaints received by the University include the following:

On September 23, 2024, the University received a letter from attorneys representing Student 3 notifying the University that Student 3 was joining a lawsuit against the NCAA based on their policy of allowing men to compete against women in athletic programs designated for women, in violation of Title IX. In that same notice, Student 3 informed the University that Student 3 was also alleging the University was violating Title IX by allowing Student 1 to compete on the women's indoor volleyball team, and the attorneys for Student 3 reminded the University of their obligation to not retaliate against Student 3, and to not permit retaliation against Student 3, for exercising her rights under Title IX.

On September 24, 2024, the University received a Title IX and Equal Protection complaint from the Independent Council on Women's Sports (ICONS) alleging the University's policy and practice of allowing a male student to participate in the women's volleyball program violated Title IX by denying women equal athletic opportunities and by allowing a man in women's locker rooms. The ICONS complaint states in part: "Over the last few weeks, we have spoken with distraught student-athletes and their parents, coaches, and administrators throughout the Mountain West Conference regarding a crisis in women's volleyball . . . [because of] San José State University . . . permitting a transgender-identifying male, [Student 1], to compete on the SJSU women's volleyball team." The ICONS letter further stated [Student 3] a senior co-captain on the SJSU women's volleyball team [alleges] unlawfully allowing [Student 1] to compete on the SJSU women's volleyball team put[s] women at risk of physical injury in practices and games. [Student 3] describes terrorizing practices and games in which a man is smashing volleyballs into the faces and bodies of young women at speeds of over 80 mph and making a mockery of fair competition."

On October 5, 2024, Coach 2 sent an email to the Title IX coordinator stating in relevant part: "I received a report from one of my student-athletes yesterday of some behavior initiated by [Student 1] that could be deemed as retaliation toward [Student 3]. This behavior occurred in Colorado on Wednesday October 2 while we were there for our match vs Colorado State."

On October 29, 2024, Coach 3 filed a "Complaint about the Title IX violation," requesting "an immediate and comprehensive Title IX investigation" alleging in part: (1) San José State University was engaged in illegal discrimination on the basis of subjective identity; (2) Student 2 was wrongfully refused a women's volleyball scholarship while Student 1 was permitted to maintain a women's volleyball scholarship; (3) the University's Senior Associate Athletics Director for Student-Athlete Wellness and Leadership Development stated "anyone who disagrees with [Student 1] being on the women's volleyball team needs to get therapy and needs to leave SJSU."; (4) Student 1's physical abilities and strength placed women on the team and opponents' teams at increased risk of injury; (5) Coach 2 was giving Student 1 preferential treatment over the women on the team; (6) Women in the San José State University women's volleyball team were being denied opportunities and benefits on the basis of sex; (7) University officials took action to dissuade women on the team from filing a complaint or speaking out in opposition to Student 1 being able to participate on the women's volleyball team; (8) Coach 2 retaliated against Student 3 after she joined a Title IX lawsuit challenging Student 1's participation in the women's volleyball program; and (9) University officials were not responding properly to student, parent, and Coach 3's concerns regarding Student 1's participation in the women's volleyball program. On November 1, 2024, University records indicate the University decided to suspend Coach 3 pending an investigation regarding alleged violations of University policy.

On November 3, 2024, the parents of Student 10 sent a letter to the University, which was forwarded to the Title IX coordinator, stating in part: "Our daughter has expressed a severe level of discomfort with the polarization of the staff and the athletic department. We are hearing those same echoes from most of the team as well . . . [Coach 2] and [the Senior Associate Athletics Director for Student-Athlete Wellness and Leadership Development] have camped out on one side of the issue that supported transgender participation on the team while [Coach 3] has balanced those voices on the other side." The parents stated their concern that the suspension of Coach 3 appears to be an attempt to silence opposition to the University's policy and practice and shared their concern with University administrators telling those who disagree with Student 1 participating on the women's volleyball team to "seek therapy", "stay silent" and other "…phobic" language. The parents stated the women on the team felt Coach 3 was the only person with whom they felt they could express disagreement with Student 1 playing on the team without fear of retaliation. The parents also expressed concern that their daughter, and others on the team, perceived an overall lack of support for the women on the team, especially by Coach 2, the Senior Associate Athletics Director for Student-Athlete Wellness and Leadership Development, and the Assistant Athletic Director for Diversity, Equity & Inclusion. The parents stated those three University officials had expressed to the women on the team "clear support" of Student 1 while at the same time telling the women on the team who had concerns about Student 1 being a member of the team to "seek therapy," to stay silent because this was not their story to tell, and made "veiled threats" that anyone expressing disagreement with Student 1 being on the team could place their National Letter of Intent (their scholarship agreement with the University) in jeopardy. The parents indicated the reaction of Coach 2 to any disagreement expressed by the women on the team to Student 1's continued participation was met with hostility, and the removal of Coach 3 acted to effectively silence dissent. The parents also expressed concern that many women on the volleyball

team felt Coach 2 was giving preferential treatment to Student 1 and would not discipline Student 1 for violating team rules, whereas the women on the team were disciplined for violating team rules.

After meeting with the University's Title IX coordinator to discuss their letter, the Title IX coordinator sent an email stating: "I [take] it to mean you [do] not want to commence an investigation into these experiences. Please let me know if my interpretation is incorrect." To which the parents responded: "Candidly, with what we shared and information you have collected from other parties, we would assume it is sufficient for the university to commence an investigation. If you are saying that such an investigation has to be requested by another party and the university cannot conduct one on its own, please let us know if we misunderstood." The University provided OCR with no follow-up information to that statement.

Records provided by the University indicate most of those aforementioned Title IX issues were not opened for investigation by the University under Title IX. Instead, the University only investigated allegations that Coach 3 did not prepare, train, coach, or provide emotional support and encouragement to Student 1 in the same way she prepared, trained, coached, and or provided emotional support and encouragement to the women on the indoor volleyball team because Student 1 is male. Those allegations were opened for investigation on November 12, 2024, and a Final Investigation Report was not issued until October 16, 2025, almost a full year later. The University also investigated whether Coach 2 retaliated against Student 3 for her participation in a lawsuit against the NCAA. That allegation was opened for investigation on November 12, 2024, and, like the other allegation, a Final Investigation Report was not issued until October 16, 2025. Both Final Investigation Reports expressly state: "The findings in this Report do not reach questions of law as to whether the alleged misconduct supports a violation of applicable laws, but instead are factual findings and determinations under CSU policy. The policy determinations, however, are not intended to equate to a finding that applicable laws were violated."

### b.   Observations from Coach 3

Throughout the 2023 season and part of the 2024 season, Coach 3 stated she frequently observed Coach 2 giving Student 1 preferential treatment over the women on the indoor volleyball team. Coach 3 stated Coach 2 told her that he feels a special connection to Student 1 because Student 1 is "transgender." Coach 3 stated Coach 2 did not require Student 1 to follow several team rules that the women on the team were required to follow. For example, Student 1 was not required to regularly attend practice, while the women on the team were required to attend practice; Student 1 was allowed to wear personal clothing during practice instead of a practice jersey, which the women on the team were required to wear; and Student 1 was not disciplined for attempting to harm teammates during practice and harm opponents during matches.

Coach 3 provided another example involving Student 1 related to women's volleyball scholarship opportunities. Student 1 and a female teammate, Student 2, who both played the position of outside hitter, were recipients of a 2023 women's indoor volleyball scholarship from the University. Both players became injured during the 2023 indoor volleyball season and were unable to play for a significant part of the 2023 season. The evidence indicates Coach 2 informed Student 2 that because of her injury, she would not receive a scholarship for the remainder of the 2023 season, but she would be permitted to remain on the team if she chose to stay. Student 2 elected to stay on with the team and paid full tuition, room and board during the 2023-2024 academic year while she was rehabilitating, and Student 2 was able to play a significant part of the 2023 season. Student 1 was injured right before the beginning of the 2023 season and missed

several games as well. However, unlike Student 2, Coach 2 allowed Student 1 to retain his women's indoor volleyball scholarship, even though Student 1 missed more of the 2023 season than Student 2 did.

OCR acknowledges that Coach 3 has an incentive to place the University in a poor light due to a pending personnel action the University is taking against her, but OCR finds her statements included in these findings credible because they are corroborated by statements made by several team members, an assistant coach, and parents.

### c.      *Discord, Division, and an Effort to Silence Dissent*

The evidence is clear that team morale was terribly impacted by the situation involving Student 1's participation on the women's volleyball team and the administration's reaction to any form of dissent once Student 1 informed the team he is male but identifies as a woman.

Student 3 stated that she did not learn Student 1 was male until near the end of the 2023 season. Student 1 told Student 3 he was born male and considers himself to be a "transgender woman." Student 1 told Student 3 that he had not mentioned to her that he was male because they were living together in the dorm room and he was afraid that Student 3 would not be his friend if she knew the truth. Media reports in April 2024 amplified the division with increased pressure from the public and players on opposing teams.

The Assistant Athletics Director for Diversity, Equity, and Inclusion spoke with investigators retained by the University and stated she reports to the Senior Associate Athletics Director for Student-Athlete Wellness and Leadership Development. She stated that prior to April 2024, she had no experience with the women's volleyball team. She was brought in to "help deal with the team." She began attending practices and traveled with the team. She stated her "job is to make sure DEI is part of athletic programming at the University."

Following the media reports regarding Student 1 being allowed to participate in the women's volleyball program, Coach 2 asked the Senior Director of Media Relations to address the team because members of the team were wanting to speak out about their opinions regarding Student 1's participation on the team. The Senior Director of Media Relations stated she had no prior contact with the women's volleyball team. The Senior Director of Media Relations told the team that if asked about Student 1's participation on the team, they should respond stating this was "not their story to tell." She also told the team that Student 1 was entitled to privacy and warned them to be cautious when speaking about Student 1's participation on the team. The Senior Director of Media Relations stated that in September 2024, Coach 2 requested a meeting to discuss the campus' approach to the concerns being raised regarding Student 1's participation in the women's volleyball program. Administrators, coaches and team members were all present at the meeting. During the meeting, a player (Student 4) said "I feel like we were lied to (regarding Student 1 being male) and nobody wants to be in this. . . Why isn't anyone sticking up for us?" The Senior Director of Media Relations stated she "tried to explain keeping a low temperature six weeks from the election people would love to blow this up." Student 4 responded "I feel like we're being silenced." The Senior Director of Media Relations noted Student 3 was "nodding furiously at Student 4's silencing comment." She also noted other women on the team made comments including: "I didn't sign up for this" and kept asking why they couldn't talk about it since it was already out there. The Senior Director of Media Relations stated she then reiterated "again, I would ask yourself if this is your story to tell?" She noted she "could see how much they were struggling."

On September 12, 2024, the parents of Student 5 contacted Coach 2 and the Senior Associate Athletics Director for Student-Athlete Wellness and Leadership Development wanting to discuss concerns they had regarding the situation involving Student 1. Coach 2 and the Senior Associate Athletics Director for Student-Athlete Wellness and Leadership Development offered a meeting to discuss the parents' concerns regarding the overall wellbeing, safety and protection of the team due to the attention Student 1 was getting.

Opponents were becoming aware that San José State University had a male player on their women's volleyball team. On September 14, 2024, Southern Utah University women's volleyball team elected to forfeit their scheduled match with San José State University and accept a loss rather than compete against San José State University.

On September 20, 2024, because of the increased concerns expressed by players and parents, the University sent an email to the players' parents and guardians to address recent outreach and concerns. The Senior Associate Athletics Director for Student-Athlete Wellness and Leadership Development informed the families that the University was working on adding security measures to protect the players, including an increased police presence and administrative presence.

The University maintains it took the concerns voiced by players, coaches and parents seriously and sought information from the women impacted but took no formal action to investigate most of the issues raised because the women on the team did not cooperate with the requests for interviews. The University asserts that women on the team were free to voice their disagreement with Student 1's participation on the women's volleyball team. However, evidence in the records provided by the University undermines the University's claim that women on the team felt free to voice their disagreement with Student 1's participation on the women's volleyball team. In fact, the evidence demonstrates that numerous members of the administration effectively silenced dissent.

The University has provided evidence that due to the significant negative impact being experienced by the members of the women's indoor volleyball team as a result of Student 1's participation on the team, the University reached out to all women on the team and offered assistance to the women and to Student 1. The University provided evidence that they encouraged all of the women to speak out about their concerns. The University also contends that they assured the women on the team they would not be retaliated against if they filed a complaint. The University indicates that despite reaching out to all of the women on the team, most of the women did not respond to the outreach, so many of the concerns raised were not investigated by the University.

The evidence obtained by OCR, however, indicates that although the University made written assurances to the women that they would not be retaliated against if they complained about Student 1 being on the team, the University accompanied those "assurances" with comments that the women could file a complaint about what they were experiencing, but that these complaints were subject to the University's policy regarding gender identity harassment. The women on the team were also "reminded" that gender identity is a protected status at the University, that the scholarships of players who speak out might be at risk, and that those who disagree with Student 1 being on the team are "transphobic" and need counseling. The records obtained by OCR also indicate the notices sent to the women on the team were not responsive to the concerns expressed by the women about a male athlete being allowed to participate in their women's intercollegiate athletic program. Instead, the notices obtained by OCR were primarily focused on services related

to sexual assault survivor resources (for example: "You have the right to decide whether to make a report to law enforcement"). The notices also included statements such as: "I do not want you to feel pressured to respond" and "You are not required to respond to our outreach." Those particular statements alone are not problematic, but when combined with the other information directed at the women on the team, including comments that "this is [Student 1's] story to tell, not yours," the message was clear to many of the women to stay silent, as evidenced by the fact most of the women did not respond to the outreach.

Student interviews also indicate a lack of trust between many of the women on the team and Coach 2 and the administration. Student 7 stated "[Coach 2] cared more about [Student 1's] wellbeing than the rest of the team." Student 7 felt Coach 2 was unfair with the way he favored Student 1, allowing Student 1 to miss practices without consequences, which was not the case for the women on the team.  For example, Student 1 missed practice but was still allowed to start in the next game. Student 7 also stated that once Student 3 joined the Title IX lawsuit, Student 7 could tell Coach 2 stopped talking to her. Student 7 also felt her relationship with Coach 2 was negatively impacted after she spoke out about Student 1 playing on the team. She said it seemed like Coach 2 no longer cared about her. Student 7 also stated it felt like "they were trying to silence us."

Student 10 stated after it was revealed to the team that Student 1 is male, Coach 2 expressed his belief that anyone who spoke up was attacking Student 1. Coach 2 told the team that the "hate" affects him too as part of the LGBT community. Student 10 felt Coach 2 treated Student 1 with favoritism. After a match in late August, Coach 2 was upset with how the team played and called the team in for practice on their day off. Student 1 refused to practice that day. Coach 2 said to Student 1, if you don't want to be here, then leave. Student 10 said Student 1 left the practice and was never disciplined for it. To silence dissent, "scare tactics" were used. The women on the team were told they needed to be careful of what they said because they all signed a contract and could lose their scholarships. That threat made several members of the team afraid to speak out. Student 10 said that at one point, Coach 2 told the team to be careful regarding how they act with regard to Student 1. Following that conversation, Student 10 was hanging out with Student 8 talking about being opposed to Student 1 playing on the women's volleyball team because he's a man. They joked it would be frustrating if they were hit in the face by Student 1. The next day during practice, Student 8 was struck in the head by a ball hit by Student 1. Then, a week later, Student 10 saw Student 8 acting close with Student 1, so Student 10 asked Student 8 why she had changed her opinion. Student 8 told Student 10 she spoke with Coach 2 about what he meant by "be careful" and he said: "you should be friends with Student 1." Student 10 stated a large part of the frustration with Student 1 centered on Student 1's failure to keep a promise he made during a players-only team meeting in late September 2024. During that meeting, Student 1 said if everyone felt uncomfortable with him playing on the team, he would step down. Student 1 then called for a vote. Only *three* of the 18 members of the team voted for Student 1 to remain on the team. Once opposing teams started forfeiting their matches against the San José State University women's indoor volleyball team, the team members said to Student 1 that he owed it to them to say if he was staying or leaving the team as promised. Student 1 "very snarkily" responded "yeah, I'm stayin." This drove the division on the team even deeper.

Student 11 stated Coach 2 failed to discipline Student 1 at times when Student 1 should have been disciplined. One example was when Student 1 did not wear a matching practice shirt, which should have resulted in Student 1 being disciplined, but Coach 2 did not discipline Student

1. Student 11 also stated Coach 2 criticized Student 3 for joining the Title IX litigation, and at one point, Coach 2 asked Student 11 to tell Student 3 something so he didn't have to speak with her.

Further evidence eroding the University's assurance that women on the team were free to voice their disagreement with Student 1 being a member of the women's volleyball team included complaints against members of the team for speaking publicly about Student 1. On October 14, 2024, Coach 2 contacted the University's Title IX investigator to report that he saw an interview of Student 3 on national television in which Student 3 referred to Student 1 as "he" throughout the interview, and "call[ed] into question [his] integrity as a head coach."

On October 23, 2024, Student 3 posted a video on social media referring to Student 1 as a man and stating her relief that Student 1 had moved out of her dorm room. The video included Student 3 and other women on the volleyball team, eating pizza, listening to music and cheering. The video was entitled "THE MAN HAS MOVED OUTTTTTT."

University records indicate Coach 2 received a copy of that video and forwarded it to the Senior Associate Athletics Director for Student-Athlete Wellness and Leadership Development, who filed a Title IX complaint against Student 3 and two other teammates in the video (Students 6 and 7). During an October 24, 2024, meeting with Coach 2, Coach 3, Students 3, 6, and 7, and the Title IX investigator, Coach 2 stated the Title IX complaint was made because Student 3 "misgendered" Student 1 in the video. This was just another example of University Title IX officials and administrators effectively sending a message to the women on the team that dissent will result in discipline. Records obtained by OCR also established that on the same day, Coach 2 isolated Student 3 from her teammates after the group meeting and arranged a separate meeting with Coach 2, Students 1, 6, and 7, and the Senior Associate Athletics Director for Student-Athlete Wellness and Leadership Development. University records indicate during that meeting, Students 6 and 7 apologized to Student 1 for their part in the video, agreed they would distance themselves from Student 3, and stated they would not join Student 3's lawsuit involving Student 1, the University, and the Mountain West Conference.

Coach 2 and Student 1 also filed Title IX complaints against Student 3 relating to the video and public interviews "misgendering" Student 1. The Title IX investigator made an initial decision to close the complaint relating to the video and public interviews, but Student 1 appealed that decision to the Chancellor's Office, who on January 10, 2025, remanded the matter and reopened in part because Student 3 "referre[d] to [Student 1] as a man even though [Student 3] is aware [Student 1] is a transgender woman." Student 1 subsequently withdrew the complaint.

Additional compelling evidence regarding efforts to silence dissent came on November 1, 2024, when the University decided to suspend Coach 3 just days after she filed her Title IX complaint, requesting "an immediate and comprehensive Title IX investigation" into the University and Coach 2.

### d.    *Alleged Conspiracy to Injure Student 3*

On September 23, 2024, Student 3 notified the University that she was joining a lawsuit against the NCAA based on its policy allowing men to compete against women in athletic programs designated for women in violation of Title IX. In that same notice, Student 3 also informed the University that she was alleging the University was violating Title IX by allowing Student 1 to compete on the women's indoor volleyball team, and Student 3 reminded the University of their obligation to not retaliate against Student 3, and to not permit retaliation against

Student 3, for exercising her rights under Title IX. Shortly after notifying the University of her decision to join the Title IX lawsuit, Student 3 also notified Student 1 of her decision.

Evidence obtained by OCR from the University indicates on the morning of October 2, 2024, Student 3 met with Student 1 in person and informed Student 1 that Student 3 was moving forward with her Title IX lawsuit involving Student 1's participation on the women's volleyball team.

On the evening of October 2, 2024, the San José State University women's indoor volleyball team was staying overnight in Fort Collins, Colorado, for a match with Colorado State University the following day. That evening, a member of the women's volleyball team (Student 6) received a message on social media (Instagram) stating "please distance yourself from [Student 3] tomorrow at the game, it will not be good for her." Student 6 was concerned, so she notified the San José State University police officer traveling with the team to report the message. Law enforcement officers from San José State University and Colorado State University immediately took action and began an investigation and created a safety plan. San José State University administrators also took action. Email communications obtained by OCR indicate administrators informed Student 3 and Student 1 of the social media warning regarding Student 3 and that there would be an increased law enforcement presence during the match. Other members of the team were also notified of the situation.

Records obtained by OCR from the University, described below, establish that the social media warning regarding Student 3 coincided with actions taken by Student 1 on October 2, 2024, and should have been investigated by the University to confirm who was involved with sending the warning and whether that individual had any affiliation with the San José State University women's indoor volleyball program or with Colorado State University. A police officer from the Colorado State University Police Department stated in his report obtained by OCR: "the San Jose officer said his department was working on a production of record to obtain a search warrant on the [Instagram] account." However, when OCR requested a copy of the search warrant and related investigative report, the SJSU informed OCR that the San José State University Police Department decided not to seek a search warrant to determine who posted the warning on Instagram.

San José State University records indicate on the same day that Student 3 met with Student 1 in person and informed Student 1 that Student 3 was moving forward with her Title IX lawsuit involving Student 1's participation on the women's volleyball team, Student 1 and two other teammates (Students 7 and 8) snuck out of the team's hotel that evening and met with a Colorado State University player (Student 9) who was friends with Student 1. All three San José State University players who snuck out of the hotel later admitted to San José State University administrators what occurred that evening. It is uncontroverted that Student 1 spoke with the Colorado State player about Student 1 planning to manipulate blocks so the Colorado State player would have open shots at the position played by Student 3. Student 7 told University staff, that Student 1 stated "I'm going to leave center court open" so the Colorado State player could "blow up [Student 3]." Student 7 stated the intent was to have Student 3 hit in the face with a hard-hit ball. An administrator associated with the team reported to the University that one of the players stated Student 1 also shared a scouting report with the Colorado State player during the meeting. The teammates involved, except for Student 1, expressed regret and were emotional when recounting the events to San José State University staff. Student 1, on the other hand, was asked by staff to apologize to Student 3, but refused. Student 1 admitted to the head coach that the meeting with Student 9 did occur, but indicated they were just joking.

It is disputed whether Students 1 and 9 actually followed through with the plan to injure Student 3, or whether the discussion was meant as a joke. What is undisputed, however, is that there was a plan discussed to injure Student 3, and that plan to injure Student 3 was discussed by Student 1 and Student 9 in the presence of two other San José State University teammates (Students 7 and 8), all just hours after Student 3 informed Student 1 she was moving forward with her Title IX lawsuit involving Student 1. It is concerning that the University did not conduct a formal investigation of the matter and that there was an intentional decision not to move forward with discovering who sent the Instagram warning.

Coach 3, who was present on the court and involved in play-calling, provided her opinion that Student 1 did appear to take action during the game that could have resulted in Student 3 being harmed, but fortunately Student 3 was not harmed during the match. Another student, Student 10, was later interviewed by University investigators. Student 10 told the investigators she spoke with Student 7 about the evening Students 1, 7, and 8 snuck out and met with Student 9 shortly after the game. Student 10 stated that during the match, Student 1 was making more errors than normal, and she didn't know why Coach 2 wasn't pulling Student 1 out of the game. Student 1 was making mistakes that were not typical mistakes. Also, Student 1 was laughing with Student 9 during the match, but Student 10 knows Students 1 and 9 were friends. Student 10 said the team felt like Student 1 was throwing the game, and they ended up losing. That night, the team flew back to campus and Student 7 walked in the room and told her story. Student 7 was nervous and frustrated. She said the night before the game, she, along with Student 1 and Student 8, snuck out of the hotel and went to Student 9's house. Student 7 said she heard Student 1 and 9 saying they planned to leave the net open, actively plotting ways to hurt their own teammates. Student 7 told Student 10 she went to tell Coach 2 what happened, and he dismissed her concerns, saying he checked into it and it was just a joke. Student 7 told Student 10 that she heard the conversation and "it was not a joke."

On the other hand, Coach 2 has stated he did not see anything to indicate the plan was being carried out during the game. A law firm was retained by the Mountain West Conference to review the allegations. The law firm states that it conducted an investigation of the alleged conspiracy to injure Student 3 but found there was "insufficient evidence to corroborate the allegations of misconduct." The San José State University Title IX office acknowledged they conducted a preliminary inquiry into the allegations, but determined there was no basis for a formal investigation because of the head coach's opinion of the game footage, Student 1's assertion that it was a joke, and the findings of the Mountain West Conference investigation, which the University acknowledges it never received a copy of. OCR asked the University to request a copy of the Mountain West Conference investigation file for OCR to review. The University requested the Mountain West Conference provide a copy of the investigative file to the University to share with OCR, and the Mountain West Conference refused, citing to attorney-client privilege.

OCR finds that the University erred in deciding not to investigate the alleged conspiracy by Students 1 and 9 to harm Student 3. The University was not free to simply rely on conclusions of the Mountain West Conference in lieu of conducting its own prompt investigation because: (1) the Mountain West Conference has refused to provide the University and OCR a copy of its full investigation file and report, citing "attorney-client privilege," and instead only provided a one-page letter indicating that it found insufficient evidence of misconduct; (2) all of the players involved in the admitted preparatory meeting were pre-warned that police and coaches would be watching for problems at the game because of the social media warning received by Student 6, thus rendering irrelevant the fact that there was no obvious specific attempt to carry out the alleged

conspiracy; (3) there is no evidence the Mountain West investigation considered the late night meeting itself as misconduct; and (4) all of the Students involved admitted the conversation occurred and Coach 3 and Student 10 presented evidence indicating that the conspiracy was meant to be carried out. Additionally, the Mountain West investigation appears to have only focused on whether play itself during the match was altered. Moreover, recent reporting indicates that the law firm that conducted the Mountain West Conference investigation was also retained by the Mountain West Conference to defend the Conference in litigation regarding its decision to allow Student 1 to play in women's athletic programs, indicating a possible conflict of interest or the appearance of one (the law firm had an obvious financial incentive to clear the Conference and Student 1 in the initial investigation to improve the Conference's position in litigation). While we don't know for certain that this reporting is accurate, we certainly must consider the reporting when deciding how much, if any, weight to give to the Mountain West Conference investigative findings, especially considering that we are unable to review its investigative file. In any event, and notwithstanding all of the above and the candid admissions of the three members of the San José State University women's volleyball team about the late-night meeting with the Colorado State University player in which the players discussed conduct that sure "may reasonably constitute" retaliation under Title IX (*see* 34 C.F.R. § 106.44(a)), the University chose to close the inquiry and took no action whatsoever against Student 1. Title IX required it to do a whole lot more.

### e. *Increased Risk of Injury*

The physical advantage Student 1 had over women on the San José State University women's volleyball team and opposing teams was apparent. Coach 3, a decorated college women's volleyball athlete and veteran coach, stated: "Where [Student 1] stood out was spiking the volleyball and blocking on the front row due to [Student 1's] leaping ability and hitting power, which far exceeded that of any player in the conference." Coach 3 also stated: "I witnessed [Student 1] hit the ball so much harder than women, that [Student 1's] hits induced fear in teammates in practice," and she saw "women on the SJSU team seeking to dodge [Student 1's] hits rather than try to return them, [which] is virtually unheard of in women's volleyball." Students 3 and 4 spoke with Coach 2 and Coach 3 on behalf of the team and told them they had concerns about Student 1's participation on the team and that it was putting women at an increased risk of injury. The two women informed Coach 2 and Coach 3 that women from other teams were going to refuse to play against them if Student 1 was playing because they did not want to be injured. Coach 3 stated Coach 2 reacted with anger and told Students 3 and 4 that their protest would go nowhere.

Coach 3 stated that during a tournament in Iowa in September 2024, Student 1 hit a cross-court spike striking the face of a woman on the opposing team who was in a position on the back line, knocking her to the floor. Coach 3 stated the teammate who set the ball to Student 1 expressed remorse and appeared distraught about the play. Coach 3 stated similar spikes from Student 1 hit other women in the head throughout the season.

Student 3 has stated Student 1 hit the ball with more force and "far harder than any women she had ever played against." Student 3 has stated many women on the team spoke with Student 3 about their fears of being hit by balls spiked by Student 1. Student 3 stated the women on the team were doing everything they could to dodge Student 1's spikes during practice but they still could not fully protect themselves. Student 3 stated she was hit in the head and about her body by volleyballs hit by Student 1, which caused greater bruising, pain, and discomfort than balls hit by

women. Student 3 stated, as team captain, she personally spoke with Coach 2 about the risk of injury posed by Student 1, but Coach 2 dismissed her concerns and told Student 3 that Student 1's continued participation on the women's volleyball team was "non-negotiable." Student 3 corroborated Coach 3's recitation of the events involving Student 1 knocking over an opposing player in the back row with a spike to the head and her teammate's tearful reaction after setting the ball to Student 1 and seeing what happened.

On September 28, 2024, Boise State University women's volleyball team elected to forfeit their scheduled match with San José State University and accept a loss rather than compete against San José State University because the University allowed a male student athlete, Student 1, to compete in the women's athletic program. Later that day, the Director of Athletics sent an email to the members of the volleyball team in part, to inform the team that they had a right to speak openly about their own experiences without fearing retaliation from the University, "subject to the University's policy against harassment."

Other teams saw what was happening with Student 1's ability to jump and hit with excessive power, and many chose to forfeit their games against San José State University rather than risk injury. Several all-women's teams from other universities who were scheduled to compete against the San José State University women's indoor volleyball team informed the University they elected to forfeit their contests and accept a loss rather than compete against San José State University because a male (Student 1) was competing as a member of the San José State University women's team. These teams include Southern Utah University, Boise State University, the University of Wyoming, Utah State University, and the University of Nevada Reno. Boise State University and the University of Wyoming chose to accept two forfeits each because of the unfair advantage and dangers caused by the male player, Student 1. The seven forfeitures negatively impacted women on all teams. The number of forfeits was so significant that the University sent a letter to the NCAA on November 12, 2024, making a "Season of Competition Waiver Request" seeking "a blanket waiver of eligibility from the Seasons of Competition: Five Year Rule for all eligible players on the team for the 2024-2025 season" acknowledging the large number of teams forfeiting their matches against the University "negatively impact[ed] the participation and competitive opportunities of eligible players" on the San José State University women's indoor volleyball team.

### 4.    San José State University Women's Beach Volleyball Program

Student 1 also played on the San José State women's beach volleyball team for the 2023 season. The team finished the 2022 season without Student 1 with a 12-12 record. The team finished the 2023 season with Student 1 earning an 11-9 record, and a first-time appearance in the Southland Conference Championship.[15]

Student 1 made a significant impact on the San José State women's beach volleyball team's success. Some examples include:

- On February 25, 2023, Student 1 and a female teammate won twice in straight sets with a 4-1 win against an all-female team from the University of the Pacific and a 3-2 win against an all-female team from Santa Clara University.[16]

---

[15] https://sjsuspartans.com/documents/510ecfda-3d5d-4bdf-ba21-7ba3528b94b3.pdf
[16] https://sjsuspartans.com/news/2023/02/25/spartans-kick-off-season-with-two-wins

- On March 3, 2023, Student 1 and a female teammate defeated an all-female pair from the University of Portland.[17]

- On March 11, 2023, Student 1 and a female teammate defeated an all-female pair from the University of New Orleans during the Southland Midseason Tournament.[18]

- On March 17, 2023, Student 1 and a female teammate defeated an all-female pair from University of San Francisco during the San José State Tournament.[19] The following day, on March 18, 2023, Student 1 and a female teammate defeated an all-female pair from the University of Oregon in straight sets during the final day of the San José State Tournament.[20]

- On April 13, 2023, Student 1 and a female teammate defeated two all-female pairs from St. Mary's College and Sacramento State University, in a final regular season doubleheader.[21]

- During the Southland All-Conference Championship tournament, Student 1 and a female teammate "went 2-0 on the day to lead No. 6 seed San José State to a second round upset victory over No. 5 seed Southeastern Louisiana 3-1 before falling 1-3 to No. 2 seed Houston Christian."[22]

- On April 20, 2023, Student 1 and a female teammate were named to the Southland All-Conference Second Team for women's beach volleyball.[23] Student 1's position on the All-Conference team displaced a female beach volleyball player for that honor.

Student 1's participation on the San José State University women's beach volleyball team denied educational opportunities to female student athletes at San José State University, including scholarship opportunities, playing time, and publicity, and likewise denied women on the team the opportunity and benefit of playing in an all-women intercollegiate athletic program. Student 1's participation on the San José State University women's beach volleyball team also provided the San José State University women's beach volleyball team an unfair advantage over the all-female teams from opposing colleges and universities. At the same time, male student athletic programs at San José State University were not similarly impacted in such a negative manner.

---

[17] https://sjsuspartans.com/news/2023/03/3/spartans-sweep-doubleheader-against-portland
[18] https://sjsuspartans.com/news/2023/03/11/spartans-finish-day-one-at-southland-midseason-tournament
[19] https://sjsuspartans.com/news/2023/03/17/spartans-finish-day-one-of-sjsu-tournament
[20] https://sjsuspartans.com/news/2023/03/18/spartans-prevail-in-final-day-of-san-jose-state-tournament
[21] https://sjsuspartans.com/news/2023/04/13/spartans-split-doubleheader-against-sac-st-and-saint-marys
[22] https://sjsuspartans.com/news/2023/04/22/spartans-split-day-two-of-slc-championship
[23] https://sjsuspartans.com/news/2023/04/20/spartans-blaire-fleming-and-nayeli-tia-named-to-slc-all-conference-second-team

### 5.    Invasion of Privacy

OCR received evidence that Student 1 shared living quarters with Student 3 on campus and often during overnight road trips, and Student 1 shared the women's locker room with the women on the team, both on campus and during road trips. The evidence is that at various times, most, if not all, of the women on the team at the time of sharing a dorm room, hotel room, and/or locker room with Student 1 were unaware that Student 1 was a male. At least one female team member openly expressed her concern to the University that her privacy was violated by her not knowing Student 1 was a male while rooming with and sharing a locker room with Student 1. Evidence obtained from the University shows Student 3 told Coaches 2 and 3 that she locked her bedroom door at night for safety after learning her roommate, Student 1, was a male. Student 3 has stated the athletic department would frequently assign her to room with Student 1 on road trips, and she later learned that Student 1 specifically requested Student 3 as a roommate, so University officials frequently assigned Student 1 to room with Student 3. Student 3 stated that she did not learn Student 1 was male until near the end of the 2023 season. Student 1 told Student 3 he was born male and considers himself to be a "transgender woman." Student 1 told Student 3 that he had not mentioned to her that he was male because they were living together in the dorm room and he was afraid that Student 3 would not be his friend if she knew the truth.

### 6.    Different Treatment in Employment

OCR also found evidence raising a concern about possible different treatment on the basis of sex in employment practices by the University. Both Coach 2 and Coach 3 had complaints filed against them during the 2024 indoor volleyball season relating to allegations of Title IX violations and employee conduct violations. During the pendency of the employee conduct investigations, the University suspended Coach 3 (a woman) but chose to not suspend Coach 2 (a man), for similar alleged conduct at the beginning of both investigations. Notes made by the University's investigator relating to the parallel personnel investigations, both of which were opened November 12, 2024, indicate preferential treatment of Coach 2 over Coach 3 on the basis of sex. The allegations involved similar conduct relating to the alleged unauthorized release of Student information to the public.

University records indicate the decision to suspend Coach 3 was primarily based on allegations that Coach 3 committed a "FERPA violation" when she "openly went to the press and trashed a student." Similarly, the investigator's notes specifically state Coach 2 "crossed the FERPA line in his interview with ESPN." Additional notes indicate the decision to not suspend Coach 2 also included the improper consideration: "If we relieve him . . . [w]e could also spark more media attention. . . ." University records indicate University officials, including the President of the University, agreed to not suspend Coach 2 because they felt his suspension would unduly disrupt the team, yet an email from the Title IX coordinator dated October 17, 2024, includes the observation that: "The team has rallied around [Student 3] and [Coach 3], [Coach 2] isn't organically being communicated with, borderline *ignored or not even acknowledged*." (emphasis added).

Adding to OCR's concern about possible different treatment in the handling of the personnel matter is an indication of favoritism in the process. The investigator's notes state: "Call to [the Senior Associate Athletics Director for Student-Athlete Wellness and Leadership Development] – [Coach 2's] closest friend at SJSU – informing her that [Coach 2] received a notice today and may need a shoulder to lean on." The University provided no similar notes regarding a shoulder for Coach 3 to lean on when she received her notice.

These findings are based on the information provided by the University in response to OCR's multiple requests for information. OCR has made multiple requests for the University to provide access to all sources of information relating to these allegations and related investigations, but the University has failed to provide sufficient information for OCR to make additional conclusions regarding compliance. The University's failure to provide sufficient records was intentional, despite OCR's notice of obligation pursuant to 34 C.F.R. §§ 100.6, 106.6. Instead, the University has provided only partial records to OCR, which are partially responsive to OCR's requests, while redacting portions of the records that were provided and withholding other records entirely. OCR finds that the limited information to which we had access is credible, sufficiently corroborated, and sufficient to support a compliance concern regarding different treatment, as described above.

## III.    The Department Finds that San José State University is Noncompliant with Title IX and its Implementing Regulations

Despite Title IX's express provisions regarding sex-separated teams in intercollegiate sports and Title IX's equal-opportunity mandate, San José State University adopted and implemented a practice that forces women to compete against men in intercollegiate athletic programs designated for women, whenever a male student athlete asserts he is a woman, notwithstanding real and relevant biological differences between the sexes and historically limited athletic opportunities for women in intercollegiate athletics. San José State University also allows males to invade female's intimate facilities, endangering women's safety, privacy, and dignity. The evidence establishes that the San José State University's actions violate Title IX, 20 U.S.C. § 1681(a), and several of its implementing regulations: (1) 34 C.F.R. § 106.41(a) (prohibition against discrimination on the basis of sex); (2) 34 C.F.R. § 106.41(c) (equal opportunity mandate); (3) 34 C.F.R. § 106.33 (permitting segregation of intimate facilities by sex, not identity); and (4) 34 C.F.R. §§ 106.8(b)(2), 106.44 (prompt and equitable resolution of complaints alleging sex discrimination under Title IX). In addition, OCR has compliance concerns related to the University's compliance with 34 C.F.R. § 106.37(a), (c) (prohibiting sex-based discrimination in the award of athletics scholarships) and 34 C.F.R. § 106.51(a) (prohibiting sex-based discrimination in employment).

San José State University's discriminatory practices, intentional actions, and deliberate inaction, in the face of clear Title IX violations, constitutes discrimination on the basis of sex, in violation of Title IX and its implementing regulations.

### A.    San José State University's Policies and Practices Involving Athletics and Intimate Facilities Violate Title IX

#### 1.    San José State University's Policies and Practices Allowing Male Students Who Identify as Women to Participate in Women's Sports Violate Title IX

San José State University's actions related to athletics violates Title IX by unlawfully discriminating against women in violation of 20 U.S.C. § 1681(a); 34 C.F.R. § 106.41(a) (and outside the exception created by 34 C.F.R. § 106.41(b)), and by denying women the equal opportunity in athletics guaranteed by 34 C.F.R. § 106.41(c).

**a.** When a recipient of federal funding separates sports based on sex, the recipient is not "discriminat[ing]" based on sex because the recipient is treating the sexes differently with a sufficient justification: the real biological differences between men and women. But when the

recipient separates sports based on sex and also allows males with a certain "gender identity" to participate in women's sports, that undermines the recipient's justification for different treatment based on sex. Because these recipients are segregating based on sex without any biological justification for doing so, they are illegally discriminating based on sex, without a valid basis under Title IX.

Here, San José State University has abandoned the biological justification for sex separation in athletics by allowing males who identify as women participate in women's sports, so the University is discriminating based on sex by separating the sexes without a valid basis under Title IX and thus is in violation of Title IX. 20 U.S.C. § 1681(a).

Title IX's athletics regulation—which is a contemporaneous and accurate interpretation of Title IX that has been endorsed by Congress, *see Loper Bright*, 603 U.S. at 394; *Grove City*, 465 U.S. at 568—also shows that San José State University's actions violate Title IX. That regulation first sets out a "[g]eneral" rule prohibiting sex-separated teams: "No person shall, on the basis of sex, be excluded from participation in, be denied the benefits of, be treated differently from another person or otherwise be discriminated against in any interscholastic, intercollegiate, club or intramural athletics offered by a recipient, and no recipient shall provide any such athletics separately on such basis." 34 C.F.R. § 106.41(a). It then lays out the only circumstance where recipients may have "[s]eparate teams": "Notwithstanding the requirements of paragraph (a) of this section, a recipient may operate or sponsor separate teams for members of each sex where selection for such teams is based upon competitive skill or the activity involved is a contact sport." *Id.* § 106.41(b). Still, "where a recipient operates or sponsors a team in a particular sport for members of one sex but operates or sponsors no such team for members of the other sex, and athletic opportunities for members of that sex have previously been limited, members of the excluded sex must be allowed to try-out for the team offered unless the sport involved is a contact sport." *Id.*

San José State University's actions violate the athletics regulations. As explained above, the Title IX regulations explicitly prohibit such discrimination, barring recipients from excluding or otherwise discriminating against members of one sex in their participation in the recipient's athletic program. 34 C.F.R. § 106.41(a). The regulations exempt from that prohibition athletics teams "where selection for such teams is based upon competitive skill" but only to the extent that that such segregation is truly on the basis of sex. 34 C.F.R. § 106.41(b). But the University is not segregating exclusively based on sex: Though the University purports to have male and female teams, the teams are not "for members of each sex," as the University allows males with a certain "gender identity" to participate on the women's team. 34 C.F.R. § 106.41(b). The regulations, on their face, do not permit segregation based on "gender identity." And, as explained above, segregation based on "gender identity" does *not* help create fair competition for the members of each sex. To the contrary: allowing a man to participate on a women's volleyball team, for example, *undermines* fair competition for women.

The facts of this case demonstrate the harm that the inclusion of a man on the woman's volleyball team does to fair competition for women. As detailed above, Student 1, a man, is stronger, jumps higher, and hits the ball with more force and far harder than the women he competed against. As one of Student 1's coaches reported: "I witnessed [Student 1] hit the ball so much harder than women, that [Student 1's] hits induced fear in teammates in practice," and she saw "women on the SJSU team seeking to dodge [Student 1's] hits rather than try to return them, [which] is virtually unheard of in women's volleyball." Student 3, the team captain, stated the

women on the team were doing everything they could to dodge Student 1's spikes during practice but they still could not fully protect themselves. Student 3 stated she was hit in the head and about her body by volleyballs hit by Student 1, which caused greater bruising, pain, and discomfort than balls hit by women. She complained that Student 1 regularly "smash[ed] volleyballs into the faces and bodies of young women at speeds of over 80 mph and ma[de] a mockery of fair competition." Indeed, in at least one instance, Student 1 injured a competitor who was positioned on the back line (*i.e.*, far from the net) by spiking the ball into her head, knocking her to the floor. It is not surprising that many opponents opted to forfeit their matches against San José State University's women's volleyball team rather than face Student 1 and risk injury.

It is uncontroverted that: (1) San José State University is a recipient of federal funding from the Department; (2) San José State University knowingly recruited a male student athlete (Student 1) to join the San José State University women's indoor volleyball team with the intent of gaining a competitive advantage over other teams; (3) San José State University knowingly permitted a male student athlete (Student 1) to compete in two intercollegiate athletics programs designated for women, the women's indoor volleyball team and the women's beach volleyball team; (4) historically, intercollegiate athletic opportunities for women have been limited, but the same cannot be said for men; (5) San José State University has a history of offering sex-separated athletic programs for both men and women, in order to comply with Title IX; (6) San José State University provided a men's volleyball team; (7) San José State University provided a volleyball team designated for women but that was open to men; and (8) San José State University did not provide a volleyball team that was open exclusively to women. Accordingly, San José State University's actions involving Student 1 participating on the indoor women's volleyball team and the women's beach volleyball team violate Title IX and its implementing regulation, 34 C.F.R. § 106.41(a)-(b).

**b.** San José State University has also violated the equal opportunity in athletics guaranteed by the Title IX regulations: "A recipient which operates or sponsors interscholastic, intercollegiate, club or intramural athletics shall provide equal athletic opportunity for members of both sexes." 34 C.F.R. § 106.41(c). Recipients that provide men's athletic teams are therefore required to provide corresponding athletic teams that are, in fact, open only to biological women. But San José State University has opened up its women's athletics to biological men, subjecting its female athletes to increased risk of injury, displacing them from podiums in athletic competitions, denying them opportunities for advancement to regional and national competitions, and causing them to miss out on critical visibility for future opportunities and recognition.

The following pertinent evidence is uncontroverted: (1) San José State University is a recipient of federal funding from the Department; (2) San José State University knowingly recruited a male student athlete (Student 1) to join the San José State University women's indoor volleyball team with the intent of gaining a competitive advantage over other teams; (3) San José State University knowingly permitted a male student athlete (Student 1) to compete in two intercollegiate athletics programs designated for women, the women's indoor volleyball team and the women's beach volleyball team; (4) San José State University knowingly provided a women's volleyball scholarship to the male student (Student 1); (5) San José State University was aware that the presence of the male (Student 1) on the women's indoor volleyball team resulted in women being injured, women losing out on playing time and recognition, women being treated differently, and women-only teams being defeated during intercollegiate competitions; (6) San José State University knowingly allowed a male student to utilize locker rooms, student housing, and overnight accommodations designated for women; (7) historically, intercollegiate athletic opportunities for women have been limited, but the same cannot be said for men; (8) there is

sufficient interest and ability among San José State University students to sustain viable women-only intercollegiate athletic teams, and there is a reasonable expectation of intercollegiate competition for women's teams; (9) San José State University has a history of offering sex-separated athletic programs for both men and women, in order to comply with Title IX; (10) San José State University provided a men's volleyball team; (11) San José State University provided a volleyball team designated for women but that was open to men; and (12) San José State University did not provide a volleyball team that was open exclusively to women.

One of the factors that OCR considers in deciding whether members of a particular sex have been deprived equal athletic opportunity is "[w]hether the selection of sports and levels of competition effectively accommodate the interests and abilities of members of both sexes." 34 C.F.R. § 106.41(c)(1). OCR "considers the effective accommodation of interests and abilities in conjunction with equivalence in the availability, quality and kinds of other athletic benefits and opportunities provided male and female athletes to determine whether an institution provides equal athletic opportunity as required by Title IX." *Berndsen v. N. Dakota Univ. Sys.,* 7 F.4th 782, 788 (8th Cir. 2021) (citing Office for Civil Rights, Clarification of Intercollegiate Athletics Policy Guidance: The Three-Part Test (Jan. 16, 1996)).

At San José State University, men get sex-segregated teams in which competitors compete only against other men; women in sex-segregated teams, however, are compelled to compete against men. Men competing in men's sports get fair and safe competition while women get unfair and unsafe competition, are subjected to increased risk of injury, are displaced from podiums and other opportunities and recognition. San José State University's actions thus deprive women of equal athletic opportunities in violation of Title IX. 34 C.F.R. § 106.41(c); *see also* Executive Order 14,201, 90 Fed. Reg. at 9279 ("In recent years, many educational institutions and athletic associations have allowed men to compete in women's sports. This is demeaning, unfair, and dangerous to women and girls, and denies women and girls the equal opportunity to participate and excel in competitive sports."); *McCormick*, 370 F.3d at 294-95 ("Treating girls differently regarding a matter so fundamental to the experience of sports—the chance to be champions—is inconsistent with Title IX's mandate of equal opportunity for both sexes.").

San José State University has permitted these violations of Title IX to occur, in full knowledge that its female student athletes want and demand better. Women, their families, and coaches have expressed to San José State University their interests in female-only athletic programs, teams, and competitions that effectively accommodate their interests and abilities and in San José State University ending its practice of allowing men to compete against women in athletic programs designated for women. Yet San José State University refuses to change its practices and has even asserted it will continue allowing men into athletic programs designated for women. San José State University's intentional action in the face of clear Title IX violations constitutes discrimination against female athletes on the basis of sex in violation of Title IX and its implementing regulations.

### 2.    San José State University's Locker Room, Student Housing, and Overnight Stay Practices Violate Title IX

San José State University's locker room, student housing, and overnight stay practices, particularly as to Student 1, violate Title IX.

When a recipient of federal funding recipient separates locker rooms, student housing, and overnight stays arrangements based on sex, the recipient is not "discriminat[ing]" based on sex

because the recipient is treating the sexes differently with a sufficient justification: the real biological and privacy-based differences between men and women. But when the recipient separates such intimate facilities based on sex and also allows males with a certain "gender identity" to use the women's facilities, that undermines the recipient's justification for different treatment based on sex. Because these recipients are segregating based on sex without any biological justification for doing so, they are illegally discriminating based on sex, without a valid basis under Title IX.

Here, San José State University has purported to create sex-separate intimate facilities but it has abandoned the biological justification for sex separation in intimate facilities by allowing males who identify as women to use the women's locker room, housing, or overnight stay arrangements. So the University is discriminating based on sex by separating the sexes without a valid basis under Title IX and thus is in violation of Title IX. 20 U.S.C. § 1681(a).

Further, as explained above, 34 C.F.R. § 106.33 authorizes recipients to segregate intimate facilities based on sex, not "gender identity." A recipient that designates separate intimate facilities for men and women and then permits men to access the women's facilities thus violates Title IX. In so doing, the recipient also facilitates the repeated violation of the privacy and dignity of its female students. *See Adams*, 57 F.4th at 804-05; *Grimm*, 972 F.3d at 634-36 (4th Cir. 2020) (Niemeyer, J., dissenting). Indeed, such a recipient imposes on women the very harms that § 106.33 was intended to prevent.

Recipients have an obligation under Title IX to all students in the provision of restrooms, locker rooms, and student housing. Students in school have enough to worry about; worrying about whether it is safe to use the bathroom, change in a locker room, or sleep in campus housing, cannot be among them. *See, e.g., Women's Sports Pol'y Working Grp., Access to Female Athletes' Locker Rooms Should Be Restricted to Female Athletes,* https://womenssportspolicy.org/access-to-female-athletes-locker-rooms-should-be-restricted-to-female-athletes-january-28-2023/ ("Women's locker rooms are designed to provide female athletes with a separate, safe, private place to shower, change clothes, and use the toilet.").

Indeed, women have a privacy interest in using intimate facilities away from men, and in shielding their bodies from men while changing in the locker room, living in on-campus housing, and on overnight stays for school activities. "[T]he privacy afforded by sex-separated bathrooms has been widely recognized throughout American history and jurisprudence. In fact, 'sex-separation in bathrooms dates back to ancient times, and, in the United States, preceded the nation's founding.'" *Adams*, 57 F.4th at 805. Unsurprisingly, "courts have long found a privacy interest in shielding one's body from the opposite sex in a variety of legal contexts," which is why "[t]he protection of students' privacy interests in using the bathroom away from the opposite sex and in shielding their bodies from the opposite sex is obviously an important governmental objective." *Id.* at 804-05.

These concerns all became very real for Student 3. Once Student 3 learned that Student 1 is male, she had to lock her bedroom door at night out of fear because she was unwillingly sharing her living space with a man. Student 3 informed the University of her concerns but did not receive an adequate response. The other female members of the team suffered similarly: Student 1 shared the locker room with the women on the team and hotel rooms during overnight stays.

When recipients, such as San José State University, allow men to use locker rooms, restrooms, and student housing facilities designated for women based on "gender identity," they are facilitating the significant deleterious effects—including discomfort, embarrassment,

psychological harm, and potential physical injury—that Title IX seeks to prevent, and heighten the risk and likelihood of sexual harassment which results in a denial of the overall benefits of an education program or activity based on sex, in violation of Title IX, including 20 U.S.C. § 1681(a), and 34 C.F.R. §§ 106.31, 106.33.

**B.    San José State University Failed to Provide a Prompt and Equitable Resolution of Student and Employee Complaints of Sex Discrimination**

The question whether the University provided a prompt and equitable response to complaints of sex discrimination under Title IX was not an issue identified in the Notification Letter sent to the University initiating this investigation. However, during the course of this investigation, OCR received information indicating a possible failure to comply with the University's Title IX obligations regarding complaints of sex discrimination. Accordingly, this issue is being addressed in this letter pursuant to 34 C.F.R. § 100.7(c): "The responsible Department official or his designee will make a prompt investigation whenever a compliance review, report, complaint, or any other information indicates a possible failure to comply with this part."

Under Title IX and its implementing regulations, if a student or employee alleges that he or she has been discriminated against on the basis of sex, the recipient is required to provide a prompt and equitable resolution of the complaint. 34 C.F.R. §§ 106.8, 106.44. What constitutes a reasonable response to discrimination will differ depending upon the circumstances. But in all cases, the recipient must conduct a prompt, adequate and impartial inquiry designed to reliably determine what occurred, and if discrimination is found, the recipient must take reasonable, timely, age-appropriate, and effective corrective action, including steps tailored to the specific situation. *Id.*

As a preliminary matter, it is important to note that during the course of this investigation, OCR made multiple requests for the University to provide access to sources of information relating to these allegations and related investigations, including documents and witnesses, but the University has failed to provide sufficient information or approve requested interviews, for OCR to make additional conclusions regarding compliance. The University's failure to provide sufficient records was intentional, despite OCR's notice of obligation pursuant to 34 C.F.R. §§ 100.6, 106.6. Instead, the University has provided only partial records to OCR that are partially responsive to OCR's requests, while redacting significant portions of the records that were provided and withholding other records entirely and stating they are working to make arrangements for interviews. Due to the University's refusal to provide complete and unredacted records to OCR, it was difficult to ascertain precisely what Title IX issues were investigated by the University. What has been provided to OCR forms the basis of these findings and conclusions. As we explain below, OCR believes that the limited information provided to date is sufficient to enable us to make the findings described below.

**1.    Title IX Complaints Acknowledged by the University**

The University indicated in its March 6, 2025, data response to OCR that: "To date, the University has received numerous reports and one formal complaint of potential discrimination due to [Student 1's] participation on the team." However, the evidence obtained by OCR indicates the University, in fact, received multiple Title IX sex discrimination complaints related to Student 1's participation in the women's volleyball program, but it appears the University failed to respond to those complaints in a prompt and equitable manner, as required by Title IX. Records provided

by the University indicate the issues of alleged sex discrimination raised in those complaints were not opened for investigation by the University under Title IX. Instead, the University only investigated allegations that Coach 3 did not prepare, train, coach, or provide emotional support and encouragement to Student 1 in the same way she prepared, trained, coached, or provided emotional support and encouragement to the women on the indoor volleyball team because Student 1 is male. Those allegations were opened for investigation on November 12, 2024, and a Final Investigation Report was not issued until October 16, 2025, almost a full year later.[24] The University also investigated whether Coach 2 retaliated against Student 3 for her participation in a lawsuit against the NCAA. That allegation was opened for investigation on November 12, 2024, and, like the other allegation, a Final Investigation Report was not issued until October 16, 2025. Both Final Investigation Reports expressly state: "The findings in this Report do not reach questions of law as to whether the alleged misconduct supports a violation of applicable laws, but instead are factual findings and determinations under CSU policy. The policy determinations, however, are not intended to equate to a finding that applicable laws were violated."

### 2.    Title IX Complaints Actually Received by the University

On September 23, 2024, the University received a letter from attorneys representing Student 3 notifying the University that Student 3 was joining a lawsuit against the NCAA based on their policy of allowing men to compete against women in athletic programs designated for women in violation of Title IX. In that same notice, Student 3 also informed the University that Student 3 was also alleging the University was violating Title IX by allowing Student 1 to compete on the women's indoor volleyball team, and the attorneys for Student 3 reminded the University of their obligation to not retaliate against Student 3, and to not permit retaliation against Student 3, for exercising her rights under Title IX.

On September 24, 2024, the University received a Title IX and Equal Protection complaint from the Independent Council on Women's Sports (ICONS) alleging the University's policy and practice of allowing a male student to participate in the women's volleyball program violated Title IX by denying women equal athletic opportunities and by allowing a man in women's locker rooms likewise violates Title IX. The ICONS complaint states in part: "Over the last few weeks, we have spoken with distraught student-athletes and their parents, coaches, and administrators throughout the Mountain West Conference regarding a crisis in women's volleyball. . . [because of] San José State University . . . permitting a transgender-identifying male, [Student 1], to compete on the SJSU women's volleyball team." The ICONS letter further stated "[Student 3] a senior co-captain on the SJSU women's volleyball team [alleges] unlawfully allowing [Student 1] to compete on the SJSU women's volleyball team put[s] women at risk of physical injury in practices and games. [Student 3] describes terrorizing practices and games in which a man is smashing volleyballs into the faces and bodies of young women at speeds of over 80 mph and making a mockery of fair competition."

On October 5, 2024, Coach 2 sent an email to the Title IX coordinator stating, in relevant part: "I received a report from one of my student-athletes yesterday of some behavior initiated by

---

[24] The University's Title IX policy states a Final Investigation Report should be provided to the parties within 100 working days from the date the Notice of Investigation is issued. Article VII(A)(vii).

[Student 1] that could be deemed as retaliation toward [Student 3]. This behavior occurred in Colorado on Wednesday, October 2, while we were there for our match vs Colorado State."

On October 29, 2024, Coach 3 filed a "Complaint about the Title IX violation," requesting "an immediate and comprehensive Title IX investigation" alleging in part: (1) San José State University was engaged in illegal discrimination on the basis of subjective identity; (2) Student 2 was wrongfully refused a women's volleyball scholarship while Student 1 was permitted to maintain a women's volleyball scholarship; (3) the University's Senior Associate Athletics Director for Student-Athlete Wellness and Leadership Development stated "anyone who disagrees with [Student 1] being on the women's volleyball team needs to get therapy and needs to leave SJSU"; (4) Student 1's physical abilities and strength placed women on the team and opponents' teams at increased risk of injury; (5) Coach 2 was giving Student 1 preferential treatment over the women on the team; (6) Women in the San José State University women's volleyball team were being denied opportunities and benefits on the basis of sex; (7) University officials took action to dissuade women on the team from filing a complaint or speaking out in opposition to Student 1 being able to participate on the women's volleyball team; (8) Coach 2 retaliated against Student 3 after she joined a Title IX lawsuit challenging Student 1's participation in the women's volleyball program; and (9) University officials were not responding properly to student, parent, and Coach 3's concerns regarding Student 1's participation in the women's volleyball program.

On November 3, 2024, the parents of Student 10 sent a letter to the University, which was forwarded to the Title IX coordinator, stating in part: "Our daughter has expressed a severe level of discomfort with the polarization of the staff and the athletic department. We are hearing those same echoes from most of the team as well. . . . [Coach 2] and [the Senior Associate Athletics Director for Student-Athlete Wellness and Leadership Development] have camped out on one side of the issue that supported transgender participation on the team while [Coach 3] has balanced those voices on the other side." The parents stated their concern that the suspension of Coach 3 appears to be an attempt to silence opposition to the University's policy and practice and shared their concern with University administrators telling those who disagree with Student 1 participating on the women's volleyball team to "seek therapy", "stay silent" and other "…phobic" language. The parents stated the women on the team felt Coach 3 was the only person with whom they felt they could express disagreement with Student 1 playing on the team, without fear of retaliation. The parents also expressed concern that their daughter and others on the team perceived an overall lack of support for the women on the team, especially by Coach 2, the Senior Associate Athletics Director for Student-Athlete Wellness and Leadership Development, and the Assistant Athletic Director for Diversity, Equity & Inclusion. The parents stated those three University officials had expressed to the women on the team, "clear support" of Student 1 while at the same time telling the women on the team who had concerns about Student 1 being a member of the team to "seek therapy," to stay silent because this was not their story to tell, and made "veiled threats" that anyone expressing disagreement with Student 1 being on the team could place their National Letter of Intent (their scholarship agreement with the University) in jeopardy. The parents indicated the reaction of Coach 2 to any disagreement expressed by the women on the team to Student 1's continued participation were met with hostility and the removal of Coach 3 acted to effectively silence dissent. The parents also expressed concern that many women on the volleyball team felt Coach 2 was giving preferential treatment to Student 1 and would not discipline Student 1 for violating team rules whereas the women on the team were disciplined for violating team rules.

After meeting with the University's Title IX coordinator to discuss their letter, the Title IX coordinator sent an email stating: "I [take] it to mean you [do] not want to commence an investigation into these experiences. Please let me know if my interpretation is incorrect." To which the parents responded: "Candidly, with what we shared and information you have collected from other parties, we would assume it is sufficient for the university to commence an investigation. If you are saying that such an investigation has to be requested by another party and the university cannot conduct one on its own, please let us know if we misunderstood." The University provided OCR with no follow-up information to that statement.

### 3.    Analysis

The University has acknowledged only two of the many Title IX complaints it received related to Student 1's participation on the women's volleyball team. The University's investigation into both of those complaints took nearly a year. OCR acknowledges there is no set date associated with a "prompt" resolution, but given the information that has been made available to OCR, accompanied with the University's Title IX policy's timeline of 100 days for resolution of complaints, OCR finds the investigations the University undertook were not adequately and promptly resolved, as required by 34 C.F.R. §§ 106.8, 106.44-106.46. OCR also finds the University's failure to investigate the many other Title IX allegations that were properly raised constitute a violation of 34 C.F.R. §§ 106.8, 106.44-106.46. (If, in fact, the University opened investigations in response to any of those complaints, the University has failed to provide the investigative files to OCR, despite multiple requests.)

The University stated the Title IX office decided not to investigate most of the allegations raised in the aforementioned Title IX complaints after conducting preliminary inquiries because the students impacted by those allegations chose not to meet with University officials to discuss the allegations during the preliminary inquiry stage. But, based on the information the University provided to OCR, the University had sufficient information to open investigations into those complaints even without involvement by a complainant. The evidence available to OCR demonstrates that, despite having received significant credible allegations of sex-based discrimination, including different treatment, retaliation and denial of equal educational opportunities on the basis of sex, the University's Title IX office failed to take appropriate action to address those concerns and even appears to have taken action that could reasonably discourage women from participating in the Title IX complaint process.

Although the University "assured" the women impacted by the allegations they would not be retaliated against if they responded to the Title IX office's preliminary inquiry, the evidence indicates that the impacted student athletes and Coach 3 were also, at the same time, provided information by the University that could reasonably dissuade them from participating in the Title IX investigative process. For example, the women on the volleyball team were sent written communications from the Title IX office which included statements such as: "You are not required to respond to our outreach" and "I do not want you to feel pressured to respond." The coaching staff and women on the team were also told by the Title IX office that "Gender identity is a protected status under [the University's] Nondiscrimination Policy. . . Discrimination can occur when we treat someone less favorably . . . because of their protected status such as their Gender Identity." Another example is the September 28, 2024, email sent to the women's indoor volleyball team by the Director of Athletics after a team meeting with the Senior Associate Athletics Director for Student-Athlete Wellness and Leadership Development to discuss "confusion around [their]

rights that may stem from a recent meeting with a university administrator." The Director of Athletics stated he wanted to "specifically reinforce that each of you has a right to speak openly about your own experiences without fearing retaliation, *subject to the University's policy against harassment*." (emphasis added). Additionally, the information sent to the women was not responsive to the complaints that were being made. The information sent to the women was largely focused on services related to "survivor" resources and noted: "You have the right to decide whether to make a report to law enforcement," which was not responsive to the concerns expressed by the women on the team about a male athlete being allowed to play in their women's intercollegiate athletic program. Moreover, not long after all of this, University administrators told those who disagreed with Student 1's participation on the women's volleyball team to "seek therapy" and "stay silent," and it made "veiled threats" that anyone expressing disagreement with Student 1 being on the team could place their National Letter of Intent (their scholarship agreement with the University) in jeopardy.

After reviewing the evidence, we find that it is no mystery why the complainants chose to remain silent. Only one student agreed to meet with the University's Title IX investigator despite all of the problems facing the women on the team because the women, in fact, did not feel free to voice their concerns with the University about Student 1 participating in the women's volleyball program without facing retaliation. The evidence suggests a concerted effort was made to silence the women on the team, and it succeeded for the most part. The University cannot then reap the benefit of such intimidation by being permitted to close valid Title IX complaints for lack of participation by impacted individuals.

### C.    Different treatment in employment and athletic scholarships

Title IX states a general prohibition on sex discrimination in education programs or activities receiving federal funding: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving federal financial assistance." 20 U.S.C. § 1681(a).

The Title IX implementing regulation prohibits different treatment based on sex. 34 C.F.R. § 106.31. It specifically prohibits discrimination in the award of athletic scholarships, requiring recipients to afford members of both sexes "reasonable opportunities" for such awards and forbidding them from applying different criteria or to otherwise discriminate on the basis of sex. 34 C.F.R. § 106.37(a), (c). It also specifically prohibits discrimination based on sex in employment:

> No person shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination in employment, or recruitment, consideration, or selection therefor, whether full-time or part-time, under any education program or activity operated by a recipient which receives Federal financial assistance.

34 C.F.R. § 106.51(a); *see also* 34 C.F.R. § 106.51(b)(2)-(3) (indicating that the regulation covers decisions to layoff, terminate, or alter the compensation of employees).

In determining whether a recipient has subjected an individual to prohibited discrimination, OCR examines whether there were any apparent differences in the treatment of similarly situated individuals. If different treatment is established, OCR then considers whether the recipient had a legitimate, non-discriminatory or non-retaliatory reason for the apparent different treatment or whether the reason provided was a pretext for discrimination or retaliation. Based on the limited

information the University provided to OCR, OCR has a compliance concern to the effect that the University may have treated Coach 3 and women on the indoor volleyball team differently than the University treated men, including Coach 2 and Student 1, in violation of Title IX. The evidence obtained indicates that the University treated Coach 2 and Student 1, both men, more favorably than Coach 3 and women on the indoor volleyball team, both in responding to complaints of sex discrimination, and in situations involving scholarships, practice and playing time, and the overall benefits of its intercollegiate athletics program.

As described above, the evidence indicates that Coach 3, a woman, was immediately suspended in conjunction with allegations of a FERPA violation, whereas Coach 2, a man, was not suspended despite facing similar FERPA allegations. OCR has requested additional information regarding these matters from the University in order to make an informed determination, but, despite having ample opportunity to provide it, the University refused to provide all of the requested information.

Also as described above, the evidence indicates Student 2, a woman on the volleyball team, lost her scholarship when she was injured during the 2023 season, yet Student 1, a man on the women's volleyball team, was permitted to retain his scholarship when he was also injured during the 2023 season, despite Student 1 missing more games than Student 2. OCR has requested additional information regarding these matters from the University in order to make an informed determination, but, despite having ample opportunity to provide it, the University refused to provide all of the requested information.

Additionally, as described above, the evidence indicates Student 1, a man, was permitted to violate team rules without facing discipline, but the women on the same team did face discipline for similar violations of team rules. OCR has requested additional information regarding these matters from the University, but, despite having ample opportunity to provide it, the University has not provided all of the requested information.

These compliance concerns are based on the information provided by the University in response to OCR's multiple requests for information. OCR has made multiple requests for the University to provide access to sources of information relating to these allegations and related investigations, but the University has failed to provide sufficient information for OCR to make additional conclusions regarding compliance. The University's failure to provide sufficient records was intentional, despite OCR's notice of obligation pursuant to 34 C.F.R. §§ 100.6, 106.6. Instead, the University has provided only partial records to OCR, while redacting significant portions of the records that were provided and withholding other records entirely. Additionally, the University has not approved OCR's request to interview the University's investigators. OCR finds that the limited information to which we had access is credible, sufficiently corroborated, and sufficient to support these stated compliance concerns.

### D.    Effect of Conflicting State Law and NCAA Policy

San José State University has acknowledged it permitted a male student to compete in two intercollegiate athletic programs designated for women but indicates it did so because of a past NCAA policy and existing California state law. The University's reliance on an NCAA policy and/or California state law fails to account for the University's obligations to follow Title IX and all related regulations and Executive Orders as a recipient of federal funding, notwithstanding any conflicting state laws or rules of private organizations.

The Title IX implementing regulations clearly state, in relevant part:

(b) Effect of State or local law or other requirements. The obligation to comply with this part is not obviated or alleviated by any State or local law or other requirement which would render any applicant or student ineligible, or limit the eligibility of any applicant or student, on the basis of sex, to practice any occupation or profession.

(c) Effect of rules or regulations of private organizations. The obligation to comply with this part is not obviated or alleviated by any rule or regulation of any organization, club, athletic or other league, or association which would render any applicant or student ineligible to participate or limit the eligibility or participation of any applicant or student, on the basis of sex, in any education program or activity operated by a recipient and which receives federal financial assistance.

34 C.F.R. § 106.6(b)-(c). Additionally, all federal grant recipients from the Department are required to comply with all applicable federal laws, including Title IX, and all related Executive Orders. 34 C.F.R. § 75.500.

The evidence has established that the University failed to comply with Title IX and its implementing regulations, as described above. And after the University was informed by Executive Orders 14168 and 14201, and OCR's specific guidance that under Title IX, that biological men cannot be permitted to participate in athletic programs designated for women, the University has doubled down on its defiance and stated that the University intends to continue allowing men to participate in women's athletic programs despite OCR's guidance that such actions violate Title IX. The University stated in a March 6, 2025, written response to OCR:

On February 6, 2025, the NCAA updated its Participation Policy for Transgender Student-Athletes. The revised Policy significantly departs from prior years and prohibits a student-athlete assigned male at birth from competing on a women's team. However, the Policy plainly states that "schools are subject to local, state and federal legislation and such legislation *supersedes* the rules of the NCAA." Given that state law squarely contradicts the current NCAA's Participation Policy for Transgender Student-Athletes, SJSU and other similarly situated universities, are obligated to follow state law.

March 6, 2025, letter from Mary Keating, Associate Vice President for Title IX and Equal Opportunity, p. 7 (emphasis in original).

The University's statement to OCR that it plans to continue ignoring the Executive Orders and OCR's warnings because of California state law is contrary to the assurances that San José State University has submitted to the Department as a condition of federal funding, and conflicts with the plain language of 34 C.F.R. §§ 75.500, 75.700, 106.4, 106.6.

### E.     Duty to Remedy Past Discrimination

Title IX and its implementing regulations require recipients to commit to taking whatever remedial action is necessary to eliminate existing discrimination on the basis of sex and to eliminate the effects of past discrimination, whether occurring before or after the recipient's request for federal financial assistance. *See* 34 C.F.R. § 106.4(a). This investigation has shown San José State University discriminated against women on the San José State University women's indoor volleyball team and beach volleyball team, and against women on teams San José State

University competed against, including women on teams who were defeated by San José State University while Student 1 was playing, women who were injured during games, and women on teams that forfeited matches in lieu of playing against a male player in a women's intercollegiate athletic program. San José State University is obligated to remedy the effects of that past discrimination and to take action to prevent additional discrimination. The University's failure to commit to taking whatever remedial action is necessary to eliminate existing discrimination on the basis of sex and to eliminate the effects of past discrimination whether occurring before or after the recipient's request for federal financial assistance is a violation of 34 C.F.R. § 106.4.

## IV.    Conclusion

This concludes OCR's investigation. This letter of finding of noncompliance should not be interpreted to address San José State University's compliance with any other statutory or regulatory provision, or to address any issues other than those addressed in this letter. This letter of findings does not constitute final agency action.

This letter sets forth OCR's determination in an individual OCR case. This letter is not a formal statement of OCR policy and should not be relied on, cited, or construed as such. OCR's formal policy statements are approved by a duly authorized OCR official and made available to the public.

The University must not harass, coerce, intimidate, discriminate, or otherwise retaliate against an individual because that individual asserts a right or privilege under a law or regulation enforced by OCR or files a complaint, testifies, assists, or participates in a proceeding under a law or regulation enforced by OCR.  If this happens, the individual may file a retaliation complaint with OCR.

Under the Freedom of Information Act, it may be necessary to release this document and related correspondence and records upon request.  If OCR receives such a request, it will seek to protect, to the extent provided by law, personally identifiable information that, if released, could reasonably be expected to constitute an unwarranted invasion of personal privacy.

This letter is accompanied by a proposed resolution agreement that specifies actions that will remedy current and past discrimination, and to prevent any similar instances where future violative conduct may recur. If OCR determines an agreement will not be reached, the Department may begin enforcement action including referral to the U.S. Department of Justice or other means authorized by law, including the initiation of an action to suspend, terminate, or refusal to grant or continue federal financial assistance.

Respectfully,

BRADLEY BURKE

Digitally signed by BRADLEY BURKE
Date: 2026.01.28 08:58:49 -06'00'

Bradley R. Burke
Regional Director

Enclosure